# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| ILLINOIS NETWORK OF CHARTER SCHOOLS, INTRINSIC SCHOOLS, and THE MONTESSORI NETWORK D/B/A THE MONTESSORI SCHOOL OF ENGLEWOOD | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 1:24-cv-5057 |
| v. | ) ) ) | |
| KWAME RAOUL in his official capacity as the Attorney General for the State of Illinois, The BOARD OF EDUCATION OF THE CITY OF CHICAGO, the ILLINOIS STATE BOARD OF EDUCATION | ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION

Michael L. Sullivan
Jon E. Klinghoffer
Meredith S. Kirshenbaum
Peter D. Kauffman
GOLDBERG KOHN LTD.
55 East Monroe Street
Suite 3300
Chicago, Illinois  60603
(312) 201-4000

# TABLE OF CONTENTS

I.     INTRODUCTION..................................................................................................1

II.    FACTUAL BACKGROUND ................................................................................2

       A.    Illinois Charter Schools .............................................................................2

       B.    The Plaintiffs .............................................................................................3

             1.    Plaintiff Illinois Network of Charter Schools ...................................3

             2.    The Charter School Plaintiffs ...........................................................4

       C.    The Act and its Enforcement......................................................................5

       D.    The NLRA's Statutory Protections.............................................................7

III.   ARGUMENT .......................................................................................................8

       A.    Plaintiffs Will Succeed on the Merits of Their Preemption Claim ..............9

             1.    The Charter School Plaintiffs Are Covered by the NLRA ...............9

                   (a)    The Act is Preempted Under the Garmon Preemption Doctrine .........11

                   (b)    The Act is Also Preempted Under the Machinists
                          Preemption Doctrine ...........................................................13

       B.    Plaintiffs Will Succeed on the Merits of Their Free Speech Claims..........14

       C.    Plaintiffs and all Illinois Charter Schools Will Suffer Irreparable Harm in the
             Absence of Injunctive Relief and They Have No Adequate Remedy at Law ...........18

       D.    The Equities Weigh Heavily in Plaintiffs' Favor ......................................20

       E.    No Bond Should Be Required Before the Preliminary Injunction is Issued .............21

IV.    CONCLUSION ..................................................................................................22

# TABLE OF AUTHORITIES

## Cases

*Am. C.L. Union of Ill. v. Alvarez,*
679 F.3d 583 (7th Cir. 2012) ..........................................................8, 20, 21

*Austin Dev. Ctr., Inc.,*
606 F.2d 785 (7th Cir. 1979) ..........................................................10

*Bd. of Cnty. Comm'rs, Wabaunsee Cnty., Kan. v. Umbehr,*
518 U.S. 668 (1996)..........................................................15

*Bolger v. Youngs Drug Prods. Corp.,*
463 U.S. 60 (1983)..........................................................15

*Chamber of Com. of the U.S.A. v. Brown,*
554 U.S. 60 (2008)..........................................................14

*Chicago Mathematics & Sci. Acad. Charter Sch., Inc.,*
359 N.L.R.B. 455 (2012) ..........................................................10

*Christensen v. City of Wheaton,*
2000 WL 204225 (N.D. Ill. Feb. 16, 2000) ..........................................................17

*Christian Legal Soc'y v. Walker,*
453 F.3d 853 (7th Cir. 2006) ..........................................................20

*Citizens for a Better Env't v. City of Park Ridge,*
567 F.2d 689 (7th Cir. 1975) ..........................................................19

*Citizens United v. Fed. Election Comm'n,*
558 U.S. 310 (2010)..........................................................15, 17

*Complete Angler, LLC v. City of Clearwater, Fla.,*
607 F. Supp. 2d 1326 (M.D. Fla. 2009)..........................................................22

*Consol. Edison Co. of N.Y., Inc. v. Pub. Serv. Comm'n of N.Y.,*
447 U.S. 530 (1980)..........................................................16

*Covenant Media of Ill., L.L.C. v. City of Des Plaines, Ill.,*
2005 WL 2277313 (N.D. Ill. Sept. 15, 2005) ..........................................................16

*Creek v. Vill. of Westhaven,*
1993 WL 291786 (N.D. Ill. Aug. 2, 1993) ..........................................................16

*Crue v. Aiken,*
370 F.3d 668 (7th Cir. 2004) ..........................................................9

*Deferio v. City of Syracuse,*
193 F. Supp. 3d 119 (N.D.N.Y. 2016)..........................................................22

*Ezell v. City of Chicago,*
　651 F.3d 684 (7th Cir. 2011) ...................................................................................17

*Foodcomm Int'l v. Barry,*
　328 F.3d 300 (7th Cir. 2003) .....................................................................................8

*Habitat Educ. Ctr. v. U.S. Forest Serv.,*
　607 F.3d 453 (7th Cir. 2010) ...................................................................................22

*Healthcare Ass'n of N.Y. State, Inc. v. Pataki,*
　471 F.3d 87 (2d Cir. 2006)..................................................................................12, 13

*Higher Soc'y of Ind. v. Tippecanoe Cnty., Ind.,*
　858 F.3d 1113 (7th Cir. 2017) .................................................................8, 15, 18, 20

*Joelner v. Vill. of Washington Park, Ill.,*
　378 F.3d 613 (7th Cir. 2004) .....................................................................................8

*Korte v. Sebelius,*
　735 F.3d 654 (7th Cir. 2013) .............................................................................15, 20

*Krislov v. Rednour,*
　226 F.3d 851 (7th Cir. 2000) ...................................................................................17

*Lechmere, Inc. v. NLRB,*
　502 U.S. 527 (1992) .................................................................................................12

*Lodge 76, Int'l Assoc. of Machinists & Aerospace Workers v. Wis. Emp. Rels. Comm'n,*
　427 U.S. 132 (1976) .................................................................................................13

*Midwest Div.-MMC, LLC v. NLRB,*
　867 F.3d 1288 (D.C. Cir. 2017) ...............................................................................11

*Mitchell v. Cuomo,*
　748 F.2d 804 (2d Cir. 1984)................................................................................8, 18

*Nat'l People's Action v. Vill. of Wilmette,*
　914 F.2d 1008 (7th Cir. 1990) ............................................................................8, 18

*Neb. Press Ass'n v. Stuart,*
　427 U.S. 539 (1976) .................................................................................................16

*NLRB v. Kemmerer Vill., Inc.,*
　907 F.2d 661 (7th Cir. 1990) ...................................................................................11

*NLRB v. Nash-Finch Co.,*
　404 U.S. 138 (1971) .................................................................................................11

*NLRB v. Natural Gas Util. Dist. of Hawkins Cnty., Tenn.,*
　402 U.S. 600 (1971)..............................................................................................9, 10

