## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

ILLINOIS NETWORK OF CHARTER )
SCHOOLS, et al.,                              )
                                              )
        Plaintiffs,                        )    Case No. 1:24-cv-05057
                                              )
        v.                                 )    Judge John Robert Blakey
                                              )
KWAME RAOUL, in his official                  )
capacity as the Attorney General for          )
the State of Illinois, et al.,                )
                                              )
        Defendants.                        )

## MEMORANDUM OPINION AND ORDER

Plaintiffs Illinois Network of Charter Schools (INCS), Intrinsic Schools, and The Montessori Network d/b/a The Montessori School of Englewood (TMSOE) (collectively "Plaintiffs") claim that enforcement of Illinois Public Act 103-0416, mandating the inclusion of a "union neutrality clause" in every charter and charter renewal, violates federal and Illinois law. *See* [1]. Plaintiffs argue that: the National Labor Board Relations Act (NLRA) preempts the law (Count I); the law violates their First Amendment rights (Count II); and the law constitutes an impermissible taking under the Fifth Amendment (Count III). Plaintiffs seek preliminary injunctive relief to stay the enforcement of Illinois Public Act 103-0416 based upon Counts I and II, *see* [6].

For the reasons stated below, the Court denies Plaintiffs' motion for preliminary relief, [6].

## I.    Background

The Illinois Charter Schools Law regulates charter schools in Illinois.  105 ILL. COMP. STAT. 5/27A-1 *et seq.*  Under the law, "a proposal to establish a charter school may be initiated by individuals or organizations that will have majority representation on the board of directors or other governing body of the corporation or other discrete legal entity" operating the proposed charter school.  *Id.* § 27A-7(b).  The individuals or organizations "may be school teachers, school administrators, local school councils, colleges or universities or their faculty members, public community colleges or their instructors or other representatives, corporations, or other entities or their representatives."  *Id.*  These individuals or organization must submit a proposal "to the local school board and State Board," acting as authorizers, "for certification under Section 27A-6 of this Code in the form of a proposed contract."  *Id.* § 27A-7(a); *id.* § 27A-7.10.  If the authorizer accepts the proposal, the parties create an agreement, called a "charter."  *Id.* § 27A-6(a).  Any charter school agreement imposes several requirements for the administration and operation of charter schools, including compliance with health and safety guidelines, certain board membership procedures, and financial recordkeeping.  *See* 105 ILL. COMP. STAT. 5/27A-5(c)–(d).  In exchange, the charter school receives funding from its authorizer.  105 ILL. COMP. STAT. 5/27A-5(h).  While the law considers charter schools part of the public school system, a charter school "shall be organized and operated as a nonprofit corporation or other discrete, legal, nonprofit entity authorized under the laws of the State of Illinois."  105 ILL. COMP. STAT. 5/27A-5(a), (c).

The Illinois Educational Labor Relations Act (IELRA) governs labor relations for all public schools in the state.  In 2009, the State Assembly passed Illinois Public Act 096-0104, explicitly including charter schools within the scope of the IELRA, following a state court decision holding the opposite.  *See* 105 ILL. COMP. STAT. 5/27A-5(g); *Northern Kane Educational Corp. v. Cambridge Lakes Education Ass'n, IEA-NEA*, 914 N.E.2d 1286, 1291 (Ill. App. Ct. 2009).

In 2023, the State Assembly passed Illinois Public Act 103-0416, amending 105 ILL. COMP. STAT. 5/27A-6, to include a requirement that all new charters or charter renewals contain a "union neutrality clause" within the charter agreement.  *See* 105 ILL. COMP. STAT. 5/27A-6.  According to the law, a charter school must "be neutral regarding the unionization of any of its employees, such that the charter school will not at any time express a position on the matter of whether its employees will be unionized."  105 ILL. COMP. STAT. 5/27A-3.  The school may not "express a position on the matter of whether its employees will be unionized" or "threaten, intimidate, discriminate against, retaliate against, or take any adverse action based on their decision to support or oppose union representation."  *Id.*  The school must also permit labor organization representatives onto school property, and the law requires votes for union recognition by a majority card check procedure verified by a neutral third-party arbitrator.  *Id.*

Plaintiffs in this case consist of a charter school network and charter schools: INCS, Intrinsic Schools, and TMSOE.[1]  [19] at 3–4.  INCS, the umbrella organization