*NLRB v. Noel Canning,*
573 U.S. 513 (2014) ........................................................................10

*NLRB v. Parents & Friends of the Specialized Living Ctr.,*
879 F.2d 1442 (7th Cir. 1989) ......................................................9, 10

*NLRB v. Va. Elec. & Power Co.,*
314 U.S. 469 (1941) ........................................................................16

*O'Brien v. Town of Caledonia,*
748 F.2d 403 (7th Cir. 1984) ..........................................................19

*People v. Alexander,*
204 Ill. 2d 472 (2003) ......................................................................17

*San Diego Bldg. Trades Council, Millmen's Union, Loc. 2020 v. Garmon,*
359 U.S. 236 (1959) ....................................................................11, 12

*Thomas v. Collins,*
323 U.S. 516 (1945) ........................................................................16

*Tong v. Chicago Park Dist.,*
316 F. Supp. 2d 645 (N.D. Ill. 2004) ..............................................14

*United Food & Com. Workers Loc. 99 v. Brewer,*
817 F. Supp. 2d 1118 (D. Ariz. 2011) .............................................22

*Voices for Int'l Bus. & Educ., Inc. v. NLRB,*
905 F.3d 770 (5th Cir. 2018) ..........................................................10

*Wayne Chem., Inc. v. Columbus Agency Serv. Corp.,*
567 F.2d 692 (7th Cir. 1977) ..........................................................21

*Weinberg v. City of Chicago,*
310 F.3d 1029 (7th Cir. 2002) ......................................................9, 16

*Westfield High Sch. L.I.F.E. Club v. City of Westfield,*
249 F. Supp. 2d 98 (D. Mass. 2003) ...............................................22

*Wis. Dep't of Indus., Labor & Human Rels. v. Gould Inc.,*
475 U.S. 282 (1986) ........................................................................11

**Statutes**

29 U.S.C. § 152(2) ...........................................................................9

29 U.S.C. § 153 ..............................................................................11

29 U.S.C. § 158(c) .......................................................................7, 12

29 U.S.C. § 159(c)(1)(B) ..................................................................7

29 U.S.C. § 159(d) ...................................................................................................7, 12

105 ILCS 5/27A ...................................................................................................................1

105 ILCS 5/27A-3 ....................................................................................................1, 5, 18

105 ILCS 5/27A-7(a)(14.7)............................................................................................1, 5

Article I Section 4 of the Illinois Constitution ...............................................................15

U.S. Const. amend. I .......................................................................................................15

**Rules**

Federal Rule of Civil Procedure 65(c) ............................................................................21

**Other Authorities**

11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2948 (1973) .......................8

11A Wright, Miller & Kane, *Federal Practice and Procedure* § 2944 (2009) ................18

# I.    INTRODUCTION

Plaintiffs, Illinois Network of Charter Schools ("INCS"), Intrinsic Schools ("Intrinsic") and the Montessori Network d/b/a the Montessori School of Englewood ("TMSOE") (collectively, with Intrinsic, the "Charter School Plaintiffs") seek a preliminary injunction preventing Defendants Kwame Raoul in his official capacity as the Attorney General for the State of Illinois, the Board of Education of the City of Chicago ("CPS"), and the Illinois State Board of Education ("ISBE"), from enforcing Illinois Public Act 103-0416 (the "Act"). The Act, which was signed into law on August 4, 2023, amended the Charter Schools Law (the "Charter Schools Law") (105 ILCS 5/27A) and, in so doing, seeks to impose a new set of "union-neutrality" requirements on Illinois' charter schools that are preempted by the NLRA and unconstitutional.  In short, the Act requires charter schools and their administrators to "be neutral regarding the unionization of any of its employees" – meaning that they "will not **at any time** express a position on the matter of whether its employees will be unionized." 105 ILCS 5/27A-3 (emphasis added).  The Act further requires charter schools (including the Charter School Plaintiffs) to forego the NLRB's process for a secret ballot election by requiring them to recognize a labor union's exclusive representative status on the basis of "majority card check" (105 ILCS 5/27A-7(a)(14.7); 105 ILCS 5/27A-3), rather than pursuant to the NLRA's secret ballot election process.

There is nothing neutral about the Act's requirements. Rather, the Act tilts the careful balance achieved by federal labor law in favor of any labor union that attempts to unionize an Illinois charter school by depriving Illinois charter schools, and their employees, free speech guaranteed under the NLRA and the Illinois and the United States Constitutions (collectively, the "Constitutions").  Put simply, the Act is a gag order that censors charter schools from honestly communicating with their stakeholders, including employees, parents, students, funders, legislators, voters and community members, on significant political and ideological issues.

Enforcement of the Act would regulate conduct Congress protected by the NLRA and would trample charter school and charter school employees' constitutional rights. The irreparable harm to Plaintiffs is self-evident and substantial. To protect their statutory and constitutional rights, and those of all charter schools and charter school employees in Illinois, Plaintiffs must pursue the present litigation and to seek injunctive relief precluding enforcement of the Act.

Fortunately, enjoining enforcement and implementation of the Act pending an outcome on the merits of the underlying matter poses no harm. In the interim, charter schools' labor relations will continue to be governed by the NLRA, as they have historically, including with respect to protection of employees' rights and the process for union certification. At the same time, granting injunctive relief preserves Illinois charter schools' and their employees' Constitutional rights and averts Constitutional violations that cannot later be unwound. For all of these reasons, and as set forth below and in the accompanying Complaint for Declaratory and Injunctive Relief and Motion for Preliminary Injunction, this Court must enjoin Defendants from enforcing the Act.

## II. FACTUAL BACKGROUND

### A. Illinois Charter Schools

The Charter Schools Law governs the authorization of charter schools in Illinois, which are free, independent, neighborhood public schools open to all children in the state, including students who are English language learners and students with disabilities. ("Compl.") ¶ 59. Illinois charter schools must be non-profit schools and organized and operated as a non-profit corporation or other discrete, legal, non-profit entity authorized under the laws of the State of Illinois. *Id.* ¶ 64. Under the Charter Schools Law, "authorizers" are entities that have the power under the Charter Schools Law to approve or reject charter school applications and to enter into charter contracts with applicants. Pursuant to the Charter Schools Law, Local Educational Agencies ("LEAs") like

CPS, can be authorizers. *Id.* ¶ 63. Under appropriate circumstances, ISBE can also authorize charter schools in Illinois. *Id.*

If authorized, Illinois charter schools are granted a charter agreement. *Id.* ¶ 62. Charter schools cannot operate in Illinois without a charter agreement, which is a binding contract containing the terms and conditions for the charter school's continued operation. *Id.* Charter agreements can be renewed by their authorizers pursuant to the Charter Schools Law. *Id.* Charter schools must be administered and governed by a board of directors or other governing body. *Id.* ¶ 64.