---

[1] The amended complaint, filed after the parties briefed Plaintiffs' preliminary injunction motion, also names the following Plaintiffs: Namaste Charter School, Inc.; Chicago Charter School Foundation

for all Illinois charter schools, represents 134 charter schools, serving over 60,000 students in Illinois. [20] ¶ 2. Intrinsic Schools operates two charter schools within the city of Chicago, one authorized by CPS and another by the Illinois State Board of Education. [21] ¶ 2. Intrinsic's board has full independence from the government and full control over hiring decisions. *Id.* ¶ 5. When the State Board of Education renewed Intrinsic's charter in summer 2024, the renewed charter contained the aforementioned union neutrality clause. *Id.* ¶ 7–9. Likewise, TMSOE operated under a similar governance structure and was asked to sign a charter renewal agreement containing a union neutrality clause in March 2024. *See* [22].

On June 18, 2024, Plaintiffs filed their complaint against the Illinois Attorney General in his official capacity, the Illinois State Board of Education, ("State Defendants"), and The Board of Education of the City of Chicago (collectively, "Defendants"). Plaintiffs seek a declaration that Illinois Public Act 103-0416—the act amending the Illinois Charter School Law to require that charter renewal agreements contain a "union neutrality clause"—remains invalid based upon NLRA preemption, the First Amendment, and the Fifth Amendment.[2] Along with their complaint, Plaintiffs filed a motion for a preliminary injunction to prevent the enforcement of the Act pending a decision on the merits.

---

d/b/a Chicago International Charter School; Noble Network of Charter Schools; Great Lakes Academy Charter School; Perspectives Charter School; Catalyst Schools; and Erie Elementary Charter School. *See* [56].

[2] In their amended complaint, Plaintiffs allege that the illegality of the Act includes the Board of Education for the City of Chicago's implementation of the Act by way of a Resolution, passed May 29, 2025. *See* [56] ¶¶ 10–11 & n.1.

## II.  Legal Standard

A preliminary injunction constitutes "an extraordinary remedy" reserved for exceptional cases.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008); *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States of Am., Inc.*, 549 F.3d 1079, 1085 (7th Cir. 2008).  A party seeking a preliminary injunction must establish it has a likelihood of success upon the merits, *Adkins v. Nestle Purina PetCare Co.*, 779 F.3d 481, 483 (7th Cir. 2015), that it has no adequate remedy at law, and that it will suffer irreparable harm if the court denies a preliminary injunction, *Stiller, Inc. v. Steak N Shake Enters., Inc.*, 695 F.3d 676, 678 (7th Cir. 2012); *see also Wis. Right to Life, Inc. v. Barland*, 751 F.3d 804, 830 (7th Cir. 2014).

Following the Supreme Court's twin decisions in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008) and *Nken v. Holder*, 556 U.S. 418 (2009), the Seventh Circuit retired the previous "better than negligible" standard, adopting instead a "strong" showing standard.  *See Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762–63 (7th Cir. 2020) ("We note this to remind both the district courts and ourselves that the 'better than negligible' standard was retired by the Supreme Court."); *Mays v. Dart*, 974 F.3d 810, 821 (7th Cir. 2020) (explaining that the "better than negligible" standard "is not the proper standard to apply when evaluating the likelihood of success on the merits in a preliminary injunction motion").  This modification remains only a change in degree and not kind; a plaintiff must still demonstrate that the claim has "some chance" of success, but "better than negligible" will not do.  *Ill. Republican Party*, 973 F.3d at 762.

If the moving party shows a likelihood of success on the merits, the Court then "must consider the irreparable harm that the nonmoving party will suffer if preliminary relief is granted, balancing such harm against the irreparable harm the moving party will suffer if relief is denied." *Stuller*, 695 F.3d at 678 (quoting *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 895 (7th Cir. 2001)). To do so, the Court considers the public interest in granting or denying the injunction, using a "sliding scale approach" to weigh these considerations. *Id.*; *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006).

In First Amendment cases, a likelihood of success suffices to meet the standard for a preliminary injunction. *Higher Soc'y of Ind. v. Tippecanoe County, Ind.*, 858 F.3d 1113, 1116 (7th Cir. 2017). The loss of First Amendment freedoms, even for minimal periods of time, constitutes an irreparable injury, and protecting such freedoms thus always serves the public interest. *Id.*; *Korte v. Sebelius*, 735 F.3d 654, 666 (7th Cir. 2013). If Plaintiffs demonstrate that they are likely to succeed on the First Amendment claim pled in Count II, then "the analysis begins and ends with the likelihood of success on the merits." *Korte v. Sebelius*, 735 F.3d at 666.