**B.    The Plaintiffs**

*1.    Plaintiff Illinois Network of Charter Schools*

Plaintiff INCS is a not-for-profit corporation founded in 2003 that serves as an umbrella organization for approximately 134 Illinois charter school members. *Id.* ¶ 23; *see also* Affidavit of Andrew Broy ("Broy Aff.") ¶ 2. Collectively, INCS' members constitute 100% of Illinois' charter schools, including the Charter School Plaintiffs, and serve approximately 60,853 students in Illinois. Compl. ¶ 23; Broy Aff. ¶ 2. To achieve its mission of improving public education by leveraging the charter school model as a catalyst to transform lives and communities, one of INCS' central purposes is to help Illinois charter schools preserve their operating autonomy. Compl. ¶ 24; Broy Aff. ¶ 3. Twelve of INCS' members making up 49 charter campuses were approved for a renewed charter in January 2024 and each of INCS' remaining members is up for charter renewal before 2028, and subject to the Act's renewal conditions. All of INCS' members are therefore directly impacted by the Act. Compl. ¶ 28; Broy Aff. ¶ 8. Because the Act unlawfully restricts charter schools' legal rights and autonomy, INCS' mission and purpose is frustrated by the Act.

### 2. The Charter School Plaintiffs

Each of the Charter School Plaintiffs operates one or more non-profit Illinois Charter Schools registered in the State of Illinois. Compl. ¶¶ 33, 41; Affidavits of Rita Nolan ("Nolan Aff.") ¶ 2 and Tim Ligue ("Ligue Aff.") ¶ 2. Both of the Charter School Plaintiffs were independently created as 501(c)(3) not-for-profit entities in the State of Illinois. Intrinsic's Downtown campus, which is authorized and currently up for renewal by ISBE, opened in 2019. Compl. ¶ 33; Ligue Aff. ¶ 2. TMSOE is a charter school operating in Englewood since 2012 that was authorized by and is currently up for renewal by CPS. Compl. ¶ 41; Nolan Aff. ¶ 2.

The Charter School Plaintiffs serve broadly diverse students who face numerous obstacles. As examples, both Charter School Plaintiffs serve a majority of students who qualify for free or reduced lunch and significant percentages of students are identified as diverse learners and English language learners. Compl. ¶¶ 35, 45; Ligue Aff. ¶ 4; Nolan Aff. ¶ 6. Moreover, eighteen percent of TMSOE's students are in temporary living situations. Compl. ¶ 45; Nolan Aff. ¶ 6. Notwithstanding these obstacles, the Charter School Plaintiffs have enjoyed success in providing educational choice for their students and families and in carrying out their distinct missions. Compl. ¶¶ 34, 42; Ligue Aff. ¶ 3; Nolan Aff. ¶ 3.

The Charter School Plaintiffs are each governed by an independent board of directors made up of volunteers interested in their respective mission. Compl. ¶¶ 37, 46; Ligue Aff. ¶ 5; Nolan Aff. ¶ 7. None of their board members is an elected official; nor are any of these board members accountable to any elected official. Members of both of their boards of directors are selected according to their bylaws. *Id.* Neither CPS, ISBE, nor any other state actor, has ever attempted to appoint or remove any member of the Charter School Plaintiffs' board of directors. *Id.*

## C.       The Act and its Enforcement

Effective August 4, 2023, the Act amended the Charter Schools Law, and legislatively requires authorizers to include a "union neutrality clause" in any renewal of a certified charter. Compl. ¶ 9. 105 ILCS 5/27A-7(a)(14.7).  The Act defines a "union neutrality clause" as follows:

> [A] provision whereby a charter school agrees: (1) to be neutral regarding the unionization of any of its employees, such that the charter school will not at any time express a position on the matter of whether its employees will be unionized and such that the charter school will not threaten, intimidate, discriminate against, retaliate against, or take any adverse action against any employees based on their decision to support or oppose union representation; (2) to provide any bona fide labor organization access at reasonable times to areas in which the charter school's employees work for the purpose of meeting with employees to discuss their right to representation, employment rights under the law, and terms and conditions of employment; and (3) that union recognition shall be through a majority card check verified by a neutral third-party arbitrator mutually selected by the charter school and the bona fide labor organization through alternate striking from a panel of arbitrators provided by the Federal Mediation and Conciliation Service. As used in this definition, "bona fide labor organization" means a labor organization recognized under the National Labor Relations Act or the Illinois Educational Labor Relations Act. As used in this definition, "employees" means non-represented, non-management, and non-confidential employees of a charter school.

105 ILCS 5/27A-3.

On its face, the Act expressly changes Illinois labor policy for private, charter school employers. Compl. ¶ 12. The sponsor of the Act, Representative Will Guzzardi, described its purpose as providing charter school teachers with the same measures and protections available to teachers in traditional public schools under the Illinois Educational Labor Relations Act ("IELRA").  *Id.*  Representative Guzzardi stated that the Act was "simply seeking to extend similar [IELRA] provisions to teachers at charter schools." *Id.*

The Charter School Plaintiffs were approved for renewed charters in January 2024 – TMSOE by its authorizer, CPS, and INCS' downtown campus by its authorizer, ISBE.  Compl. ¶¶ 39, 48; Nolan Aff. ¶ 9; Ligue Aff. ¶ 7. Intrinsic received a draft charter renewal agreement from ISBE in January 2024. Compl. ¶ 39; Ligue Aff. ¶ 7. ISBE has informed Intrinsic that it requires

execution of its renewal charter agreement by June 30, 2024. *Id.* ISBE's charter renewal agreement includes a "union-neutrality" provision, requiring the following:

> The Charter School agrees (1) to be neutral regarding the unionization of any of its employees; the Charter School will not at any time express a position on the matter of whether its employees will be unionized nor will the Charter School threaten, intimidate, discriminate against, retaliate against, or take any adverse action against any employee based on their decision to support or oppose union representation, and (2) the Charter School will provide any Bona Fide Labor Organization access at reasonable times to areas in which the Charter School's employees work for the purpose of meeting with employees to discuss their right to representation, employment rights under the law, and terms and conditions of employment, and (3) union recognition shall be through a majority card check verified by a neutral third-party arbitrator mutually selected by the Charter School and the Bona Fide Labor Organization through alternate striking from a panel of arbitrators provided by the Federal Mediation and Conciliation Service.