## III.    Analysis

### A.    Likelihood of Success: Supremacy Clause

Plaintiffs argue that the NLRA, a federal law that contains numerous provisions governing the labor relations of employers, preempts the IELRA. While the NLRA "contains no express preemption provision," the federal law may nonetheless preempt a state law where "the NLRA prevents a State from regulating

6

within a protected zone, whether it be a zone protected and reserved for market freedom," known as *Machinists* preemption, or "for NLRB jurisdiction," known as *Garmon* preemption. *Building. & Construction Trades Council of the Metropolitan District v. Associated Builders and Contractors of Massachusetts/Rhode Island,* 507 U.S. 218, 226–27 (1993) ("*Boston Harbor*") (first citing *San Diego Bldg. Trades Council, Millmen's Union, Local 2020 v. Garmon,* 359 U.S. 236 (U.S. 1959); and then citing *Lodge 76, Intern. Ass'n of Machinists and Aerospace Workers, AFL-CIO v. Wisconsin Employment Relations Commission,* 427 U.S. 132 (1976)); *see also id.* at 224–26 (discussing *Garmon* and *Machinists* preemption).

Defendants argue that preemption does not apply because Plaintiffs constitute political subdivisions and that, even if preemption does apply, the State, acting as a market participant, may nonetheless permissibly impose otherwise preempted contractual restrictions. The Court considers each argument in turn.

### 1. Political Subdivision

Defendants first argue that preemption does not apply here because Plaintiffs fall outside the reach of the NLRA as a political subdivision. The NLRA defines employers as "any person acting as an agent of an employer, directly or indirectly, but shall not include the United States or any wholly owned Government corporation," or "any State or political subdivision thereof." 29 U.S.C. § 152(2). In interpreting the NLRA, the National Labor Relations Board defines a political subdivision as an entity: "(1) created directly by the state, so as to constitute departments or administrative arms of the government, or (2) administered by

individuals who are responsible to public officials or to the general electorate." *NLRB v. National Gas Utility District of Hawkins County*, 402 U.S. 600, 604–05 (1971).[3] The Supreme Court has utilized this test and considered additional factors, such as whether the entity has the power of eminent domain, tax exempt status, an ability to issue tax-exempt bonds, and whether its records were subject to public records laws. *Id.* at 606–07; *Austin Developmental Center, Inc.*, 606 F.2d at 789.

An entity's close relationship with the state does not necessarily make that entity a political subdivision. For example, a state-funded mental healthcare facility did not qualify as a political subdivision even though the state created, funded, and operated the facility on state property. *NLRB v. Parents & Friends of the Specialized Living Center*, 879 F.2d 1442 (7th Cir. 1989). Factors weighing against classification as a political subdivision included the fact that a non-profit corporation managed the facility through a license with the state, the state had "no authority to hire or fire" the entity's "directors or executive director," and the board of directors were "chosen by its corporate members, not by the state or general public." *Id.* at 1448–49. Though the services the facility provided remained "essential to the execution of the SLC Act," (legislation related to the facility), the court noted that the entity did not act "as an arm of the state by providing its services." *Id.* at 1448; *see also id.* at 1449 ("If a not-

---

[3] Because the Supreme Court and Seventh Circuit have relied upon this test, this Court may continue to do so as well, despite the parties' arguments regarding the lack of *Chevron* deference. *See Hawkins*, 402 U.S. at 604–05; *NLRB v. Austin Developmental Center, Inc.*, 606 F.2d 785, 789 (7th Cir. 1979). *Loper Bright* does "not call into question prior cases that relied on the Chevron framework. The holdings of those cases that specific agency actions are lawful" remain "subject to statutory stare decisis despite our change in interpretive methodology." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024). Since Defendants have presented no other authority compelling the Court to disregard *Hawkins*, that case and its progeny remain binding today.

for-profit corporation operates a hospital pursuant to a contract with the state as opposed to a statutory duty, the employer is 'not transformed into a political subdivision of the State.'") (quoting *Truman Medical Center, Inc. v. NLRB*, 641 F.2d 570, 572 (8th Cir. 1981)).