Compl. ¶ 40; Ligue Aff. ¶ 8. ISBE informed Intrinsic that it would not, and legally could not, consider changes to the union neutrality provision. Compl. ¶¶ 39-40, 70; Ligue Aff. ¶ 9.

CPS sent TMSOE a draft charter renewal agreement in March 2024 which incorporates the Act's "union neutrality" provision requirements and proposes the following language:

> Public Act 103-0416 regarding union neutrality, whereby the Charter School agrees (1) to be neutral regarding the unionization of any of its employees such that the Charter School will not at any time express a position on the matter of whether its employees will be unionized and such that the charter school will not threaten, intimidate, discriminate against, retaliate against, or take any adverse action against any employees based on their decision to support or oppose union representation; (2) to provide any bona fide labor organization access at reasonable times to areas in which the Charter School's employees work for the purpose of meeting with employees to discuss their right to representation, employment rights under the law, and terms and conditions of employment; and (3) that union recognition shall be through a majority card check verified by a neutral third-party arbitrator mutually selected by the charter school and the bona fide labor organization through alternate striking from a panel of arbitrators provided by the Federal Mediation and Conciliation Service.

Compl. ¶¶ 48-49; Nolan Aff. ¶ 10. CPS has been pressing, with increasing urgency and frequency, to require charter schools to execute their respective renewal agreements by June 30, 2024. Compl. ¶ 71; Broy Aff. ¶ 9. CPS has suggested that if charter schools do not execute their renewal charter

agreements, their future funding would be at risk. *Id.* In light of the foregoing, the Charter School Plaintiffs are reasonably fearful about the consequences of refusing to execute their renewal agreements that include the statutorily preempted and unconstitutional union neutrality language. Nolan Aff. ¶ 13; Ligue Aff. ¶ 12.

### D. The NLRA's Statutory Protections

Section 8(c) of the NLRA expressly protects an employer's federally and constitutionally protected free speech, by providing that "[t]he expressing of any views, argument, or opinion, or the dissemination thereof . . . shall not constitute or be evidence of an unfair labor practice under any of the provisions of [the NLRA], if such expression contains no threat of reprisal or force or promise of benefit." 29 U.S.C. § 158(c). Section 8(d) of the NLRA further provides that it does not require employers and unions to enter into contractual agreements with one another. 29 U.S.C. § 159(d) (stating that the NLRA "does not compel either party to agree to a proposal or require the making of a concession . . . ."). Finally, Section 9 outlines requirements and procedures for determining a union's status as the exclusive bargaining representative of employees. In particular, Section 9(c) provides that when a question regarding recognition exists, the NLRB "shall direct an election by secret ballot and shall certify the results thereof." 29 U.S.C. § 159(c)(1)(B).

Many charter school staff members in Illinois have elected union representation pursuant to the secret ballot election process outlined in Section 9 of the NLRA. According to the Chicago Teachers Union (the "CTU"), the CTU is a labor union that currently represents educators and staff at thirteen charter schools, across 35 charter school campuses. Compl. ¶ 65. The CTU has filed representation petitions at the NLRB invoking the jurisdiction of the NLRA seeking to organize employees of Illinois charter schools into their union. *Id*. ¶ 67. Additionally, the CTU has repeatedly invoked the jurisdiction of the NLRB by filing unfair labor practice charges against several of the Illinois charter school employers who are members of INCS and subject to the Act.

*Id.* ¶ 68. In each instance, the NLRB has exercised its jurisdiction over Illinois public charter schools. *Id.*

## III. ARGUMENT

Preliminary injunctive relief is necessary and appropriate in this case. The standard for obtaining a preliminary injunction requires that the moving party demonstrate: (1) a likelihood of success on the merits, (2) the lack of an adequate remedy at law, and (3) irreparable harm if the order is not issued. *Foodcomm Int'l v. Barry*, 328 F.3d 300, 303 (7th Cir. 2003). Once these conditions are established, the Court must balance the harm to the movant if the injunction is not issued against the harm to the defendant if it is issued, and consider the interest of the public in whether the injunction is to be granted or denied. *Id.* at 303. Here, each of the aforementioned factors, and the balancing of the harms, strongly favors granting the requested injunctive relief.

Injunctive relief is especially warranted because this case involves state deprivation of free speech. "[I]n First Amendment cases, 'the likelihood of success on the merits will often be the determinative factor' . . . because even short deprivations of First Amendment rights constitute irreparable harm, and 'the balance of harms normally favors granting preliminary injunctive relief because the public interest is not harmed by preliminarily enjoining the enforcement of a statute that is probably unconstitutional.'" *Higher Soc'y of Ind. v. Tippecanoe Cnty., Ind.*, 858 F.3d 1113, 1116 (7th Cir. 2017) (quoting *Am. C.L. Union of Ill. v. Alvarez*, 679 F.3d 583, 589 (7th Cir. 2012) and *Joelner v. Vill. of Washington Park, Ill.*, 378 F.3d 613, 620 (7th Cir. 2004); *Nat'l People's Action v. Vill. of Wilmette*, 914 F.2d 1008, 1013 (7th Cir. 1990) ("Even a temporary deprivation of first amendment freedom of expression rights is generally sufficient to prove irreparable harm."). Indeed, when "an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary," *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984) (citing 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2948 (1973).

Here, Plaintiffs have sufficiently established that the Act's prior restraint violates the First Amendment and for this reason, and all those set forth below, preliminary injunctive relief is warranted. *See, e.g., Weinberg v. City of Chicago*, 310 F.3d 1029, 1045–46 (7th Cir. 2002) (Chicago ordinance "violates the law of prior restraint" given that "prior restraint exists when a law gives public officials the power to deny use of a forum in advance of actual expression") (internal quotations omitted); *Crue v. Aiken*, 370 F.3d 668, 678–80 (7th Cir. 2004) (plaintiffs' free speech rights were infringed by directive banning all speech to prospective student athletes given in part that the court is "dealing with a significant prior restraint on speech.")

## A. Plaintiffs Will Succeed on the Merits of Their Preemption Claim

The Act is preempted by the NLRA and unconstitutional under the Supremacy Clause of the United States Constitution, and any attempt to enforce the Act is unconstitutional as well.