Likewise, a state-funded zoo did not constitute a political subdivision where state officials "deliberately designed" the zoo "as a private entity to be operated independently of" state institutions. *Brock v. Chicago Zoological Society*, 820 F.2d 909, 911 (7th Cir. 1987). Decisive factors included the entity's "corporate structure, its resulting independence" for "operations and maintenance, and the indisputably private nature of its employment relationships." *Id.* at 912–13.

In contrast, a national gas utility district constituted a political subdivision where the state essentially controlled the entity. *Hawkins*, 402 U.S. at 609. The Court recognized the extent of the state's control since the district operated as a nonprofit, public officials appointed the district's board, board members remained subject to the state's "General Ouster Law" for removal, the district's records were public, a statute named the district a "municipality," and the district possessed powers of eminent domain, tax exempt status, and the ability to issue tax-exempt bonds. *Hawkins*, 402 U.S. at 609. The Fifth Circuit, applying *Hawkins*' framework, determined that Louisiana charter schools did not qualify as political subdivisions. *Voices for International Business & Education, Inc. v. NLRB*, 905 F.3d 770 (5th Cir. 2018). In so doing, the court emphasized that "there is no way for the public to select the board members who set policy for" the charter school and thus concluded that the

9

charter school "is 'not administered by individuals who are responsible to public officials or to the general electorate.'" *Id.* at 775. Since the court determined that the authority for the government to remove Board members for cause remains different from the authority to remove-and-replace for policy reasons, the public did not control the administration of the organization without that ability to replace board members. *Id.* at 774.

Illinois charter schools similarly fail the *Hawkins* test. First, the charter, an agreement between an independent nonprofit and the state, creates a charter school, a process that mirrors the license granted by the state to the mental health facility in *Parents and Friends of Specialized Living Center.* As noted in that case, the use of a state law to approve the receipt of state funds by a private entity differs from a statute creating the entity itself. *See Parents and Friends of Specialized Living Center*, 879 F.2d at 1448. Consequently, Illinois charter schools do not constitute departments or administrative arms of the government.

Nor are Illinois charter schools "administered by individuals who are responsible to public officials or to the general electorate." *Id.* A board of directors, or equivalent governing body, administers the charter school. Illinois law imposes two requirements on the board of directors or government body: (1) the charter school's governing body must include at least one parent or guardian of a currently enrolled student, selected by the board, governing body, parent teacher organization, or equivalent; and (2) board members must complete some hours of professional development leadership training. 105 ILL. COMP. STAT. 5/27A-5(c)–(c-5). Beyond

10

these requirements, Illinois law does not mandate the selection or removal process for board members. This structure parallels the state-entity relationships in *Brock* and *Voices*, where the State had minimal, if any, involvement in board decisions and the entities did not constitute political subdivisions. Indeed, *Graham v. Board of Education of the City of Chicago* explicitly states that "what distinguishes charter schools from ordinary public schools in Illinois is that they are not administratively parts of the school district." 8 F.4th at 629. The State does not determine board membership of a charter school at all, and the general electorate likewise does not have a mandated role. In short, charter schools in Illinois are not "administered by individuals responsible to public officials or the general electorate." *Hawkins*, 402 U.S. at 605.

Further, while the State does exercise a certain amount of control over charter schools through various statutory requirements, like compliance with health and safety guidelines, certain board membership procedures, reporting requirements, and curriculum, this level of control resembles contracting conditions, not a political subdivision. Unlike the entity in *Hawkins*, the state does control board membership, subject members to a removal law, or impart state powers like eminent domain or an ability to issue tax-exempt bonds; all factors that contributed to the political subdivision finding in *Hawkins*. Given the characteristics of Illinois charter schools, the schools do not constitute political subdivisions under the NLRA and consequently fall within the "employer" definition of the NLRA. As a result, this theory to avoid preemption fails.

11

### 2. Market Participant Exception

Next, the State Defendants argue that, even if Illinois charter schools meet the "employer" definition within the NLRA, the schools act as state contractors, and, as a result, the State, by acting as a market participant, may permissibly impose contractual restrictions otherwise preempted by federal law. Since "pre-emption doctrines apply only to state *regulation*," where a state acts merely as a market participant, "the State is not subject to pre-emption by the NLRA." *Boston Harbor*, 507 U.S. at 227 (emphasis in original); *see also Lavin*, 431 F.3d at 1006 ("A city or state acting as proprietor, however, is a market participant rather than a market regulator."). Courts distinguish "between government as regulator and government as proprietor," as the NLRA does not prohibit "all legitimate state activity that affects labor." *Boston Harbor,* 507 U.S. at 227. Where the state "is not functioning as a private purchaser of services," however, and the state action is "tantamount to regulation," NLRA preemption applies. *Boston Harbor*, 507 U.S. at 229 (quoting *Wisconsin Department of Industry, Labor & Human Relations v. Gould Inc.*, 475 U.S. 282, 291 (1986).