### 1. The Charter School Plaintiffs Are Covered by the NLRA

The NLRA governs labor relations of "employers," defined to include "any person acting as an agent of an employer, directly or indirectly, but shall not include the United States or any wholly owned Government corporation, . . . or any State or political subdivision thereof, . . . or any labor organization (other than when acting as an employer), or anyone acting in the capacity of officer or agent of such labor organization." 29 U.S.C. § 152(2). Whether an employer is a political subdivision within the meaning of the Act is determined pursuant to federal law, not state law and the National Labor Relations Board's ("NLRB") "jurisdiction is to be interpreted broadly." *NLRB v. Parents & Friends of the Specialized Living Ctr.*, 879 F.2d 1442, 1448 (7th Cir. 1989); *NLRB v. Natural Gas Util. Dist. of Hawkins Cnty., Tenn.*, 402 U.S. 600, 602-603 (1971) ("Federal, rather than state, law governs the determination, under § 2(2), whether an entity created under state law is a 'political subdivision' of the State and therefore not an 'employer' subject to the Act."). "The statutory limitation contained in Section 2(2) has not been broadly construed." *NLRB. v.*

*Austin Dev. Ctr., Inc.*, 606 F.2d 785, 789 (7th Cir. 1979) (NLRB had jurisdiction over nonprofit corporation engaged in providing educational and counseling services to school age children).

The general test for determining whether an employer is an exempt political subdivision is whether or not it was "(1) created directly by the state, so as to constitute departments or administrative arms of the government, or (2) [is] administered by individuals who are responsible to public officials or to the general electorate." *Hawkins Cnty.*, 402 U.S. at 604-05. The Charter School Plaintiffs are not political subdivisions, because they are not created directly by the state, nor administered by individuals who are responsible to public officials or the general electorate. To the contrary, the Charter School Plaintiffs are each not-for-profit corporations, incorporated in the State of Illinois and governed by independent boards of directors, made up of volunteers and selected pursuant to their respective board bylaws. Compl. ¶¶ 3, 23, 37, 46; Ligue Aff. ¶ 5; Nolan Aff. ¶ 7.

Nor has CPS, ISBE, nor any other state actor ever attempted to appoint or remove any member of the Charter School Plaintiffs' boards of directors and the Charter School Plaintiffs' board members are not elected officials, nor accountable to elected officials. *Id.* Given these facts, under the *Hawkins* analysis, the Charter School Plaintiffs do not meet the definition of a "political subdivision" and are subject to the NLRA.[1] *See Specialized Living Ctr.*, 879 F.2d at 1448

---

[1] Since 2009, the NLRB has repeatedly asserted and reaffirmed its jurisdiction over Illinois charter schools. *Civitas Schs., LLC, and Chicago All. of Charter Teachers & Staff, Ill. Fed't of Teachers (AFT),AFL-CIO*, Case No. 13-RM-1764 (Decision & Direction of Election, June 2, 2009) (applying *Hawkins* and finding that an Illinois charter school was not a political subdivision and was subject to NLRB jurisdiction). Civitas was followed by the NLRB in *Chicago Mathematics & Sci. Acad. Charter Sch., Inc.*, 359 N.L.R.B. 455 (2012) (asserting NLRB jurisdiction over Illinois charter school with independent board of directors), but that case was voided by *NLRB v. Noel Canning*, 573 U.S. 513 (2014) (voiding multiple NLRB decisions decided by members found to be unconstitutionally appointed). A copy of the Civitas decision is attached as Exhibit 1. Additionally, multiple NLRB decisions from across the country have found NLRB jurisdiction over charter schools, as has the sole federal circuit court to examine the issue. *See Voices for Int'l*

(enforcing Board's order exercising NLRB jurisdiction over not-for-profit corporation that received 99% of its funding from public sources); *NLRB v. Kemmerer Vill., Inc.*, 907 F.2d 661, 663 (7th Cir. 1990) (non-profit corporation without public directors was not a "political subdivision," even if funded in large part by state subsidy); *Midwest Div.-MMC, LLC v. NLRB*, 867 F.3d 1288, 1297 (D.C. Cir. 2017) (entity established and maintained by private company pursuant to state law, where public officials did not appoint or remove committee members held not to be a "political subdivision").

### (a) The Act is Preempted Under the Garmon Preemption Doctrine

State laws are preempted to the extent they attempt to regulate conduct that is the aim of federal regulation. The NLRA was enacted to federalize and bring uniformity to labor-management relations. *See NLRB v. Nash-Finch Co.*, 404 U.S. 138, 144 (1971) (the NLRA is designed "to obtain uniform application of its substantive rules and to avoid the diversities and conflicts likely to result from a variety of local procedures and attitudes toward labor controversies") (internal quotations omitted). To resolve labor disputes, the NLRA created a centralized agency, the NLRB, to interpret and to administer the federal labor statutes and their uniform policies. 29 U.S.C. § 153.

Given the federal labor framework created by Congress, "[w]hen an activity is arguably subject to § 7 or § 8 of the [NLRA], the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board." *San Diego Bldg. Trades Council, Millmen's Union, Loc. 2020 v. Garmon*, 359 U.S. 236, 245 (1959). To that end, "[s]tates ***may not*** regulate activity that the NLRA protects, prohibits, or ***arguably*** protects or prohibits." *Wis. Dep't of Indus., Labor & Human Rels. v. Gould Inc.*, 475 U.S. 282, 286 (1986) (emphasis added).

---

*Bus. & Educ., Inc. v. NLRB*, 905 F.3d 770, 777 (5th Cir. 2018) (affirming NLRB assertion of jurisdiction over Louisiana charter school and collecting NLRB cases finding the same).

*Garmon's* "arguably subject" test for determining whether the NLRA preempts state law is intentionally broad in order to ensure that the federally created balance of rights is preserved. Accordingly, under *Garmon*, a court must decide whether a state entity seeks to regulate conduct that is either "arguably protected" or "arguably prohibited" by the NLRA. If the conduct arguably falls within the scope of the NLRA, then the interest in a uniform federal labor policy identified in *Garmon* requires that the states defer to the exclusive jurisdiction of the NLRB. *Garmon*, 359 U.S. at 245. That test is more than met here.

Here, the Act's restrictions and requirements fall squarely within the scope of the NLRA. The Act attempts to govern (i) charter school employers' speech related to unionization, in a manner that is in conflict with Section 8(c) of the NLRA; (ii) the process by which charter school employees can vote whether to unionize, in a manner that is in conflict with Section 9 of the NLRA; and (iii) non-employee, union property access. Indeed, the NLRA expressly provides an existing framework governing employer speech related to unionization and the determination of majority status and union representation. 29 U.S.C. § 158(c); 159(c). Further, numerous NLRB precedents have established a federal framework governing employers' rights to deny property access to non-employee, union organizers under the NLRA and other federal law. *Lechmere, Inc. v. NLRB*, 502 U.S. 527 (1992). The Act also purports to compel charter schools to agree to certain contractual terms with unions, in conflict with Section 8(d) of the NLRA, which expressly provides for collective bargaining over such issues and makes clear that the NLRA "does not compel either party to agree to a proposal or require the making of a concession . . . ." 29 U.S.C. § 159(d).