Proprietary state action should only bind the contracting parties and serve a market participant interest, such as cost savings. *See Lavin*, 431 F.3d at 1006; *cf. Metropolitan Milwaukee Ass'n of Commerce v. Milwaukee County,* 431 F.3d at 277 ("The state has the same interest as any other purchaser in imposing conditions in contracts with its sellers that will benefit the state in its capacity as a buyer, as distinct from enforcing or modifying the NLRA."). In contrast, state action that binds

noncontractors, controls conduct unrelated to the state contract, or fails to serve a market-participant interest suggests a concealed attempt at regulation. *See Metropolitan Milwaukee Ass'n of Commerce*, 431 F.3d at 279, 281–82.

Plaintiffs argue that the State does not act as a proprietor since the charter school authorizers, not the state, impose the contract requirements. [41] at 10–11. A similar situation existed in *Lavin*, where Illinois placed conditions on subsidies for renewable-fuels plants but did not actually act as a proprietor since the private renewable-funds "project's owner, not the state, is its proprietor." *Lavin*, 431 F.3d at 1006. Despite this conclusion, the market exception did apply to the state action "because Illinois has limited its condition to the project financed by the subsidy"; therefore, it did not engage in "regulation" under *Boston Harbor*, and federal preemption did not apply. *Id.* at 1007. In this case, it thus remains immaterial whether the State itself functions as the proprietor, the key issue depends upon whether or not the State acts as a market participant.

Here, the State passed a law governing all charter contracts, rather than independently negotiating for the provision in certain specific charters. Even if the State is not a proprietor, it acts as a market participant by mandating an additional condition in the agreement between charter schools and authorizers. The union neutrality clause only restricts charter school managers while talking to teachers, donors, and other community members—expected functions of the charter school within its contract. The law does not impose requirements on noncontractors or implicate conduct unrelated to the charter. Like *Lavin*, the State does not seek to

regulate education or labor generally, rather, the law manages the State's specific charter contracts in the world of education and labor. *See Boston Harbor*, 507 U.S. at 227.

Through the charter school law, the State seeks to prevent labor discord, a proper state proprietary interest. Indeed, *Boston Harbor* recognized such a proprietary interest in a law imposing union conditions motivated to "maintain worksite harmony, labor-management peace, and overall stability throughout the duration of the project." 507 U.S. at 221; *see also Colfax Corp. v. Illinois State Toll Highway Authority*, 79 F.3d 631, 634 (7th Cir. 1996). Likewise, the Third Circuit recognized union neutrality clauses as an acceptable condition of state funding to promote labor peace. *Hotel Employees & Restaurant Employees Union v. Sage Hospitality Resources, LLC*, 390 F.3d 206, 218 (3d Cir. 2004). In that case, since the city was an investor in a project, requiring the contracting company to sign the union neutrality agreement served the proprietary interest of protecting the city's investment. *Id.*; *see also* [34] at 13 (citing cases in other circuits following same rule regarding conditions on performance duties by state contractors).

Plaintiffs argue that the Act conceals its true regulatory interest given the comments made by Representative Guzzardi—the Act's sponsor—on the House Floor regarding the implications of the bill on charter schools' speech and charter school teachers. [41] at 12–13 (citing [41-1] at 17). These comments alone, however, do not change the Court's analysis, as "federal preemption doctrine evaluates what legislation *does*, not why legislators voted for it or what political coalition led to its

enactment." *Lavin*, 431 F.3d at 1007 (emphasis in original). As discussed, the law serves the proprietary interests of the State by promoting labor peace through a union neutrality agreement, a proper proprietary interest.[4] Consequently, the law reflects proper proprietary state action, not regulation.

For the reasons stated above, IELRA and the union neutrality clause it requires constitute acceptable conditions of state funding that satisfy the market participant exception to the preemption doctrine. The record, thus, undermines this preemption theory as well.