For the purpose of *Garmon* preemption, the aforementioned topics are not only "arguably" within the scope of the NLRA, they are plainly and clearly addressed by the NLRA and NLRB case law interpreting the same. *See, e.g.*, *Healthcare Ass'n of N.Y. State, Inc. v. Pataki*, 471 F.3d

87, 97 (2d Cir. 2006) ("section 8(c) itself protects employer speech and that state action impinging on this protection may be preempted under *Garmon*.") (internal citations omitted). Under *Garmon*, because the Act seeks to prohibit or otherwise regulate conduct that falls within the scope of NLRA, the state must defer to the exclusive jurisdiction of the NLRB and the Act is thus preempted and unconstitutional under the Supremacy Clause of the United States Constitution. Any enforcement or implementation of the Act is likewise unconstitutional; Plaintiffs will succeed on the merits of *Garmon* preemption.

(b)   *The Act is Also Preempted Under the Machinists Preemption Doctrine*

A second Supreme Court doctrine of preemption, "*Machinists* preemption," also applies under the NLRA. *Lodge 76, Int'l Assoc. of Machinists & Aerospace Workers v. Wis. Emp. Rels. Comm'n,* 427 U.S. 132 (1976). *Machinists* preemption provides that states cannot regulate conduct when the United States Congress intends for that conduct to be left unregulated and controlled instead by the free play of economic forces. *Machinists,* 427 U.S. at 140. As is true here, *Garmon* preemption and *Machinists* preemption "are conceptually complementary" and can "tend toward the same point." *Healthcare Ass'n of New York State,* , 471 F.3d at 107.

In addition to enacting its own regulations through the NLRA, Congress also intended for conduct pertaining to private employers' assistance, promotion or deterrence of union organizing to be left unregulated and controlled instead by the free play of economic forces. In regulating the field of labor relations, Congress accordingly intended to preempt the individual states from enacting legislation which would regulate labor relations in the private sector. Specifically, because Section 8(c) of the NLRA expressly regulates what types of employer speech about unionization are permitted and prohibited, Congress explicitly directed states to leave non-coercive labor-related speech unregulated. As explained in *Brown*, it is the policy of the NLRA, through Section 8(c), not only to "implement[] the First Amendment," but also to manifest a "congressional

intent to encourage free debate on issues dividing labor and management.*" Chamber of Com. of the U.S.A. v. Brown*, 554 U.S. 60, 67 (2008) (this policy judgment, "which suffuses the NLRA as a whole" favors "uninhibited, robust, and wide-open debate in labor disputes"). The State of Illinois thus had "explicit direction from Congress to leave noncoercive speech unregulated," because "8(c) expressly precludes regulation of speech about unionization . . . ." *Id*. at 68. The Act's limitation on charter schools' speech – through their agents (including volunteer board members and individual school leaders) about unionization, which facially restricts free and robust debate on the issue of unionization, violates Congressional intent and is preempted by the NLRA under the *Machinists* preemption doctrine. *Id*. at 69 ("California plainly could not directly regulate noncoercive speech about unionization by means of an express prohibition.").

So too does the Act's attempt to automatically grant union organizers access to charter schools' premises and to compel certain substantive agreements between charter schools and labor unions. Private property access and contractual rights granted in favor of labor unions clearly exceed the rights that otherwise exist under the *status quo*, and assist unions in organizing. This is inconsistent with the free play of economic forces and, for these reasons as well, the Act is preempted by the NLRA under the *Machinists.* Plaintiffs will succeed on the merits of *Machinists* preemption, and the Act must be enjoined.

### B. Plaintiffs Will Succeed on the Merits of Their Free Speech Claims

Plaintiffs will also succeed on the merits of their claim that the Act's restriction on speech violates Illinois charter schools' constitutionally protected right to free speech.[2] Because this is a

---

[2] Although "the Free Speech clause of the Illinois Constitution provides even broader protection of speech than does the Federal Constitution," Plaintiffs' claim under the Illinois Constitution is evaluated under the same standard as their claim under the First Amendment of the Federal Constitution. *Tong v. Chicago Park Dist.*, 316 F. Supp. 2d 645, 652 n.4 (N.D. Ill. 2004) ("Illinois courts adhere to the 'lockstep doctrine' in resolving claims brought under the Free Speech . . .

First Amendment case, that analysis alone warrants injunctive relief since the analysis on awarding a preliminary injunction "begins and ends with the likelihood of success on the merits." *Higher Soc'y of Ind.*, 858 F.3d at 1116. *See also Korte v. Sebelius*, 735 F.3d 654, 666 (7th Cir. 2013) ("in First Amendment cases, 'the likelihood of success on the merits will often be the determinative factor'" because even short deprivations of First Amendment rights constitute irreparable harm, and "the balance of harms normally favors granting preliminary injunctive relief . . . .").

The First Amendment of the Constitution, as applied to the states through the Fourteenth Amendment, and Article I Section 4 of the Illinois Constitution, expressly protects freedom of speech. U.S. Const. amend. I ("Congress shall make no law . . . prohibiting the free exercise thereof; or abridging the freedom of speech . . . ."); Ill. Const. art. I, § 4 ("[a]ll persons may speak, write and publish freely, being responsible for the abuse of that liberty.").

As shown above in Sections II. A-B, Illinois charter schools are not-for-profit entities, governed by independent boards of directors. Illinois charter schools are thus nonprofit, corporate entities entitled to the free-speech protections afforded under the United States and Illinois Constitutions. *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 365 (2010) ("No sufficient governmental interest justifies limits on the political speech of nonprofit or for-profit corporations."); *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 68 (1983) ("A company has the full panoply of protections available to its direct comments on public issues . . . ."). *See also Bd. of Cnty. Comm'rs, Wabaunsee Cnty., Kan. v. Umbehr*, 518 U.S. 668 (1996) (extending First Amendment's guarantee of freedom of speech to government contractors on matters of public

---

clauses of the Illinois Constitution" which "dictates that Illinois courts should construe the Illinois Constitution in the same manner as the United States Supreme Court construes similar provisions of the Federal Constitution").

concern); *Creek v. Vill. of Westhaven*, No. 83 C 1851, 1993 WL 291786, at *4-5 (N.D. Ill. Aug. 2, 1993) (quasi-governmental Fire Protection District entitled to First Amendment protections where, notwithstanding that it derived its existence and all of its powers from the state legislature, it was an "independent body" with its "own norms and goals")). Many Illinois charter schools have previously exercised their freedom of speech by specifically addressing unionization with their employees, board members, donors and stakeholders. Compl. ¶¶ 80, 94; Ligue Aff. ¶ 11.