**B.    Likelihood of Success: Freedom of Speech**

**1.    Standing**

Defendants argue that Plaintiffs lack standing to pursue their claim because they have not demonstrated sufficiently concrete and particularized harm under the First Amendment. Article III of the Constitution limits "federal judicial power to certain 'cases' and 'controversies.'" *Silha v. ACT, Inc.*, 807 F.3d 169, 172–73 (7th Cir. 2015) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559−60 (1992)). A plaintiff must show that: (1) he has suffered an "injury in fact" that is concrete and particularized and actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable

---

[4]    Additionally, even if they were relevant, Representative Guzzardi's comments also suggest an additional proprietary motivation: avoiding NLRB-imposed fines—Representative Guzzardi cites one Illinois charter school fined $250,000 for firing teachers after they joined a union. [41-1] at 16. Clearly, the state would have a proprietary interest in ensuring that state funds allocated to charter schools promote education, not pay such fines.

decision. *Id.* at 173 (quoting *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 180−81 (2000); *Lujan*, 504 U.S. at 560−61). The party invoking federal jurisdiction bears the burden of establishing the elements of Article III standing. *Lujan*, 504 U.S. at 561.

Chilled speech constitutes an injury supporting standing. *Bell v. Keating*, 697 F.3d 445, 453 (7th Cir. 2012). The "chilling effect" on the plaintiff's speech must be "objectively reasonable," result in self-censorship by the plaintiff, and "affect the plaintiff in a personal and individual way." *Speech First, Inc. v. Killeen*, 968 F.3d 628, 638–39 (7th Cir. 2020) (first citing *Bell*, 697 F.3d at 454; and then citing *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016)).

Here, the union neutrality law requires Plaintiffs to choose between signing a charter agreement that forbids them from expressing "a position on the matter of whether its employees will be unionized" and securing public funding for their organization. 105 ILL. COMP. STAT. 5/27A-3. Plaintiffs communicate with their employees about various issues at their schools, including unionization, but the union neutrality clause would prevent certain communication. If Plaintiffs sign the new agreements, there exists an objective fear that a contract violation—speaking about unions—would jeopardize future funding, thus having a "chilling effect" on Plaintiffs' speech. Without doubt, such repercussions constitute concrete and particularized harm. *See Speech First*, 968 F.3d at 638–39.

Plaintiffs accordingly have standing to sue under their First Amendment claim.

16

### 2.    Political Subdivision

Political subdivisions "cannot challenge a state statute on federal constitutional grounds." *Village of Arlington Heights v. Regional Transportation Authority*, 653 F.2d 1149, 1151 & n.7 (7th Cir. 1981) (quoting *Appling County v. Municipal Electric Authority*, 621 F.2d 1301, 1308 (5th Cir. 1980)); *see also Ysursa v. Pocatello Education Ass'n*, 555 U.S. 353, 363 (2009).   Though Illinois charter schools do not constitute political subdivisions for purposes of the NLRA, the same need not be true within the First Amendment context.   Plaintiffs rely on the *Hawkins* analysis to argue that charter schools are not political subdivisions for First Amendment purposes, but the Supreme Court and Seventh Circuit have only applied *Hawkins*' political subdivision test to cases pertaining to the NLRA, OSHA, and ERISA.   *See e.g.*, *Parents & Friends of the Specialized Living Ctr.*, 879 F.2d at 1448; *Brock v. Chicago Zoological Soc.*, 820 F.2d at 910; *Shannon v. Shannon*, 965 F.2d 542, 547 (7th Cir. 1992).   In a First Amendment case, the Supreme Court defined "state political subdivisions" as "merely departments of the State" and "a subordinate unit of government created by the State to carry out delegated governmental functions." *Ysursa*, 555 U.S. at 362–63 (quoting *Trenton v. New Jersey*, 262 U.S. 182, 187 (1923)). Compared to the NLRA *Hawkins* test, this definition does not expand the scope of entities that qualify as political subdivisions; if anything, this definition views political subdivisions more narrowly.   Therefore, if Illinois' charter schools do not constitute political subdivisions under the NLRA, it remains unlikely that they would qualify as political subdivisions in the First Amendment context.