The Act imposes a prior restraint on charter schools' speech by prohibiting charter schools, as a condition of their charter approval or renewal, from expressing a position – either in favor or against – on the matter of whether their employees will be unionized. Prior restraints on speech, like those set forth in the Act, "are the most serious and the least tolerable infringement[s] on First Amendment rights." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976); *see also Weinberg*, 310 F.3d at 1045–46 (noting that "prior restraints are highly disfavored and presumed invalid"); *Covenant Media of Ill., L.L.C. v. City of Des Plaines, Ill.*, No. 04 C 8130, 2005 WL 2277313, at *3 (N.D. Ill. Sept. 15, 2005) ("Although a prior restraint on expressive conduct is not *per se* unconstitutional, any system of prior restraint that comes before the court bears a heavy presumption against its constitutional validity."). The Act is also a content-based restriction – and one that specifically governs speech which is political and ideological in nature – because it restricts any charter school speech on the topic of employee unionization. *See Consol. Edison Co. of N.Y., Inc. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 530, 537 (1980) ("The First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic."); *see also Thomas v. Collins*, 323 U.S. 516, 537-38 (1945) (*citing NLRB v. Va. Elec. & Power Co.*, 314 U.S. 469 (1941)).

"Laws that burden political speech are 'subject to strict scrutiny,' which requires the Government to prove that the restriction 'furthers a compelling interest and is narrowly tailored to achieve that interest.'" *Citizens United*, 558 U.S. at 340. Likewise, "[c]ontent-based regulations are presumptively invalid," and also subject to strict scrutiny. *Ezell v. City of Chicago*, 651 F.3d 684, 707 (7th Cir. 2011); *see also People v. Alexander*, 204 Ill. 2d 472, 476 (2003) ("The first amendment … prohibits content-based restrictions on speech which do not survive so-called strict scrutiny."). The State of Illinois must accordingly show that the Act furthers a compelling interest and is narrowly tailored to achieve that interest, which it cannot do. *See, e.g., Krislov v. Rednour*, 226 F.3d 851, 864 (7th Cir. 2000) (Illinois law limiting political candidates' association with non-registered voters was not narrowly tailored toward interest of ensuring candidates had sufficient support to merit ballot access); *Christensen v. City of Wheaton*, No. 99 C 8426, 2000 WL 204225, at *4 (N.D. Ill. Feb. 16, 2000) (preliminary injunction granted where content-based ordinance limiting political signs not narrowly tailored to defendant's interest in safety and aesthetic).

Even if there were a compelling interest underlying the Act's censorship of ideological speech, far from being narrowly tailored, the Act's restriction on charter schools' speech is immensely broad. "[A] statute cannot be narrowly tailored when it burdens 'substantially more speech than is necessary to further the government's legitimate interests.'" *Krislov*, 226 F.3d at 864. Far from being tailored, the Act prohibits "**<u>any</u>**" expression of an employer's position on the matter of employee union organizing. The Act's restriction is not limited to speech which is threatening or coercive (which is already prohibited under the NLRA), nor is it thoughtfully limited in any meaningful way. Expressions of opinion on employee unionization, distributing facts about employee unionization, sharing information about union dues, and sharing past experiences related to a union – whether positive, negative or agnostic – are <u>all</u> allowed by the NLRA but prohibited

under the Act. Even sharing information about the NLRB's process for unionization would seemingly be prohibited given the overbroad language of the Act. 105 ILCS 5/27A-3.

Additionally, the Act restricts speech no matter to whom the speech is directed – the Act does not distinguish between speech directed towards employees, parents, donors, or community members. Under the only logical reading of the Act, all charter school speech about employee unionization, to *anyone*, is prohibited under any circumstance. There is thus no colorable argument that the Act's restriction on speech is narrowly tailored.

C. **Plaintiffs and all Illinois Charter Schools Will Suffer Irreparable Harm in the Absence of Injunctive Relief and They Have No Adequate Remedy at Law**

Because the Act impinges on charter schools' constitutional rights, Plaintiffs need not show anything further to establish irreparable harm. Demonstrating a violation of constitutional rights is "[p]robably the most common method of demonstrating that there is no adequate legal remedy . . . ." 11A Wright, Miller & Kane, *Federal Practice and Procedure* § 2944 (2009); *see also Nat'l People's Action*, 914 F. 2d at 1013 ("Even a temporary deprivation of first amendment freedom of expression rights is generally sufficient to prove irreparable harm."); *Mitchell*, 748 F.2d at 806 ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.") (citing C. Wright & A. Miller, *supra*).

Indeed, because deprivation of the Plaintiffs' constitutional rights are central to Plaintiffs' claims, no further showing of irreparable injury is required. S*ee Nat'l People's Action*, 914 F.2d at 1013 (preliminary injunction properly granted, given free speech impingement); *Higher Soc'y of Ind.*, 858 F.3d at 1116 (granting preliminary injunction, given that "even short deprivations of First Amendment rights constitute irreparable harm, and the balance of harms normally favors granting preliminary injunctive relief because the public interest is not harmed by preliminarily enjoining the enforcement of a statute that is probably unconstitutional.") (internal quotation omitted);

*O'Brien v. Town of Caledonia*, 748 F.2d 403, 409 (7th Cir. 1984) (noting that "[e]ven the temporary deprivation of First Amendment rights constitutes irreparable injury," concluding there was a "chilling effect on [free speech] rights," and so "revers[ing] the District Court and remand[ing] the case for entry of a preliminary injunction"); *Citizens for a Better Env't v. City of Park Ridge*, 567 F.2d 689, 691 (7th Cir. 1975) (noting that "even the temporary deprivation of First Amendment rights constitutes irreparable harm in the context of a suit for an injunction" and concluding that Citizens demonstrated a "sufficient showing that it would suffer irreparable harm from the denial of the preliminary injunction" given that other "objectives do not justify the unnecessarily broad restraint on the communication of ideas which results from the Park Ridge ordinance at issue.").

Even beyond the constitutional infringement, Plaintiffs can establish irreparable harm. Illinois charter schools are facing a Hobson's choice, with immediate and irreversible consequences: (1) they can comply with the Act's requirements, and sign charter renewal agreements depriving them and their employees of free speech and other federally protected rights; or (2) they can refuse Defendant CPS and ISBE's attempts to enforce the Act – by refusing to sign the renewal charter agreement – thereby threatening their continued funding. Without continued funding after June 30, 2024, charter schools ability to continue operations will be in grave jeopardy. All charter schools rely on funding from their authorizer to make payroll, pay vendors, and for preparations to welcome students back in the fall. There is no amount of compensation, or adequate remedy at law, that could subsequently reinstate a charter school forced into closure, or ensure that its students, families and staff members would return. The harm of doing nothing is thus irreparable and without any adequate remedy at law.