Defendants rely upon *Nampa Classical Academy v. Goesling*, where the Ninth Circuit ruled that Idaho's charter schools constituted political subdivisions for First Amendment purposes. 447 F. App'x 776, 778 (9th Cir. 2011). Just a year earlier, however, the Ninth Circuit held that Arizona charter schools were not political subdivisions in the § 1983 context, noting that an entity may qualify as a political subdivision "for some purposes but still function as a private actor in other respects." *Caviness v. Horizon Community Learning Center, Inc.*, 590 F.3d 806, 814 (9th Cir. 2010). In both cases, the Ninth Circuit analyzed the extent to which a state supervised and controlled schools in the relevant context. *See id.* at 808–10 (describing Arizona charter school law); *Nampa Classical Academy*, 447 F. App'x 776, 777–78 (describing the same for Idaho).

Neither case binds this Court, and, given the different state outcomes, the cases suggest that any analysis for political subdivisions depends upon the specific factual context of the state and its charter school laws. As described here, boards of directors or other governing bodies manage Illinois charter schools. Although Illinois law imposes some requirements on these governing bodies, the State does not have a direct role in appointing, removing, or otherwise regulating members. *See* 105 ILL. COMP. STAT. 5/27A-5(c)–(c-5). Additionally, the State itself does not create a charter school; rather, a statute permits "authorizers" to contract with the proposed charter schools and the agreement or "charter" between the parties acts as the basis for the school's existence. *Id.* § 27A-6(a). Based upon this structure, the charter schools are not "merely departments of the State"; nor are they "a subordinate unit of government

created by the State to carry out delegated governmental functions." *Ysursa*, 555 U.S. at 362–63 (quoting *Trenton*, 262 U.S. at 187). The Seventh Circuit acknowledged this separation in stating that Illinois' charter schools "are not *administratively* parts of the school district." *Graham v. Board of Education*, 8 F.4th 625, 629 (7th Cir. 2021) (emphasis in original)[5]; *see also Board of Education v. Illinois State Charter School Comm'n*, 97 N.E.3d 85, 89 (Ill. App. Ct. 2018) ("A charter school is a tuition-free public school supported by public funds but operated by a nonprofit entity independent from the school district in which it operates.") (first citing 105 ILL. COMP. STAT. 5/27A-5(a), (e); and then citing *Comprehensive Community Solutions, Inc. v. Rockford School District No. 205*, 837 N.E.2d 1 (2005)). And, while Illinois law imposes some speech requirements on charter schools, *see e.g.*, 105 ILL. COMP. STAT. 5/27A-5(g) (reporting and bully prevention requirements), these conditions resemble typical contracting clauses and do not exert such control over the schools to create a "subordinate unit of government."

Given the charter schools' independence from the State, even within the First Amendment context, Illinois charter schools do not constitute political subdivisions and may challenge the Illinois law on constitutional grounds.

---

[5] This case held that Illinois charter schools were "governmental under ERISA," where a "governmental plan" under ERISA included "a plan established or maintained for its employees by the Government of the United States, by the government of any State or political subdivision thereof, or by any agency or instrumentality of any of the foregoing." *Graham v. Board v. Education*, 8 F.4th 625, 628–29 (7th Cir. 2021). The Seventh Circuit's holding that Illinois charter schools are "governmental" does not necessarily signify that the charter schools are political subdivisions for First Amendment purposes given the different contexts and definitions. *Graham* sought to answer whether charter schools were "governmental" based upon a statutory definition; here, the Court must determine whether charter schools constitute political subdivisions in First Amendment common law.

### 3. First Amendment Claim

Plaintiffs claim that the union neutrality clause violates the charter schools' constitutionally protected right to free speech. Defendants respond that the law merely places constitutional conditions on program funding.

While "government *suppression* of protected activity" violates the First Amendment, "*denial of a subsidy*" does not necessarily constitute an unconstitutional effort to "suppress." *Camelot Banquet Rooms, Inc. v. United States Small Business Administration*, 24 F.4th 640, 646 (7th Cir. 2022) (emphasis in original); *see also Regan v. Taxation With Representation*, 461 U.S. 540, 549 (1983) ("A legislature's decision not to subsidize the exercise of a fundamental right" does not infringe the right). Consequently, the "Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way." *Rust v. Sullivan*, 500 U.S. 173, 193 (1991).

Here, Illinois does not seek to generally suppress speech related to unions, rather, the charter schools' funding remains conditioned upon the acceptance of the union neutrality clause. In this way, the State "has simply chosen not to subsidize" speech by the charter schools related to unions. *Camelot*, 24 F.4th at 646.