Nor can charter schools simply agree to the Act's illegal language as part of their renewal charter agreements pending litigation on the merits of Plaintiffs' claims. The issue cannot be

understated: while the Plaintiffs litigate this matter, Illinois charter schools would be required to forfeit their constitutional and statutory rights – and those of their employees. Pending the outcome of this litigation, employees may be forced to decide whether to unionize without a free flow of information and without their federally-protected right to a secret ballot election. Charter schools would likewise be without their constitutionally and statutorily protected free speech rights. Moreover, if staff unionize, charter schools will effectively be forced to begin the process of negotiating a collective bargaining agreement with the union, or risk further legal consequence. When the Act is later overturned, the harm of the Act's interim implementation will already be done, and it will be impossible to un-wind. There is no remedy at law that could redress the damage caused to charter schools and their employees. An injunction is the only remedy that will protect Plaintiffs from these irreparable harms.

### D.    The Equities Weigh Heavily in Plaintiffs' Favor

Given Plaintiffs have demonstrated a likelihood of success on their First Amendment and state Constitution claims, the Court need not balance the equities before awarding injunctive relief. *See. Tippecanoe Cnty*, 858 F.3d at 1116 ("[I[n First Amendment cases, the likelihood of success on the merits will often be the determinative factor."); *Korte v. Sebelius*, 735 F.3d 654, 665-66 (7th Cir. 2013) (finding no need to remand to the district court to weigh the injunction entities, given likelihood of success on First Amendment claim); *Am. C.L. Union of Ill. v. Alvarez*, 679 F.3d 583, 589–90 (7th Cir. 2012) (same).

Regardless, the equities here weigh heavily in Plaintiffs' favor because Defendants will suffer no hardship if the Court grants Plaintiffs' requested relief. *Alvarez*, 679 F.3d at 589–90 ("the public interest is not harmed by preliminarily enjoining the enforcement of a statute that is probably unconstitutional."); *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859-60 (7th Cir. 2006) (no harm to defendants in enjoining a policy that likely violates Plaintiff's First Amendment

rights). In the interim, charter school employees will continue to be able to decide whether to unionize under the procedures and protections afforded by the NLRA, the same process that has currently governs charter school unionization in Illinois. Likewise, charter schools will continue to be bound by the NLRA, including its restrictions on coercive or threatening conduct. The only potential consequence of an injunction will be delayed enforcement of the Act. Without injunctive relief, Plaintiffs, on the other hand, would be forced to forgo their constitutionally protected rights and endure all of the irreparable harm addressed above.

Most significantly, it is not only Illinois charter school employers that will be harmed by the implementation of the Act's requirements. Charter school <u>employees</u> will *also* be harmed because if the Act is enforced, they will be losing their statutory right to vote in a secret ballot election on the issue of whether or not they want to be represented by a union. Further, charter school employees, families and stakeholders will also lose the ability, and value, of hearing employer's perspective – positive, negative or agnostic – on the issue of unionization. On the other hand, granting injunctive relief would mean that teachers and employees can hear all sides of the debate when it comes to unionization, which increases the flow of information. An injunction is thus squarely aligned with the preservation of constitutional rights *and* with furthering the strong public interest of encouraging, rather than artificially stifling, a robust forum of political and ideological speech. For this reason, "injunctions protecting First Amendment freedoms are always in the public interest." *Alvarez*, 679 F.3d at 589–90. For all of these reasons, the equities weigh heavily against enforcement of the Act.

### E.     No Bond Should Be Required Before the Preliminary Injunction is Issued

While Federal Rule of Civil Procedure 65(c) assumes imposition of a bond, the Seventh Circuit has recognized that "[u]nder appropriate circumstances a bond may be excused, notwithstanding the literal language of Rule 65(c)." *Wayne Chem., Inc. v. Columbus Agency Serv.*

*Corp.*, 567 F.2d 692, 701 (7th Cir. 1977). In particular, the Seventh Circuit has reasoned that there is no reason to require a bond in cases in which "the court is satisfied that there's no danger that the opposing party will incur any damages from the injunction." *Habitat Educ. Ctr. v. U.S. Forest Serv.*, 607 F.3d 453, 458 (7th Cir. 2010); *see also Deferio v. City of Syracuse*, 193 F. Supp. 3d 119, 132 (N.D.N.Y. 2016) (no bond required in first amendment case where injunctive relief would not result in cost or damage to defendants); *United Food & Com. Workers Loc. 99 v. Brewer*, 817 F. Supp. 2d 1118, 1128 (D. Ariz. 2011) (no bond required where no realistic likelihood that defendants would be harmed by being enjoined from enforcing a law that constitutes viewpoint discrimination in violation of the First Amendment); *Complete Angler, LLC v. City of Clearwater, Fla.*, 607 F. Supp. 2d 1326, 1335 (M.D. Fla. 2009) ("Waiving the bond requirement is particularly appropriate where a plaintiff alleges the infringement of a fundamental constitutional right."); *Westfield High Sch. L.I.F.E. Club v. City of Westfield*, 249 F. Supp. 98, 128-29 (D. Mass. 2003) (no bond required in preliminary injunction case prohibiting enforcement of allegedly unconstitutional school-speech policy). Here, Defendants will not face any particular monetary injury as a result of the issuance of the preliminary injunction protecting Plaintiffs' constitutional rights and for this reason, no bond should be required.

## IV.     CONCLUSION

For all of the foregoing reasons, to avoid irreparable and immediate injury, Plaintiffs respectfully request that this Court grant their Motion for Preliminary Injunction.

Dated: June 25, 2024

PLAINTIFFS ILLINOIS NETWORK OF CHARTER
SCHOOLS, INTRINSIC SCHOOLS, and THE
MONTESSORI NETWORK D/B/A THE
MONTESSORI SCHOOL OF ENGLEWOOD

By:  /s/ Michael L. Sullivan
       One of Their Attorneys

Michael L. Sullivan
Jon E. Klinghoffer
Meredith S. Kirshenbaum
Peter D. Kauffman
GOLDBERG KOHN LTD.
55 East Monroe Street, Suite 3300
Chicago, Illinois  60603
(312) 201-4000
michael.sullivan@goldbergkohn.com
jon.klinghoffer@goldbergkohn.com
meredith.kirshenbaum@goldbergkohn.com
peter.kauffman@goldbergkohn.com

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on June 25, 2024, he caused a copy of **PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION** to be served via the Court's ECF/electronic mailing system upon all counsel of record.


/s/ Michael L. Sullivan_____