Most importantly, the law also does not implicate any viewpoint-based discrimination, as the law prevents speech related to unions "without reference to whatever viewpoint that speaker may hold." *Wisconsin Education Ass'n Council v. Walker*, 705 F.3d 640, 651–52 (7th Cir. 2013). Therefore, by refusing to grant a

charter (and the related funding) to charter schools that do not accept the union neutrality clause, the law does not violate the First Amendment. *See Camelot*, 24 F.4th at 646 ("The Supreme Court has never struck down a denial of subsidy on this ground—it surely requires something more, like viewpoint discrimination, than denial of the subsidy itself.") (citing *Wisconsin Education Ass'n Council*, 705 F.3d at 650–52, 664–70).

Additionally, the union neutrality law constitutes an otherwise permissible condition on funding. Illinois, "in the exercise of its powers, generally may attach conditions to the receipt of its funds by others." *In re County Collector of Cook County*, 774 N.E.2d 832, 846 (Ill. App. Ct. 2002); *see also South Dakota v. Dole*, 483 U.S. 203 (1987). Constitutional conditions "define the limits of the government spending program" or "specify the activities Congress wants to subsidize," while unconstitutional conditions "seek to leverage funding to regulate speech outside the contours of the program itself." *Agency for International Development v. Alliance for Open Society International, Inc.*, 570 U.S. 205, 214–15 (2013). For example, Congress may prohibit using funds "to promote legalization of prostitution or human trafficking," but cannot require recipients to "adopt a policy" taking a position on the issue (*i.e.* "'explicitly opposing prostitution and sex trafficking.'"). *Camelot*, 24 F.4th at 650 (discussing *Agency for International Development*, 570 U.S. at 210). The court specifically noted that "by demanding that funding recipients adopt—as their own— the Government's view on" prostitution and sex trafficking, issues of public concern, "the condition by its very nature affected 'protected conduct outside the scope of the

federally funded program.'" *Id.* (quoting *Rust*, 500 U.S. at 197). On the other hand, when Congress limited "§ 501(c)(3) status to organizations that did not attempt to influence legislation, Congress had merely 'chose[n] not to subsidize lobbying'" and such exclusion was permissible. *Agency for Intern. Development*, 570 U.S. at 215 (quoting *Regan*, 461 U.S. at 544) (alteration in original). Conversely, Congress could not condition "federal financial assistance to noncommercial broadcast television and radio stations that prohibited all editorializing, including with private funds" since the condition used "federal funding to regulate the stations' speech outside the scope of the program." *Id.* at 215–16 (citing *FCC v. League of Women Voters of California*, 468 U.S. 364, 399–401 (1984)).

Here, Illinois' condition on charter school funds falls more in line with the permitted conditions in *Agency for International Development* and *Regan*, where Congress provided funds with a condition that the recipient refrain from certain types of speech or conduct related to the funded programming. The limitation on charter schools' speech reflects the State's desire to not fund charter schools that express opinions on the issue of unions. *See Camelot*, 24 F.4th at 651 ("Congress 'has not infringed any First Amendment rights or regulated any First Amendment activity' by excluding prurient businesses from receiving Program funding." (quoting *Regan*, 461 U.S. at 546)). Unlike the prohibited condition in *Agency for International Development*, the Illinois law does not require the schools to express the government's view on unions; charter schools simply cannot express a view on the issue.

Furthermore, Plaintiffs do not allege that the restriction affects the use of private funds or restricts the speech of actors outside the charter school program (i.e., persons speaking in their individual compacity remain free to express their opinions on the matter). The affected speakers (agents of charter schools themselves) certainly fall within the scope of the government spending program, unlike the affected speakers in *League of Women Voters*, which included any broadcast programming regardless of its funding. Therefore, Illinois' law mandating the inclusion of a union neutrality clause in school charters does not "seek to leverage funding to regulate speech outside the contours of the program itself," and qualifies as a constitutional condition on funding. *See Agency for International Development*, 570 U.S. at 214–15. This finding undermines Plaintiff's likelihood of success as to Count II.[6]

## IV. Conclusion

For the foregoing reasons, the Court denies Plaintiffs' preliminary injunction motion [6].

Dated: February 24, 2026

Entered:

John Robert Blakey
United States District Judge

---

[6] Because Plaintiffs have failed to show a likelihood of success on the merits of their preemption and First Amendment claims, this Court need not address the State Defendants' Eleventh Amendment argument. Likewise, the Court need not consider whether Plaintiffs have met the other requirements for a preliminary injunction.