## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| ILLINOIS NETWORK OF CHARTER SCHOOLS, INTRINSIC SCHOOLS, and THE MONTESSORI NETWORK D/B/A THE MONTESSORI SCHOOL OF ENGLEWOOD, NAMASTE CHARTER SCHOOL, INC., CHICAGO CHARTER SCHOOL FOUNDATION D/B/A CHICAGO INTERNATIONAL CHARTER SCHOOL, NOBLE NETWORK OF CHARTER SCHOOLS, GREAT LAKES ACADEMY CHARTER SCHOOL, PERSPECTIVES CHARTER SCHOOL, CATALYST SCHOOLS, and ERIE ELEMENTARY CHARTER SCHOOL, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 1:24-cv-05057 |
| Plaintiffs, | ) | |
| v. | ) ) | |
| The BOARD OF EDUCATION OF THE CITY OF CHICAGO, and DR. TONY SANDERS, in his official capacity as the Illinois State Superintendent of Education, | ) ) ) ) ) ) | |
| Defendants. | ) | |

## SECOND AMENDED COMPLAINT
## FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs, Illinois Network of Charter Schools ("INCS"), Intrinsic Schools ("Intrinsic"), and the Montessori Network d/b/a the Montessori School of Englewood ("Montessori"), Namaste Charter School, Inc. ("Namaste"), Chicago Charter School Foundation d/b/a Chicago International Charter School ("Chicago International"), Noble Network of Charter Schools ("Noble"), Great Lakes Academy Charter School ("Great Lakes Academy"), Perspectives Charter School ("Perspectives"), Catalyst Schools ("Catalyst"), and Erie Elementary Charter School ("Erie" and, together with Intrinsic, Montessori, Namaste, Chicago International, Noble,

Great Lakes Academy, Perspectives and Catalyst, the "Charter School Plaintiffs"), for their Complaint against the Board of Education of the City of Chicago ("CPS"), and Dr. Tony Sanders ("Sanders"), in his official capacity allege as follows:

1.      This action seeks a declaration that Illinois Public Act 103-0416 (the "Act") and CPS's May 29, 2025, resolution titled "Resolution Addressing Various Improvements Needed to the Board's Authorization and Renewal of Charter Schools" (the "Resolution" and, collectively with the Act, the "Neutrality Regulations") are invalid.  This action also seeks an injunction against enforcement of the Neutrality Regulations.  The Neutrality Regulations are invalid because they are preempted by the National Labor Relations Act ("NLRA") and because they violate the First, Fifth, and Fourteenth Amendments to the United States Constitution.  More specifically, the Neutrality Regulations impermissibly a) alter and interfere with the uniform body of federal labor law Congress implemented under the NLRA; b) restrain speech that is protected by the Constitution; and c) constitute a wrongful taking of private property in violation of the Constitution.

### *Illinois Charter Schools Framework*

2.      Illinois charter schools are free, independent, neighborhood public schools open to all children in the state, including students who are English-language learners and students with disabilities.  Charter schools do not have special entrance requirements and have the freedom to be innovative, while being held accountable for advancing student achievement.  Charter schools are not allowed to, and do not, charge tuition to students attending charter schools.

3.      Illinois charter schools serve public-school students whose families choose to enroll them in charter schools, but they are created and governed by private, not-for-profit 501(c)(3) entities.

4.      Sections 105 ILCS 5/27A-3, 105 ILCS 5/27A-6, and 105 ILCS 5/27A-7 of Article 27A of the Illinois School Code (which we refer to as the "Charter Schools Law") govern the authorization of charter schools in Illinois.  Charter schools are allowed to operate under the Charter Schools Law only if granted a charter by an "authorizer," such as CPS.  105 ILCS 5/27A-3.  The Illinois State Board of Education (the "State Board") has authority under the Charter Schools Law to reverse a local school board decision to revoke or not renew a charter if the State Board finds that the charter school is otherwise in compliance with the Charter Schools Law and if such revocation or nonrenewal is not in the best interests of the students it is designed to serve.  105 ILCS 5/27A-9(e).  The State Board appoints the Illinois Superintendent of Education (currently Dr. Tony Sanders).  The Superintendent is responsible for enforcing the Charter Schools Law and for implementing State Board policies and procedures.

5.       The Charter Schools Law was intended to "create a legitimate avenue for parents, teachers, and community members to take responsible risks and create new, innovative, and more flexible ways of educating children within the public school system."  105 ILCS 5/27A-2(c).

6.      The stated purpose of the Charter Schools Law is, in part: (i) to improve pupil learning; (ii) to increase learning opportunities for all pupils, with special emphasis on expanded learning experiences for at-risk pupils; (iii) to encourage the use of teaching methods that may be different in some respects than others regularly used in the public school system; (iv) to allow the development of new, different, or alternative forms of measuring pupil learning and achievement; (v) to create new professional opportunities for teachers; (vi) to provide parents and pupils with expanded choices within the public school system; (vii) to encourage parental and community involvement with public schools; and (viii) to hold charter schools accountable for meeting rigorous

school content standards and to provide those schools with the opportunity to improve accountability. 105 ILCS 5/27A-2(b).

7. A charter school cannot operate in Illinois without a charter agreement that complies with the Illinois Charter Schools Law. No alternative legal marketplace exists in Illinois for charter schools. A charter agreement is a binding contract that contains terms and conditions for the charter school's continued operation. Charter agreements can be renewed by their authorizers pursuant to the Charter Schools Law.

8. "Authorizers" are entities authorized under the Charter Schools Law to, *inter alia*, approve or reject charter applications and enter into charter contracts with applicants. Pursuant to the Charter Schools Law, Local Education Agencies, such as CPS, can be authorizers. Under certain circumstances, the State Board also can authorize charter schools in Illinois.

9. The Charter Schools Law defines the minimum and maximum amount of funding that authorizers must provide each charter school in connection with their charter approval. The Charter Schools Law mandates that funding for charter schools be between 97% and 103% of the charter school's school district's per capita student tuition ("public tuition") multiplied by the number of students residing in the district who are enrolled in the charter school. 105 ILCS 5/27A-11(b). Illinois charter schools receive such funding from their authorizers.

10. Illinois charter schools typically receive supplemental funding in addition to their public tuition allotment. Such funds can be in the form of private philanthropic grants and federal funding that support specific programs or services. Consequently, charter school employees may be funded entirely from public tuition funds but often are funded in whole or in part by private or federal funds. The federal government, for example, funds Head Start and Early Head Start programs operated by some charter schools in Illinois. Head Start and Early Head Start are federally

funded programs providing free, comprehensive education, health, nutrition, and parent involvement services to low-income children (ages 0–5), including those with disabilities and in foster care.

11. Under the Charter Schools Law, charter schools must be nonprofit schools, and a charter school must be organized and operated as a nonprofit corporation or other discrete, legal, nonprofit entity authorized under the laws of the State of Illinois. Charter schools must also be administered and governed by a board of directors or other governing body.

12. Illinois currently has 128 charter school campuses, collectively serving more than 55,000 students statewide, the vast majority of whom are authorized by the CPS district. Eighty-five percent of Illinois charter school students receive free, or reduced-cost, lunch, and Illinois charter schools serve a vastly diverse student population. In Chicago, one out of every four high school students in the Chicago Public School District attends a charter high school, and one out of every ten elementary school students in the Chicago Public School District attends a charter elementary school. Collectively, the Charter School Plaintiffs operate 42 charter school campuses in Chicago and serve over 25,500 students.

13. Since the first charter public school opened in Illinois over 25 years ago, charter schools have substantially improved academic achievement by Illinois students. Critically, charter schools have served students in economically disadvantaged communities, often by implementing unique learning models and future-oriented approaches to success. Charter public schools, by their very nature as stand-alone local educational entities governed by private boards, have the freedom to adjust curriculum and school environments specifically to meet the unique needs of students enrolled in the charter schools. In Chicago, on average, students who attend charter schools are more likely to graduate from high school and college, and they have higher standardized test scores

and higher attendance and classroom engagement. Charter schools provide parents with the ability to choose the best learning environments for the individualized needs of their children so that the children have an opportunity to succeed as well-educated and productive adults.

14. Charter schools in Illinois are employers subject to the NLRA. In Illinois, the National Labor Relations Board (the "NLRB"), on every occasion in which it has considered the issue, has found and asserted its jurisdiction over Illinois charter schools.

15. According to the Chicago Teachers Union (the "Union"), it currently represents educators and staff at thirteen charter schools, across 35 charter school campuses.

16. The Lake County Federation of Teachers also represents charter school educators at one or more charter schools.

17. The Union filed representation petitions with the NLRB invoking the jurisdiction of the NLRA to organize employees of Illinois charter schools into its union, including employees of Plaintiffs Namaste and Intrinsic. In each instance, the NLRB found that it had jurisdiction over these representation proceedings.

18. The Union has repeatedly invoked the jurisdiction of the NLRA by filing unfair labor-practice charges against several of the Illinois charter school employers who are members of INCS and subject to the Neutrality Regulations. In each instance, the NLRB has consistently exercised its jurisdiction over Illinois public charter schools.

### *The Neutrality Regulations Conflict with and Are Preempted by the NLRA*

19. The Act imposes so-called union neutrality on Illinois charter schools by requiring that new charter proposals and renewal charter agreements include a "union neutrality clause." Despite its nomenclature, there is nothing "neutral" about this required contractual clause. It prohibits charter schools from expressing "any opinion" on the issue of the unionization of their

employees. That clause also effectively grants a real estate easement to third-party union organizations to enter charter schools' private property at will for the purpose of soliciting charter school employees and contractors for unionization, regardless of whether they are funded directly or indirectly by the State of Illinois. The cost of this easement, which involves paying for charter school staff, including security personnel, is borne by the charter schools with no just compensation by the State of Illinois.

20. The Act became effective when Governor Pritzker signed it on August 4, 2023. The Act amended the Charter Schools Law and legislatively requires authorizers to include a "union neutrality clause" in any renewal of a certified charter. 105 ILCS 5/27A-6(c-10). Charter schools that are otherwise qualified face nonrenewal of their charters if they do not include the so-called "union neutrality clause" in their charter contracts. Including the so-called "union neutrality clause" in their charter contract presents a Hobson's choice, forcing charter schools to waive their statutory and constitutional rights, and to incur additional costs not otherwise covered by the state's charter school funding scheme. But under the Act, a charter school's failure to include the so-called "union neutrality clause" threatens its continued funding and operation.

21. The Act defines a "union neutrality clause" as meaning:

> a provision whereby a charter school agrees: (1) to be neutral regarding the unionization of any of its employees, such that the charter school will not at any time express a position on the matter of whether its employees will be unionized and such that the charter school will not threaten, intimidate, discriminate against, retaliate against, or take any adverse action against any employees based on their decision to support or oppose union representation; (2) to provide any bona fide labor organization access at reasonable times to areas in which the charter school's employees work for the purpose of meeting with employees to discuss their right to representation, employment rights under the law, and terms and conditions of employment; and (3) that union recognition shall be through a majority card check verified by a neutral third-party arbitrator mutually selected by the charter school and the bona fide labor organization through alternate striking from a panel of arbitrators provided by the Federal Mediation and Conciliation Service. As used in this

definition, "bona fide labor organization" means a labor organization recognized under the National Labor Relations Act or the Illinois Educational Labor Relations Act. As used in this definition, "employees" means non-represented, non-management, and non-confidential employees of a charter school.

105 ILCS 5/27A-3.

22.     A charter school's inability to express any position about unionization or discuss the potential pros and cons of unionization takes away core rights which are explicitly granted to them under Section 8(c) of the NLRA. As such, even if a charter school learns that union organizers, employees in support of unionization or other interested parties are providing incomplete or false information about unionization, the charter school is prohibited under the Neutrality Regulations from providing truthful information to set the record straight.

23.     On May 29, 2025, CPS compounded the threat to most charter schools by promulgating a board Resolution titled "Resolution Addressing Various Improvements Needed to the Board's Authorization and Renewal of Charter Schools."  The Resolution implements most of the Act's requirements but goes further by imposing additional illegal and unconstitutional requirements on charter schools under contract with CPS.

24.     In promulgating the Resolution, CPS exercised its discretion to independently impose restrictions that extend beyond the requirements of the Act.  The Resolution also includes processes for implementing neutrality requirements, which are not found in the Act.

25.     The Resolution requires that charter school operators, educational management organizations, and their management and agents be "neutral" regarding the unionization of any of their employees.  That means that charter schools cannot speak in favor of or against unionization. The neutrality requirement applies not only to employees teaching at CPS-authorized charter schools and funded with State of Illinois dollars, but also to charter school employees whose salaries

and benefits are funded in whole or in part by federal and private sources. The "spillover" effect of this labor regulation is far-reaching and unbounded.

26. The Resolution also requires that all on-site vendors at charter schools comply with the Resolution's "union neutrality" clause requirements, regardless of how the vendor is funded and regardless of whether the vendor is providing services intended for the benefit of CPS or the State of Illinois.

27. In particular, the Resolution provides that charter agreements shall include the following provisions:

> G. Charter and contract school operators, any educational management organization or other entity operating on their behalf, and all persons in their management positions, shall be and remain neutral regarding the unionization of any of its employees, such that the school operator, management or their agents will not at any time, directly or indirectly, express a position on whether its employees will be unionized and such that the charter school will not threaten, intimidate, discriminate against, retaliate against, coerce, or take any adverse action against any employees arising from or related to their rights to organize or not organize, their signing of an authorization card, or engagement in any type of protected activity;

> H. Charter and contract school operators must provide any bona fide labor organization access at reasonable times to non-work areas utilized by the charter or contract school's employees for the purpose of privately meeting with employees to discuss their right to representation, employment rights under the law, and terms and conditions of employment;

> I. Within ten (10) days following a written request from a bona fide labor organization, provide it a list of every employee in the specific job classifications requested who are eligible to organize under the National Labor Relations Act, including their, classification or job title, work address, work email address and telephone number used by the charter school to contact the employee, in the unit of employees so requested. The bona fide labor organization agrees to use all information provided under this agreement solely for internal union administration and communication purposes.

> J. Upon written request from a bona fide labor organization, the charter school shall recognize and bargain with a labor organization that establishes majority support (50% + 1) in its designated unit of unrepresented employees only after the absence of any disputes regarding the appropriate bargaining unit or, the showing of majority support. This recognition and bargaining obligation shall apply,

provided the labor organization: i. Requests recognition for a unit of employees within its regular and historical craft jurisdiction; ii. Agrees in writing that the labor organization and its members will not engage in, support, encourage, or assist in any picketing, work stoppages, boycotts, or any other economic interference in aid of recognition of the labor organization as the exclusive bargaining representative; iii. Agrees in writing not to threaten, intimidate, or coerce employees to obtain authorization cards; iv. Agrees in writing that it will submit any disputes related to Union Neutrality and the Recognition Process to final and binding arbitration.

K.   Within 30 days of a labor organization's written request, the charter school shall submit to card check majority support verification through a neutral mutually-selected arbitrator or by alternately striking from a panel of arbitrators provided by the Federal Mediation and Conciliation Service ("FMCS") or the American Arbitration Association ("AAA"). Any disputes pertaining to the appropriate unit and showing of majority support shall be decided by the arbitrator. The decision of the arbitrator shall be final and binding on all parties. The fees and costs of the arbitrator shall be equally apportioned to the charter operator and labor organization.

L.   Upon a determination by the arbitrator that the labor organization represents a majority of the employees in the designated unit, the charter shall recognize the labor organization as the exclusive bargaining representative of the employees in the unit and enter into a written recognition agreement.

M.   The charter school and the labor organization shall submit any disputes related to Union Neutrality and to the Recognition Process to final and binding arbitration through a mutually-selected arbitrator or by alternately striking from a panel of arbitrators provided by the FMCS or by the AAA. Upon request of the labor organization, the arbitration shall be conducted in accordance with the FMCS expedited arbitration rules in effect as of the effective date of this Resolution. The arbitrator shall be empowered to fashion an appropriate remedy to any violation. The arbitrator's fees and expenses shall be paid by the losing party.

N.   Following the voluntary recognition of a bona fide labor organization based on a showing of majority status, the charter school shall not file or support any petition with the National Labor Relations Board that seeks to challenge the majority status of the bona fide labor organization within one year of the organization's initial request for recognition. Nothing in this provision shall be construed to limit the rights of employees under the National Labor Relations Act to file a decertification petition.

O.   Any labor organization that is aggrieved by any violations of this agreement shall have standing to bring suit in any court of competent jurisdiction to enforce the provisions of this agreement.

P.   All schools or entities covered by this resolution shall require that any contractors or entities performing construction or related work on a school shall sign

-10-

a project labor agreement for that work and pay at least the prevailing wage rate to all workers performing said work.

Q.   All contractors providing educational, clinical, health, food service, custodial, transportation, construction, and security services on-site for the charter school shall, as a condition of such contract, consent to be bound by the terms of sections 4.G. through 4.P.

28.    The Neutrality Regulations deprive charter schools, and their employees, of free speech guaranteed under the NLRA and the Constitution.  The Neutrality Regulations restrain charter schools from honestly communicating with their stakeholders, including employees, parents, students, funders, legislators, voters, and community members, on significant political and ideological issues.  The Neutrality Regulations also effectively grant private-property easements to third-party labor organizations who can turn private school property into union organization halls—all at the cost and administrative burden of the charter schools.

29.    The Neutrality Regulations are expressly regulations that change labor policy for private, charter school employers.  The Neutrality Regulations seek to displace the authority of, and the employer protections provided by, the NLRA and the NLRB.

30.    The Neutrality Regulations are not valid exercises of the State of Illinois' or CPS's purchasing powers. The state is not using its spending power to reduce the cost or increase the quality of services provided to the state.  Nor do the Neutrality Regulations seek to prevent interruptions in service.  The Act does not include any prohibition on work stoppages, and the Resolution does not prohibit work stoppages unless they relate to union recognition.

31.    The Illinois legislative sponsor of the Act, Representative Will Guzzardi, explained that the purpose of the Act is to provide charter schoolteachers with the same measures and protections available to teachers in traditional public schools under the Illinois Educational Labor Relations Act ("IELRA").  Representative Guzzardi stated that the Act was "simply seeking to

-11-

extend similar [IELRA] provisions to teachers at charter schools." But that is incorrect because the Act does not extend constitutional measures and protections. Instead, it curbs existing constitutional measures and protections, and it interferes with carefully balanced federal labor law framework.

32. The Neutrality Regulations are invalid state and local government regulatory measures that seek to advance chosen labor policies in direct contravention of the rights guaranteed to charter schools and their employees under the NLRA.

33. For example, the Neutrality Regulations interfere with rights granted under Section 8(c) of the NLRA, which protects employers' right to express "any views, argument, or opinion, or the dissemination thereof regarding labor practices, provided that such expression contains no threat of reprisal or force or promise of benefit." 29 U.S.C. § 158(c) (1976). The Neutrality Regulations unmistakably regulate employer and employee speech that Congress intended to leave unregulated.

34. The Neutrality Regulations' restrictions on speech are far-reaching. For example, the Neutrality Regulations prohibit charter schools from addressing the merits of unionization and whether unionization could impact the freedoms and flexibilities charter schools have to provide a high-quality education to students from economically underserved communities. They prohibit discussion of factual information about unions and union organizing even if disseminated in a non-coercive manner. The Neutrality Regulations, therefore, censure dialogue on issues important to public education.

35. The Neutrality Regulations' limitations on speech have significant spillover effects. The Act requires charter schools to be neutral regarding the unionization of any of their employees, regardless of whether the employees work on-site at a charter school campus, regardless of their roles, and regardless of whether their positions are funded with state or municipal dollars. The

-12-

Resolution goes even further because it censors any on-site vendor the charter school contracts with, requiring that such vendors be "neutral" with respect to all the vendor's employees and at all times, regardless of where the vendor's employees work or whether their positions are funded with state or municipal dollars. This is not a legitimate use of state or local spending powers or police policies. It is simply regulatory overreach that runs afoul of the NLRA and the Constitution.

36. Another fundamental right afforded employees under Section 9(c) of the NLRA is the right to a secret-ballot election to vote whether or not to select any union as their exclusive bargaining representative. 29 U.S.C. § 159(c).

37. The Neutrality Regulations nevertheless eliminate charter school employers' and employees' right to a secret-ballot election by imposing recognition by card check, which means that charter schools must recognize the union if, by checking for employee union authorization cards, the union represents a majority of the employees in the bargaining unit. This card-check regulation is inconsistent with the secret-ballot protections afforded under Section 9(c) of the NLRA.

38. The Neutrality Regulations' elimination of the secret-ballot election has significant spillover effects. The Act imposes no limitations on the application of the card-check procedure to charter schools; it applies to all charter school employees regardless of whether the employees work on-site at a charter school campus, regardless of their roles, and regardless of whether their positions are funded with state or municipal dollars. The Resolution goes further, imposing card-check procedures not only for all charter school employees, but also for all employees of any on-site vendor, regardless of whether the vendor's employees work on-site at a CPS-authorized charter school campus, regardless of their roles, and regardless of whether their positions are funded with

private, federal, state, or municipal dollars. This is just naked and unbridled regulation that flouts federal labor law and the Constitution.

39. The Neutrality Regulations also conflict with Section 8(d) of the NLRA, which provides that employers and unions are not required to enter into contractual agreements with one another. 29 U.S.C. § 159(d) (stating that the NLRA "does not compel either party to agree to a proposal or require the making of a concession"). The Neutrality Regulations, by compelling charter schools to agree to certain contractual terms with unions, are inconsistent with Section 8(d) of the NLRA and interfere with conduct that Congress intended to be unregulated.

40. The Neutrality Regulations also disrupt the careful balance that the NLRA strikes between employers' property rights and the rights of third parties, such as labor unions, to access the employers' property. The Neutrality Regulations alter this purposeful balance by imposing access rights for labor unions that are directly inconsistent with employers' property rights established by the NLRA. The Neutrality Regulations impose access to any location at which a charter school's employees work, regardless of whether the employees work on-site at a charter school campus or whether their positions are funded with private, state, or municipal dollars. Under the Resolution, property access also extends to any location at which on-site vendor employees work.

41. The Neutrality Regulations also interfere with the exclusive jurisdiction of the NLRB to construe and enforce the NLRA, including the NLRB's exclusive jurisdiction to determine whether an employer's conduct or speech violates the NLRA.

42. For all these reasons, and as further described below, the Neutrality Regulations are preempted by the NLRA.

*The Neutrality Regulations Violate the United States Constitution*

43.    By regulating, chilling, prohibiting, and punishing speech protected by the NLRA and the Constitution, the Neutrality Regulations are an unlawful prior restraint on speech.

44.    The Neutrality Regulations' speech restriction is not limited to speech in connection with programs funded by state or municipal dollars.  The restrictions governing charter school speech are all-encompassing and exist in perpetuity; any charter school operating under an authorizing charter agreement, and each of its agents, is prohibited from expressing a position on the unionization of its employees, at any time, at any location, and to anyone.

45.    By forcing charter school employers to grant union organizers and agents virtually unfettered and free access to, and use of, charter school's private property, the Neutrality Regulations also unconstitutionally infringe upon charter schools' constitutionally protected property rights without just compensation for the taking.

46.    For these reasons, as elaborated below, the Neutrality Regulations violate the Supremacy Clause of the United States Constitution, and  the First, Fifth, and Fourteenth Amendments of the United States Constitution.

47.    The Neutrality Regulations are unlawful and should be declared void, and any enforcement of the Neutrality Regulations must be permanently enjoined.

## THE PARTIES

*Plaintiff Illinois Network of Charter Schools*

48.    Plaintiff INCS is a not-for-profit corporation headquartered, and established with its principal place of business, in Chicago, Illinois.  INCS is an umbrella organization with approximately 128 Illinois charter school campus members.  Collectively, INCS's members constitute 100% of Illinois charter schools and serve over 55,000 students in Illinois.

49.    INCS's mission statement is as follows: "The Illinois Network of Charter Schools advocates for the improvement of public education by leveraging the charter school model as a catalyst to transform lives and communities.  As the voice of Illinois charter schools, INCS engages a diverse coalition of policymakers, school leaders, parents, and community members to create systemic change and secure high-quality schools for underserved communities." (https://www.incschools.org/about/.)  INCS's website further describes its work to include ensuring "adequate and equitable resources for charter public schools, autonomy to find innovative approaches to meet student needs, and [a] fair, transparent policy landscape that allows high-quality options to thrive."

50.    INCS was founded in 2003.  Charter schools in Illinois can choose to join INCS as members.  Members join INCS with the expectation that INCS will represent the Illinois charter school sector in connection with important issues that affect Illinois charter schools, including with respect to the State Board, CPS, and various local education agencies.

51.    One of INCS's central purposes is to support its members.  Consistent with its mission and stated priorities, INCS focuses on preserving its members' autonomy in operating charter schools.  Encouraging innovation and flexibility in public education is central to the purposes of the Charter Schools Law and to the mission and vision of many of INCS's charter school members.

52.    INCS works to protect the flexibility and autonomy of its members so that charter schools can innovate on behalf of their students.  To that end, INCS advocates against legislation and other restrictions that reduce its members' autonomy—including measures that purport to unlawfully restrict charter schools' legal rights.

-16-

53. Fourteen of INCS's members making up 51 charter campuses were approved for a renewed charter in January 2024, and 19 INCS members making up 41 charter campuses were approved for a renewed charter in May 2025. Each of those charter schools has received a draft charter renewal agreement from its respective charter authorizer. Each of those draft charter renewal agreements incorporates a "union neutrality" provision, as required by the Act. The Resolution's additional restrictions and requirements apply to every charter renewal agreement for CPS-authorized charter schools approved in May 2025 and any CPS-authorized charter school still in negotiations with CPS at that time.

54. Each of INCS's remaining members is up for charter renewal before 2028. As a condition of their charter renewal, the Act requires that each charter renewal agreement include a "union neutrality" provision. For CPS-authorized charter schools, the Resolution requires that each charter renewal agreement include the Resolution's expanded "union neutrality" requirements. All INCS members, therefore, are directly impacted by the Act.

55. The Neutrality Regulations interfere with, and thereby frustrate, INCS's mission because the Neutrality Regulations restrict charter schools' statutory and constitutional rights, as well as the INCS members' academic freedom in operating charter schools.

56. Numerous INCS members have sought INCS's guidance and expressed concerns about the Neutrality Regulations' restrictions, and about CPS's and the State Board's enforcement of them. INCS's members are gravely concerned about the Neutrality Regulations' direct contravention of rights guaranteed by the Constitution and the NLRA. These rights include content-based restrictions on their freedom of speech, which forbid them from communicating freely and honestly on the topic of unionization, and the Neutrality Regulations' compelled property access and use for union agents.

-17-

57.     These concrete injuries are directly traceable to Defendants' conduct in enacting, enforcing, and implementing the Neutrality Regulations, and they are injuries that the Court can redress by declaring the Neutrality Regulations unlawful and enjoining their enforcement. INCS's members, therefore, have standing to bring this action on their own. INCS also has associational standing to bring these claims on behalf of its members who are not expressly named plaintiffs, but who suffer the common injuries described herein.

### *Plaintiff Intrinsic Schools*

58.     Intrinsic operates two charter school campuses in Chicago, serving students from 7th through 12th grade. Intrinsic's Belmont campus, which is authorized by CPS, opened in 2013, and Intrinsic's Downtown campus, which is authorized by the State Board, opened in 2019.

59.     Intrinsic was founded by a team of educators from CPS to create a new, excellent public charter school option for middle- and high-school students in Chicago. Intrinsic's mission is to provide all students with what they need to achieve their post-secondary plans. Intrinsic invests deeply in three areas: (i) strong instruction, (ii) exposure and opportunities, and (iii) connection to school.

60.     Intrinsic serves an at-risk student population. Eighty-seven percent of Intrinsic's students qualify for free or reduced-cost lunch, 17% of its students are identified as diverse learners, and 21% are English-language learners.

61.     Notwithstanding these obstacles, more than 90% of Intrinsic's Class of 2023 enrolled in college.

62.     Intrinsic receives public tuition funding through the State Board and CPS pursuant to its respective charter agreements. In addition, Intrinsic receives privately raised philanthropic dollars and federal grants, which support a number of critical programs, including alumni scholarships and postsecondary supports. Certain Intrinsic employees and vendors are funded in

whole or in part through non-public tuition funding sources. Additionally, certain Intrinsic employees support programs funded in whole or in part through non-public tuition funding sources.

63.    Intrinsic owns one of its campuses and leases the other. Intrinsic has a right to quiet enjoyment of its real property.

64.    Intrinsic is a not-for-profit corporation registered in the State of Illinois that is governed by an independent board of directors. Intrinsic's board of directors is made up of volunteers interested in Intrinsic's mission. Members of the board of directors are selected according to Intrinsic's bylaws. No Intrinsic board member is an elected official or accountable to any elected official. Neither CPS, the State Board, nor any other state actor, has ever attempted to appoint or remove any member of the Intrinsic board of directors.

65.    Intrinsic is not a political subdivision as defined by the NLRA.

66.    Intrinsic's Downtown campus was approved for a renewed charter in January 2024 by its authorizer, the State Board. Intrinsic received a draft charter renewal agreement from the State Board on or about January 17, 2024. At that time, the State Board informed Intrinsic that it required Intrinsic's execution of its renewal charter agreement by June 2024.

67.    The charter renewal agreement includes a "union-neutrality" provision, requiring the following:

> The Charter School agrees (1) to be neutral regarding the unionization of any of its employees; the Charter School will not at any time express a position on the matter of whether its employees will be unionized nor will the Charter School threaten, intimidate, discriminate against, retaliate against, or take any adverse action against any employee based on their decision to support or oppose union representation, and (2) the Charter School will provide any Bona Fide Labor Organization access at reasonable times to areas in which the Charter School's employees work for the purpose of meeting with employees to discuss their right to representation, employment rights under the law, and terms and conditions of employment, and (3) union recognition shall be through a majority card check verified by a neutral third-party arbitrator mutually selected by the Charter School and the Bona Fide Labor

-19-

Organization through alternate striking from a panel of arbitrators provided by the Federal Mediation and Conciliation Service.

### *Plaintiff The Montessori School of Englewood*

68.     Montessori is a charter school authorized by CPS that has operated in the Englewood neighborhood of Chicago since 2012.

69.     The mission of Montessori includes providing a high-quality, nurturing, and inclusive educational environment that follows the Montessori method.  The Montessori method is central to Montessori's educational approach.

70.     Montessori is committed to creating an inclusive environment that celebrates diversity, promotes equity, and prepares students to be active, compassionate, and lifelong learners.

71.     Montessori's educational approach emphasizes self-directed activity, hands-on learning, and collaborative play. Students at Montessori are encouraged to make creative choices in their learning, while the classroom and the teacher offer age-appropriate activities to guide the process. This method helps develop critical thinking, independence, and a lifelong love for learning. Montessori serves a total of 420 PreK-8 students in its PreK Head Start program and CPS authorized K-8 grade program.

72.     Montessori serves an at-risk student population. 97.3% of Montessori's students qualify for free or reduced-cost lunch; 14% of its students are in temporary living situations; 23% of students are identified as diverse learners; and 17% are English-language learners.

73.     Montessori receives public tuition through CPS pursuant to its charter agreement, not directly from the State of Illinois.  In addition, Montessori receives private philanthropic funding and federal grants that support critical programs, including after-school and early childhood learning.  Certain Montessori employees and vendors are funded in whole or in part through non-

CPS funding sources. Additionally, certain Montessori employees support programs funded in whole or in part through non-CPS funding sources.

74. Montessori leases its campus from CPS pursuant to a lease agreement. Montessori has a contractual right to quiet enjoyment of its real property.

75. Montessori is a not-for-profit corporation registered in the State of Illinois that is governed by an independent board of directors. Members of Montessori's board of directors are selected in accordance with its bylaws. No Montessori board member is an elected official, and no board member is appointed or removable by CPS or any other governmental entity.

76. Montessori is not a political subdivision as defined by the NLRA.

77. CPS renewed Montessori's charter in January 2024. On or about March 11, 2024, however, Montessori received a draft charter renewal agreement from CPS.

78. The March 11, 2024 draft charter renewal agreement included a "union-neutrality" provision, requiring Montessori to agree to, among other things: (1) remain neutral with respect to any effort by employees to unionize; (2) provide bona fide labor organization reasonable access to areas where employees work for the purpose of communicating with employees regarding representation and terms and conditions of employment; and (3) recognize a union through a majority card check verified by a neutral third-party arbitrator selected from a panel provided by the Federal Mediation and Conciliation Service.

79. Montessori objected to the inclusion of this so-called union-neutrality provision because it imposed undue operational, financial, and legal burdens on Montessori. In September 2024, Montessori agreed to include the provision on a conditional basis that deferred application of the provision until final resolution of this judicial action. Similar conditional language was later proposed by other charter schools negotiating with CPS. CPS, however, subsequently rejected these

proposals.  CPS advised these Plaintiffs that it will no longer agree to any such proposals and informed Montessori and other charter schools that CPS would require immediate compliance with its so-called union-neutrality provision.

### *Plaintiff Namaste Charter School, Inc.*

80.     Namaste is a charter school authorized by CPS that has operated in the McKinley Park neighborhood of Chicago since 2004, serving students in  kindergarten through 8th grade.

81.     Namaste's mission is to promote curiosity and lifelong student success by implementing and sharing a holistic educational model.  Namaste was specifically designed to integrate physical fitness, nutrition, and healthy lifestyle disciplines with rigorous academic curricula to empower its students for lifelong success.

82.     Namaste operates based on four pillars: Nutrition, Health & Wellness; Balanced Learning; Language & Culture; and Collaborative Practice.

83.     Namaste serves an at-risk student population.  Sixty-nine percent of Namaste's students qualify for free or reduced-cost lunch; 32% of students are identified as diverse learners; and 43% of students have English as a second language.

84.     Namaste receives public tuition funding through CPS pursuant to its charter agreement.  In addition, Namaste receives privately raised philanthropic dollars, which support a number of its programs. Certain Namaste employees and vendors are funded in whole or in part through non-public tuition funding sources. Additionally, certain Namaste employees support programs funded in whole or in part through non-public tuition funding sources.

85.     Namaste leases its campus property.  Namaste has a contractual right to quiet enjoyment of its real property.

86.     Namaste is a not-for-profit corporation registered in the State of Illinois that is governed by an independent board of directors.  Namaste's board of directors is made up of

volunteers interested in Namaste's mission. Members of the board of directors are selected according to Namaste's bylaws. No Namaste board member is an elected official or accountable to any elected official. Neither CPS, nor any other state actor, has ever attempted to appoint or remove any member of the Namaste board of directors.

87. Namaste is not a political subdivision as defined by the NLRA.

88. In 2018, Namaste staff voted to unionize in a secret-ballot election administered by the NLRB. Namaste staff are currently represented by the Union. Since 2018, Namaste has entered into two collective bargaining agreements with the Union. The operating agreement contains a provision governing union access to Namaste's premises.

89. Namaste was approved for a renewed charter in January 2024 by its authorizer, CPS. Namaste received a draft charter renewal agreement from CPS on or about March 11, 2024.

90. The March 2024 draft charter renewal agreement included a "union-neutrality" provision, requiring Namaste to covenant and warrant that it shall comply with the following:

> Public Act 103-0416 regarding union neutrality, whereby the Charter School agrees (1) to be neutral regarding the unionization of any of its employees such that the Charter School will not at any time express a position on the matter of whether its employees will be unionized and such that the charter school will not threaten, intimidate, discriminate against, retaliate against, or take any adverse action against any employees based on their decision to support or oppose union representation; (2) to provide any bona fide labor organization access at reasonable times to areas in which the Charter School's employees work for the purpose of meeting with employees to discuss their right to representation, employment rights under the law, and terms and conditions of employment; and (3) that union recognition shall be through a majority card check verified by a neutral third-party arbitrator mutually selected by the charter school and the bona fide labor organization through alternate striking from a panel of arbitrators provided by the Federal Mediation and Conciliation Service.

91. Since the spring of 2024, Namaste and CPS have negotiated the language of the draft charter renewal agreement.

92.     On June 20, 2025, Namaste received an updated draft charter renewal agreement from CPS.  The June 2025 draft charter renewal agreement included an expanded "union-neutrality" provision, requiring Namaste to covenant and warrant that it shall comply with the following:

Public Act 103-0416 Regarding union neutrality, whereby the Charter School, any educational management organization or other entity operating on their behalf, and all persons in their management positions shall agree (1) to be and remain neutral regarding the unionization of any of its employees such that the school operator, management, or their agents will not at any time, Charter School will not at any time express a position on the matter of whether its employees will be unionized and such that the charter school will not threaten, intimidate, discriminate against, retaliate against, or take any adverse action against any employees based on their decision to support or oppose union representation; (2) to provide any bona fide labor organization access at reasonable times to non-work areas in which the Charter School's employees for the purpose of privately meeting with employees to discuss their right to representation, employment rights under the law, and terms and conditions of employment; and (3) that union recognition shall be through a majority card check verified by a neutral third-party arbitrator mutually selected by the charter school and the bona fide labor organization through alternate striking from a panel of arbitrators provided by the Federal Mediation and Conciliation Service.

Within ten (10) days following a written request from a bona fide labor organization, the Charter School shall provide a list of every employee in the specific job classifications requested who are eligible to organize under the National Labor Relations Act, including their, classification or job title, work address, work email address and telephone number used by the Charter School to contact the employee, in the unit of employees so requested. The bona fide labor organization agrees to use all information provided under this Agreement solely for internal union administration and communication purposes.

Upon a determination by the arbitrator that the labor organization represents a majority of the employees in the designated unit, the Charter School shall recognize the labor organization as the exclusive bargaining representative of the employees in the unit and enter into a written recognition agreement.

The Charter School and the labor organization shall submit any disputes related to Union Neutrality and to the Recognition Process to final and binding arbitration through a mutually-selected arbitrator or by alternately striking from a panel of arbitrators provided by the FMCS or by the AAA. Upon request of the labor organization, the arbitration shall be conducted in accordance with the FMCS expedited arbitration rules in effect as of the effective date of this Resolution. The arbitrator shall be empowered to fashion an appropriate remedy to any violation. The arbitrator's fees and expenses shall be paid by the losing party.

Following the voluntary recognition of a bona fide labor organization based on a showing of majority status, the Charter School shall not file or support any petition with the National Labor Relations Board that seeks to challenge the majority status of the bona fide labor organization within one year of the organization's initial request for recognition. Nothing in this provision shall be construed to limit the rights of employees under the National Labor Relations Act to file a decertification petition.

Any labor organization that is aggrieved by any violations of this Agreement shall have standing to bring suit in any court of competent jurisdiction to enforce the provisions of this Agreement.

The Charter School shall require that any contractors or entities performing construction or related work on a school shall sign a Project Labor Agreement for that work and pay at least the prevailing wage rate to all workers performing said work.

All contractors providing educational, clinical, health, food service, custodial, transportation, construction, and security services on-site for the Charter School shall, as a condition of such contract, consent to be bound by the terms of paragraphs 5.17.1 to 5.17.9 of this Agreement.

### *Plaintiff Chicago Charter School Foundation D/B/A Chicago International Charter School*

93.    Chicago International is a single charter school network of 13 schools. Chicago International partners with school management organizations to operate its campuses. Chicago International's portfolio model is built to blend the scale, accountability, and equity focus of a network with the innovation and local expertise of school operators. Because Chicago International utilizes school management organizations to operate its charter campuses, Chicago International does not employ any campus-based employees. All the campus-based employees involved in school operation are employees of the school management organizations with whom Chicago International contracts.

94.    Included in Chicago International's mission is providing high-quality instruction, whole-child development, and diverse programming in order to equip students with the knowledge, skills, and confidence to enter high school and to pursue college, career, or any path they proudly

choose. To that end, Chicago International's vision is to create schools in which students are not only engaged but empowered, where educators are valued and supported, and where families are confident that their children are thriving in a safe and joyful environment that nurtures, challenges, and prepares them for the futures they choose.

95. Chicago International's 13 elementary and high schools serve approximately 6,935 students throughout Chicago. Ninety-six percent of Chicago International's students are identified as students of color, 82% of Chicago International's students qualify for free or reduced-cost lunch, 27% of students are English-language learners, and 17% of students receive special-education services.

96. Chicago International receives public tuition funding through CPS pursuant to its charter agreement. In addition, Chicago International receives privately raised philanthropic dollars and federal grants, which support several critical programs. Certain Chicago International employees and vendors are funded in whole or in part through non-public tuition funding sources. Additionally, certain Chicago International employees support programs funded in whole or in part through non-public tuition funding sources.

97. Chicago International both owns and leases campus and office property. Chicago International has a right to quiet enjoyment of its real property.

98. Chicago International is a not-for-profit corporation registered in the State of Illinois that is governed by an independent board of directors. Chicago International's board of directors is made up of volunteers interested in Chicago International's mission. Members of the board of directors are selected according to Chicago International's bylaws. No Chicago International board member is an elected official or accountable to any elected official. Neither CPS, nor any other

state actor, has ever attempted to appoint or remove any member of the Chicago International board of directors.

99. Chicago International is not a political subdivision as defined by the NLRA.

100. Chicago International was approved for a renewed charter in January 2024 by its authorizer, CPS. Chicago International received a draft charter renewal agreement from CPS on or about March 11, 2024.

101. The March 2024 draft charter renewal agreement included a "union-neutrality" provision, requiring Chicago International to covenant and warrant that it shall comply with the following:

Public Act 103-0416 regarding union neutrality, whereby the Charter School agrees (1) to be neutral regarding the unionization of any of its employees such that the Charter School will not at any time express a position on the matter of whether its employees will be unionized and such that the charter school will not threaten, intimidate, discriminate against, retaliate against, or take any adverse action against any employees based on their decision to support or oppose union representation; (2) to provide any bona fide labor organization access at reasonable times to areas in which the Charter School's employees work for the purpose of meeting with employees to discuss their right to representation, employment rights under the law, and terms and conditions of employment; and (3) that union recognition shall be through a majority card check verified by a neutral third-party arbitrator mutually selected by the charter school and the bona fide labor organization through alternate striking from a panel of arbitrators provided by the Federal Mediation and Conciliation Service.

102. Since the spring of 2024, Chicago International and CPS have negotiated the language of the draft charter renewal agreement.

103. On August 11, 2025, Chicago International received an updated draft charter renewal agreement from CPS. The August 2025 draft charter renewal agreement included an expanded "union-neutrality" provision, requiring Chicago International to covenant and warrant that it shall comply with the following:

Public Act 103-0416 Regarding union neutrality, whereby the Charter School, any educational management organization or other entity operating on their behalf, and

all persons in their management positions shall agree (1) to be and remain neutral regarding the unionization of any of its employees such that the school operator, management, or their agents will not at any time, Charter School will not at any time express a position on the matter of whether its employees will be unionized and such that the charter school will not threaten, intimidate, discriminate against, retaliate against, or take any adverse action against any employees based on their decision to support or oppose union representation; (2) to provide any bona fide labor organization access at reasonable times to non-work areas in which the Charter School's employees for the purpose of privately meeting with employees to discuss their right to representation, employment rights under the law, and terms and conditions of employment; and (3) that union recognition shall be through a majority card check verified by a neutral third-party arbitrator mutually selected by the charter school and the bona fide labor organization through alternate striking from a panel of arbitrators provided by the Federal Mediation and Conciliation Service.

Within ten (10) days following a written request from a bona fide labor organization, the Charter School shall provide a list of every employee in the specific job classifications requested who are eligible to organize under the National Labor Relations Act, including their, classification or job title, work address, work email address and telephone number used by the Charter School to contact the employee, in the unit of employees so requested. The bona fide labor organization agrees to use all information provided under this Agreement solely for internal union administration and communication purposes.

Upon a determination by the arbitrator that the labor organization represents a majority of the employees in the designated unit, the Charter School shall recognize the labor organization as the exclusive bargaining representative of the employees in the unit and enter into a written recognition agreement.

The Charter School and the labor organization shall submit any disputes related to Union Neutrality and to the Recognition Process to final and binding arbitration through a mutually-selected arbitrator or by alternately striking from a panel of arbitrators provided by the FMCS or by the AAA. Upon request of the labor organization, the arbitration shall be conducted in accordance with the FMCS expedited arbitration rules in effect as of the effective date of this Resolution. The arbitrator shall be empowered to fashion an appropriate remedy to any violation. The arbitrator's fees and expenses shall be paid by the losing party.

Following the voluntary recognition of a bona fide labor organization based on a showing of majority status, the Charter School shall not file or support any petition with the National Labor Relations Board that seeks to challenge the majority status of the bona fide labor organization within one year of the organization's initial request for recognition. Nothing in this provision shall be construed to limit the rights of employees under the National Labor Relations Act to file a decertification petition.

Any labor organization that is aggrieved by any violations of this Agreement shall have standing to bring suit in any court of competent jurisdiction to enforce the provisions of this Agreement.

The Charter School shall require that any contractors or entities performing construction or related work on a school shall sign a Project Labor Agreement for that work and pay at least the prevailing wage rate to all workers performing said work.

All contractors providing educational, clinical, health, food service, custodial, transportation, construction, and security services on-site for the Charter School shall, as a condition of such contract, consent to be bound by the terms of paragraphs 5.17.1 to 5.17.9 of this Agreement.

104. Certain of the school management organizations under contract with Chicago International operate charter schools outside of Illinois. The overbroad language of the Resolution imposes its Neutrality Regulations on those organizations with respect to all their employees, including their employees outside of Illinois who have no involvement with CPS-authorized charter schools.

### *Plaintiff Noble Network of Charter Schools*

105. Noble operates 17 charter school campuses in Chicago, including 16 high schools serving grades 9 through 12 and one combined middle and high school serving grades 6 through 12. Noble's first campus opened in 1999 with 130 9th graders. Since then, Noble has grown to serve more than 12,000 students each year and over 31,000 alumni from all 77 communities in the city. Approximately 12% of CPS high school students attend a Noble school.

106. Noble's mission and vision is to ensure that all students have equitable and positive school experiences that equip them to complete college and lead choice-filled lives. Noble's core values are: Results, Respect, Follow-Through, Diversity, Equity & Inclusion, Humility, and Self-Awareness.

107. Noble serves an at-risk student population. Eighty-nine percent of Noble's students qualify for free or reduced-cost lunch, 18% of its students are identified as diverse learners, and

19% are multilingual learners. In addition, 99% of Noble's student population identify as students of color.

108. Notwithstanding these obstacles, in a 2023 Stanford University National Charter School Study, Noble was cited as a "gap-busting" school due to its high achievements in reading and math. The study concluded that students at Noble received the equivalent of 168 additional instruction days in math and 86 additional instruction days in reading when compared to traditional Illinois public schools.

109. Over its 25 years, Noble has had more than 31,000 graduates with more than 23,295 alumni enrolled in college. Additionally, since 2019, more than $3.3 billion in scholarship dollars has been awarded to Noble graduates.

110. Noble's class of 2024 received over 17,000 college acceptances, including 19 Posse Scholars and 13 QuestBridge Scholars. Noble's 2024 class of graduates also received approximately $325 million in scholarships to colleges and universities.

111. Noble receives public tuition funding through CPS pursuant to its charter agreement. In addition, Noble receives privately raised philanthropic dollars and federal grants, which support several critical programs, including its Summer of a Lifetime program, alumni support and college access, wrap-around services, athletic programming, technology initiatives, and mental health programming. Certain Noble employees and vendors are funded in whole or in part through non-public tuition funding sources. Additionally, certain Noble employees support programs funded in whole or in part through non-public tuition funding sources.

112. Noble owns three of its campuses and leases a number of properties, including campus properties, from a number of lessors, including CPS and the Catholic Bishop of Chicago. Noble has a right to quiet enjoyment of its real property.

-30-

113.    Noble is a not-for-profit corporation registered in the State of Illinois that is governed by an independent board of directors. Noble's board of directors is made up of volunteers interested in Noble's mission. Members of the board of directors are selected according to Noble's bylaws. No Noble board member is an elected official or accountable to any elected official. Neither CPS, nor any other state actor, has ever attempted to appoint or remove any member of the Noble board of directors.

114.    Noble is not a political subdivision as defined by the NLRA.

115.    Noble was approved for a renewed charter in January 2024 by its authorizer, CPS. Noble received a draft charter renewal agreement from CPS on or about March 6, 2024.

116.    The March 2024 draft charter renewal agreement included a "union-neutrality" provision, requiring Noble to covenant and warrant that it shall comply with the following:

> Public Act 103-0416 regarding union neutrality, whereby the Charter School agrees (1) to be neutral regarding the unionization of any of its employees such that the Charter School will not at any time express a position on the matter of whether its employees will be unionized and such that the charter school will not threaten, intimidate, discriminate against, retaliate against, or take any adverse action against any employees based on their decision to support or oppose union representation; (2) to provide any bona fide labor organization access at reasonable times to areas in which the Charter School's employees work for the purpose of meeting with employees to discuss their right to representation, employment rights under the law, and terms and conditions of employment; and (3) that union recognition shall be through a majority card check verified by a neutral third-party arbitrator mutually selected by the charter school and the bona fide labor organization through alternate striking from a panel of arbitrators provided by the Federal Mediation and Conciliation Service.

117.    Since the spring of 2024, Noble and CPS have negotiated the language of the draft charter renewal agreement.

118.    On June 13, 2025, Noble received an updated draft charter renewal agreement from CPS. The June 2025 draft charter renewal agreement included an expanded "union-neutrality" provision, requiring Noble to covenant and warrant that it shall comply with the following:

-31-

a.        Public Act 103-0416. Regarding union neutrality, whereby the Charter School, any educational management organization or other entity operating on their behalf, and all persons in their management positions shall agree (1) to be and remain neutral regarding the unionization of any of its employees such that the school operator, management, or their agents will not at any time, Charter School will not at any time express a position on the matter of whether its employees will be unionized and such that the charter school will not threaten, intimidate, discriminate against, retaliate against, or take any adverse action against any employees based on their decision to support or oppose union representation; (2) to provide any bona fide labor organization access at reasonable times to non-work areas in which the Charter School's employees for the purpose of privately meeting with employees to discuss their right to representation, employment rights under the law, and terms and conditions of employment; and (3) that union recognition shall be through a majority card check verified by a neutral third-party arbitrator mutually selected by the charter school and the bona fide labor organization through alternate striking from a panel of arbitrators provided by the Federal Mediation and Conciliation Service.

b.        Unionized Employee Records. Within ten (10) days following a written request from a bona fide labor organization, the Charter School shall provide a list of every employee in the specific job classifications requested who are eligible to organize under the National Labor Relations Act, including their, classification or job title, work address, work email address and telephone number used by the Charter School to contact the employee, in the unit of employees so requested. The bona fide labor organization agrees to use all information provided under this Agreement solely for internal union administration and communication purposes.

c.        Recognition and Bargaining Obligation. Upon written request from a bona fide labor organization, the Charter School shall recognize and bargain with a labor organization that establishes majority support (50% + 1) in its designated unit of unrepresented employees only after the absence of any disputes regarding the appropriate bargaining unit or, the showing of majority support. This recognition and bargaining obligation shall apply, provided the labor organization: i. Requests recognition for a unit of employees within its regular and historical craft jurisdiction; ii. Agrees in writing that the labor organization and its members will not engage in, support, encourage, or assist in any picketing, work stoppages, boycotts, or any other economic interference in aid of recognition of the labor organization as the exclusive bargaining representative; iii. Agrees in writing not to threaten, intimidate, or coerce employees to obtain authorization cards; iv. Agrees in writing that it will submit any disputes related to Union Neutrality and the Recognition Process to final and binding arbitration.

d.        Card Check Majority Support Verification. Within 30 days of a labor organization's written request, the charter school shall submit to card check majority support verification through a neutral mutually-selected arbitrator or by alternately striking from a panel of arbitrators provided by the Federal Mediation and Conciliation Service ("FMCS") or the American Arbitration Association ("AAA").

-32-

Any disputes pertaining to the appropriate unit and showing of majority support shall be decided by the arbitrator. The decision of the arbitrator shall be final and binding on all parties. The fees and costs of the arbitrator shall be equally apportioned to the charter operator and labor organization.

e.      Exclusive Bargaining Representative. Upon a determination by the arbitrator that the labor organization represents a majority of the employees in the designated unit, the Charter School shall recognize the labor organization as the exclusive bargaining representative of the employees in the unit and enter into a written recognition agreement.

f.      Arbitration. The Charter School and the labor organization shall submit any disputes related to Union Neutrality and to the Recognition Process to final and binding arbitration through a mutually-selected arbitrator or by alternately striking from a panel of arbitrators provided by the FMCS or by the AAA. Upon request of the labor organization, the arbitration shall be conducted in accordance with the FMCS expedited arbitration rules in effect as of the effective date of this Resolution. The arbitrator shall be empowered to fashion an appropriate remedy to any violation. The arbitrator's fees and expenses shall be paid by the losing party.

g.      Majority Status Challenge. Following the voluntary recognition of a bona fide labor organization based on a showing of majority status, the Charter School shall not file or support any petition with the National Labor Relations Board that seeks to challenge the majority status of the bona fide labor organization within one year of the organization's initial request for recognition. Nothing in this provision shall be construed to limit the rights of employees under the National Labor Relations Act to file a decertification petition.

h.      Standing. Any labor organization that is aggrieved by any violations of this Agreement shall have standing to bring suit in any court of competent jurisdiction to enforce the provisions of this Agreement.

i.      Project Labor Agreement. The Charter School shall require that any contractors or entities performing construction or related work on a school shall sign a Project Labor Agreement for that work and pay at least the prevailing wage rate to all workers performing said work.

j.      On-Site Contractor Requirements. All contractors providing educational, clinical, health, food service, custodial, transportation, construction, and security services on-site for the Charter School shall, as a condition of such contract, consent to be bound by the terms of paragraphs a-i of this Agreement."

***Plaintiff Great Lakes Academy Charter School***

119. Great Lakes Academy operates a K–8 charter school campus serving more than 575 students in Southeast Chicago. Great Lakes Academy's mission is to provide all students with the fundamental academic skills, critical-thinking ability, and strength of character to excel in high school, college, and a career of their choice. Great Lakes Academy empowers all of its students with the education today that they will need to change the world tomorrow.

120. Great Lakes Academy focuses on three core areas to grow its students: fundamental academics, critical thinking and problem solving, and strength of character. To that end, Great Lakes Academy operates based on five key virtues of gratitude, respect, excellence, attitude, and truthfulness. Through Great Lakes Academy's rigorous academic programs and character-building initiatives, Great Lakes Academy strives to cultivate responsible, compassionate, and well-rounded individuals.

121. Great Lakes Academy serves an at-risk student population. Eighty-three and one-half percent of Great Lakes Academy's students qualify for free or reduced-cost lunch, 9% do not have permanent or adequate homes, and 98% are Black or Hispanic.

122. Notwithstanding these obstacles, Great Lakes Academy leads its geographic peers in English language arts and math proficiency and operates as one of the top-performing schools in the district. To that end, 39% of Great Lakes Academy graduates are accepted into selective-enrollment high schools.

123. Great Lakes Academy receives public tuition funding through CPS pursuant to its charter agreement. In addition, Great Lakes Academy receives privately raised philanthropic dollars, which support a number of its programs. Certain Great Lakes Academy employees and vendors are funded in whole or in part through non-public tuition funding sources. Additionally,

certain Great Lakes Academy employees support programs funded in whole or in part through non-public tuition funding sources.

124.    Great Lakes Academy owns its campus property.  Great Lakes Academy has a right to quiet enjoyment of its real property.

125.    Great Lakes Academy is a not-for-profit corporation registered in the State of Illinois that is governed by an independent board of directors.  Great Lakes Academy's board of directors is made up of volunteers interested in Great Lakes Academy's mission.  Members of the board of directors are selected according to Great Lakes Academy's bylaws.  No Great Lakes Academy board member is an elected official or accountable to any elected official.  Neither CPS, nor any other state actor, has ever attempted to appoint or remove any member of the Great Lakes Academy board of directors.

126.    Great Lakes Academy is not a political subdivision as defined by the NLRA.

127.    Great Lakes Academy was approved for a renewed charter in January 2024 by its authorizer, CPS.  Great Lakes Academy received a draft charter renewal agreement from CPS on or about March 11, 2024.

128.    The March 2024 draft charter renewal agreement included a "union-neutrality" provision requiring Great Lakes Academy to covenant and warrant that it shall comply with the following:

> Public Act 103-0416 regarding union neutrality, whereby the Charter School agrees (1) to be neutral regarding the unionization of any of its employees such that the Charter School will not at any time express a position on the matter of whether its employees will be unionized and such that the charter school will not threaten, intimidate, discriminate against, retaliate against, or take any adverse action against any employees based on their decision to support or oppose union representation; (2) to provide any bona fide labor organization access at reasonable times to areas in which the Charter School's employees work for the purpose of meeting with employees to discuss their right to representation, employment rights under the law, and terms and conditions of employment; and (3) that union recognition shall be

through a majority card check verified by a neutral third-party arbitrator mutually selected by the charter school and the bona fide labor organization through alternate striking from a panel of arbitrators provided by the Federal Mediation and Conciliation Service.

129. Since the spring of 2024, Great Lakes Academy and CPS have negotiated the language of the draft charter renewal agreement.

130. On or about August 5, 2025, Great Lakes Academy received an updated draft charter renewal agreement from CPS. The August 2025 draft charter renewal agreement included an expanded "union-neutrality" provision, requiring Great Lakes Academy to covenant and warrant that it shall comply with the following:

> Public Act 103-0416 Regarding union neutrality, whereby the Charter School, any educational management organization or other entity operating on their behalf, and all persons in their management positions shall agree (1) to be and remain neutral regarding the unionization of any of its employees such that the school operator, management, or their agents will not at any time, Charter School will not at any time express a position on the matter of whether its employees will be unionized and such that the charter school will not threaten, intimidate, discriminate against, retaliate against, or take any adverse action against any employees based on their decision to support or oppose union representation; (2) to provide any bona fide labor organization access at reasonable times to non-work areas in which the Charter School's employees for the purpose of privately meeting with employees to discuss their right to representation, employment rights under the law, and terms and conditions of employment; and (3) that union recognition shall be through a majority card check verified by a neutral third-party arbitrator mutually selected by the charter school and the bona fide labor organization through alternate striking from a panel of arbitrators provided by the Federal Mediation and Conciliation Service.

> Within ten (10) days following a written request from a bona fide labor organization, the Charter School shall provide a list of every employee in the specific job classifications requested who are eligible to organize under the National Labor Relations Act, including their, classification or job title, work address, work email address and telephone number used by the Charter School to contact the employee, in the unit of employees so requested. The bona fide labor organization agrees to use all information provided under this Agreement solely for internal union administration and communication purposes.

> Upon a determination by the arbitrator that the labor organization represents a majority of the employees in the designated unit, the Charter School shall recognize the labor organization as the exclusive bargaining representative of the employees in the unit and enter into a written recognition agreement.

The Charter School and the labor organization shall submit any disputes related to Union Neutrality and to the Recognition Process to final and binding arbitration through a mutually-selected arbitrator or by alternately striking from a panel of arbitrators provided by the FMCS or by the AAA. Upon request of the labor organization, the arbitration shall be conducted in accordance with the FMCS expedited arbitration rules in effect as of the effective date of this Resolution. The arbitrator shall be empowered to fashion an appropriate remedy to any violation. The arbitrator's fees and expenses shall be paid by the losing party.

Following the voluntary recognition of a bona fide labor organization based on a showing of majority status, the Charter School shall not file or support any petition with the National Labor Relations Board that seeks to challenge the majority status of the bona fide labor organization within one year of the organization's initial request for recognition. Nothing in this provision shall be construed to limit the rights of employees under the National Labor Relations Act to file a decertification petition.

Any labor organization that is aggrieved by any violations of this Agreement shall have standing to bring suit in any court of competent jurisdiction to enforce the provisions of this Agreement.

The Charter School shall require that any contractors or entities performing construction or related work on a school shall sign a Project Labor Agreement for that work and pay at least the prevailing wage rate to all workers performing said work.

All contractors providing educational, clinical, health, food service, custodial, transportation, construction, and security services on-site for the Charter School shall, as a condition of such contract, consent to be bound by the terms of paragraphs 5.17.1 to 5.17.9 of this Agreement.

### *Plaintiff Perspectives Charter School*

131.     Perspectives operates four free, open-enrollment public charter schools serving over 1,800 students in grades 6–12 in the communities of Auburn Gresham, Bronzeville, and the South Loop.  Perspectives opened its first campus in 1997, becoming one of the first charter schools in Illinois.

132.     Perspectives' mission is to provide students with a rigorous and relevant education, based on the ethical principles of A Disciplined Life ("ADL," a model created by Perspectives'

founders), preparing them for life in a changing world and helping them further become intellectually reflective, caring, and ethical people engaged in a meaningful life.

133. Perspectives serves under-resourced communities. Ninety-eight and one-half percent of Perspectives's students qualify for free or reduced-cost lunch, 96.5% of Perspectives' students identify as Black, 20.9% of its students receive special-education services, and more than 90% of Perspectives' students, if zoned to their neighborhood schools, would attend schools with lower State Board performance ratings than Perspectives.

134. Notwithstanding these obstacles, 100% of Perspectives' seniors are accepted into college or postsecondary education, 36% of Perspectives' students earn college credit in high school, and approximately $30 million in scholarships was awarded to Perspectives' graduating class of 2025, including prestigious scholarships such as Gates, Babson, and Posse.

135. Perspectives has been recognized as a "Gap Busting" school by Stanford University, for its success in eliminating learning disparities and raising achievement.

136. Perspectives receives public tuition funding through CPS pursuant to its charter agreement. In addition, Perspectives receives privately raised philanthropic dollars and federal grants, which support a number of its critical programs, including certain wrap-around services, athletics, and after-school and summer-school programming. Certain Perspectives employees and vendors are funded in whole or in part through non-public tuition funding sources. Additionally, certain Perspectives employees support programs funded in whole or in part through non-public tuition funding sources.

137. Perspectives owns one of its campuses. Perspectives also leases the building and land for one of its campuses from CPS and leases the land for its third campus, but not the building, from CPS. Perspectives has a right to quiet enjoyment of its real property.

138. Perspectives is a not-for-profit corporation registered in the State of Illinois that is governed by an independent board of directors. Perspectives' board of directors is made up of volunteers interested in Perspectives' mission. Members of the board of directors are selected according to Perspectives' bylaws. No Perspectives board member is an elected official or accountable to any elected official. Neither CPS, nor any other state actor, has ever attempted to appoint or remove any member of the Perspectives board of directors.

139. Perspectives is not a political subdivision as defined by the NLRA.

140. Perspectives was approved for a renewed charter in May 2025 by its authorizer, CPS. Perspectives received a draft charter renewal agreement from CPS on or about July 28, 2025. The July 2025 draft charter renewal agreement included a "union-neutrality" provision, requiring Perspectives to covenant and warrant that it shall comply with the following:

> Public Act 103-0416. regarding union neutrality, whereby the Charter School, any educational management organization or other entity operating on their behalf, and all persons in their management positions shall agrees (1) to be and remain neutral regarding the unionization of any of its employees such that the school operator, management, or their agents will not at any time, Charter School will not at any time express a position on the matter of whether its employees will be unionized and such that the charter school will not threaten, intimidate, discriminate against, retaliate against, or take any adverse action against any employees based on their decision to support or oppose union representation; (2) to provide any bona fide labor organization access at reasonable times to non-work areas in which the Charter School's employees for the purpose of privately meeting with employees to discuss their right to representation, employment rights under the law, and terms and conditions of employment; and (3) that union recognition shall be through a majority card check verified by a neutral third-party arbitrator mutually selected by the charter school and the bona fide labor organization through alternate striking from a panel of arbitrators provided by the Federal Mediation and Conciliation Service.

> Unionized Employee Records. Within ten (10) days following a written request from a bona fide labor organization, the Charter School shall provide a list of every employee in the specific job classifications requested who are eligible to organize under the National Labor Relations Act, including their, classification or job title, work address, work email address and telephone number used by the Charter School to contact the employee, in the unit of employees so requested. The bona fide labor

organization agrees to use all information provided under this Agreement solely for internal union administration and communication purposes.

Recognition and Bargaining Obligation. Upon written request from a bona fide labor organization, the Charter School shall recognize and bargain with a labor organization that establishes majority support (50% + 1) in its designated unit of unrepresented employees only after the absence of any disputes regarding the appropriate bargaining unit or, the showing of majority support. This recognition and bargaining obligation shall apply, provided the labor organization: i. Requests recognition for a unit of employees within its regular and historical craft jurisdiction; ii. Agrees in writing that the labor organization and its members will not engage in, support, encourage, or assist in any picketing, work stoppages, boycotts, or any other economic interference in aid of recognition of the labor organization as the exclusive bargaining representative; iii. Agrees in writing not to threaten, intimidate, or coerce employees to obtain authorization cards; iv. Agrees in writing that it will submit any disputes related to Union Neutrality and the Recognition Process to final and binding arbitration.

Card Check Majority Support Verification. Within 30 days of a labor organization's written request, the charter school shall submit to card check majority support verification through a neutral mutually-selected arbitrator or by alternately striking from a panel of arbitrators provided by the Federal Mediation and Conciliation Service ("FMCS") or the American Arbitration Association ("AAA"). Any disputes pertaining to the appropriate unit and showing of majority support shall be decided by the arbitrator. The decision of the arbitrator shall be final and binding on all parties. The fees and costs of the arbitrator shall be equally apportioned to the charter operator and labor organization.

Exclusive Bargaining Representative. Upon a determination by the arbitrator that the labor organization represents a majority of the employees in the designated unit, the Charter School shall recognize the labor organization as the exclusive bargaining representative of the employees in the unit and enter into a written recognition agreement.

Arbitration. The Charter School and the labor organization shall submit any disputes related to Union Neutrality and to the Recognition Process to final and binding arbitration through a mutually-selected arbitrator or by alternately striking from a panel of arbitrators provided by the FMCS or by the AAA. Upon request of the labor organization, the arbitration shall be conducted in accordance with the FMCS expedited arbitration rules in effect as of the effective date of this Resolution. The arbitrator shall be empowered to fashion an appropriate remedy to any violation. The arbitrator's fees and expenses shall be paid by the losing party.

Majority Status Challenge. Following the voluntary recognition of a bona fide labor organization based on a showing of majority status, the Charter School shall not file or support any petition with the National Labor Relations Board that seeks to

-40-

challenge the majority status of the bona fide labor organization within one year of the organization's initial request for recognition. Nothing in this provision shall be construed to limit the rights of employees under the National Labor Relations Act to file a decertification petition.

Standing. Any labor organization that is aggrieved by any violations of this Agreement shall have standing to bring suit in any court of competent jurisdiction to enforce the provisions of this Agreement.

Project Labor Agreement. The Charter School shall require that any contractors or entities performing construction or related work on a school shall sign a Project Labor Agreement for that work and pay at least the prevailing wage rate to all workers performing said work.

On-Site Contractor Requirements. All contractors providing educational, clinical, health, food service, custodial, transportation, construction, and security services on-site for the Charter School shall, as a condition of such contract, consent to be bound by the terms of paragraphs 5.17.1 to 5.17.9 of this Agreement."

### *Plaintiff Catalyst Schools*

141.     Catalyst operates two charter school campuses providing college-preparatory and values-based K–12 education to approximately 1,620 students in the Austin and Chicago Lawn neighborhoods.

142.     Catalyst's mission is to holistically educate the young men and women entrusted to its care by a school community committed to teaching minds and touching hearts.  Catalyst is committed to teaching its scholars to live a life of leadership, meaning, and purpose, and to build a world that is just and peaceful.  Catalyst serves children living in communities challenged by the effects of discrimination and poverty.  Catalyst helps unlock the gift that is within each child by addressing the whole child: academic, social-emotional, physical, and psychological.  Catalyst's core values include relationships, rigor, results, and hope.

143.     Catalyst scholars are provided a rigorous academic curriculum with a heavy emphasis on balanced literacy and STEM (Science, Technology, Engineering, Math) education and frequent exposure to technology.

144. Catalyst supports scholars according to their individual needs. Eighty-four percent of Catalyst's scholars qualify for free or reduced-cost lunch, 15.5 % of its scholars are identified as diverse learners, and 19.4% are English-language learners.

145. Across Catalyst, scholars consistently outperform comparable CPS and charter schools on multiple key academic and culture indicators. At Catalyst's Maria elementary campus, math growth ranks in the 75th percentile statewide and math proficiency in the 69th percentile. At Catalyst's Circle Rock campus, English Language Arts proficiency ranks in the 74th percentile statewide and science proficiency in the 72nd percentile. Additionally, Catalyst scholars have substantially lower rates of chronic absenteeism and suspensions than CPS students overall.

146. Catalyst receives public tuition funding through CPS pursuant to its charter agreement. In addition, Catalyst receives privately raised philanthropic dollars and federal grants, which support a number of its critical programs, including after school programming, professional development, family programming, alumni support programs and summer school programming. Certain Catalyst employees and vendors are funded in whole or in part through non-public tuition funding sources. Additionally, certain Catalyst employees support programs funded in whole or in part through non-public tuition funding sources.

147. Catalyst owns its campuses. Catalyst has a right to quiet enjoyment of its real property.

148. Catalyst is a not-for-profit corporation registered in the State of Illinois that is governed by an independent board of directors. Catalyst's board of directors is made up of volunteers interested in Catalyst's mission. Members of the board of directors are selected according to Catalyst's bylaws. No Catalyst board member is an elected official or accountable to

any elected official. Neither CPS, nor any other state actor, has ever attempted to appoint or remove any member of the Catalyst board of directors.

149. Catalyst is not a political subdivision as defined by the NLRA.

150. Catalyst's Circle Rock elementary campus and Maria high school campus were approved for renewed charters in May 2025 by Catalyst's authorizer, CPS. Catalyst received draft charter renewal agreements from CPS on or about July 29, 2025.

151. The July 2025 draft charter renewal agreements included a "union-neutrality" provision, requiring Catalyst to covenant and warrant that it shall comply with the following:

Public Act 103-0416. regarding union neutrality, whereby the Charter School, any educational management organization or other entity operating on their behalf, and all persons in their management positions shall agrees (1) to be and remain neutral regarding the unionization of any of its employees such that the school operator, management, or their agents will not at any time, Charter School will not at any time express a position on the matter of whether its employees will be unionized and such that the charter school will not threaten, intimidate, discriminate against, retaliate against, or take any adverse action against any employees based on their decision to support or oppose union representation; (2) to provide any bona fide labor organization access at reasonable times to non-work areas in which the Charter School's employees for the purpose of privately meeting with employees to discuss their right to representation, employment rights under the law, and terms and conditions of employment; and (3) that union recognition shall be through a majority card check verified by a neutral third-party arbitrator mutually selected by the charter school and the bona fide labor organization through alternate striking from a panel of arbitrators provided by the Federal Mediation and Conciliation Service.

Unionized Employee Records. Within ten (10) days following a written request from a bona fide labor organization, the Charter School shall provide a list of every employee in the specific job classifications requested who are eligible to organize under the National Labor Relations Act, including their, classification or job title, work address, work email address and telephone number used by the Charter School to contact the employee, in the unit of employees so requested. The bona fide labor organization agrees to use all information provided under this Agreement solely for internal union administration and communication purposes.

Recognition and Bargaining Obligation. Upon written request from a bona fide labor organization, the Charter School shall recognize and bargain with a labor organization that establishes majority support (50% + 1) in its designated unit of unrepresented employees only after the absence of any disputes regarding the

appropriate bargaining unit or, the showing of majority support. This recognition and bargaining obligation shall apply, provided the labor organization: i. Requests recognition for a unit of employees within its regular and historical craft jurisdiction; ii. Agrees in writing that the labor organization and its members will not engage in, support, encourage, or assist in any picketing, work stoppages, boycotts, or any other economic interference in aid of recognition of the labor organization as the exclusive bargaining representative; iii. Agrees in writing not to threaten, intimidate, or coerce employees to obtain authorization cards; iv. Agrees in writing that it will submit any disputes related to Union Neutrality and the Recognition Process to final and binding arbitration.

Card Check Majority Support Verification. Within 30 days of a labor organization's written request, the charter school shall submit to card check majority support verification through a neutral mutually-selected arbitrator or by alternately striking from a panel of arbitrators provided by the Federal Mediation and Conciliation Service ("FMCS") or the American Arbitration Association ("AAA"). Any disputes pertaining to the appropriate unit and showing of majority support shall be decided by the arbitrator. The decision of the arbitrator shall be final and binding on all parties. The fees and costs of the arbitrator shall be equally apportioned to the charter operator and labor organization.

Exclusive Bargaining Representative. Upon a determination by the arbitrator that the labor organization represents a majority of the employees in the designated unit, the Charter School shall recognize the labor organization as the exclusive bargaining representative of the employees in the unit and enter into a written recognition agreement.

Arbitration. The Charter School and the labor organization shall submit any disputes related to Union Neutrality and to the Recognition Process to final and binding arbitration through a mutually-selected arbitrator or by alternately striking from a panel of arbitrators provided by the FMCS or by the AAA. Upon request of the labor organization, the arbitration shall be conducted in accordance with the FMCS expedited arbitration rules in effect as of the effective date of this Resolution. The arbitrator shall be empowered to fashion an appropriate remedy to any violation. The arbitrator's fees and expenses shall be paid by the losing party.

Majority Status Challenge. Following the voluntary recognition of a bona fide labor organization based on a showing of majority status, the Charter School shall not file or support any petition with the National Labor Relations Board that seeks to challenge the majority status of the bona fide labor organization within one year of the organization's initial request for recognition. Nothing in this provision shall be construed to limit the rights of employees under the National Labor Relations Act to file a decertification petition.

-44-

<u>Standing</u>. Any labor organization that is aggrieved by any violations of this Agreement shall have standing to bring suit in any court of competent jurisdiction to enforce the provisions of this Agreement.

<u>Project Labor Agreement</u>. The Charter School shall require that any contractors or entities performing construction or related work on a school shall sign a Project Labor Agreement for that work and pay at least the prevailing wage rate to all workers performing said work.

<u>On-Site Contractor Requirements</u>. All contractors providing educational, clinical, health, food service, custodial, transportation, construction, and security services on-site for the Charter School shall, as a condition of such contract, consent to be bound by the terms of paragraphs 5.17.1 to 5.17.9 of this Agreement."

### *Plaintiff Erie Elementary Charter School*

152.    Erie operates a K–8 charter school campus in the Humboldt Park community of Chicago.  Erie was born from Erie Neighborhood House, a comprehensive social service agency that promotes a just and inclusive society.  Erie opened its doors in 2005 as a K–5 school, expanding to serve students in grades 6–8 in 2010.

153.    Erie's mission is to foster the habits of Heart, Mind, and Work.  Erie builds Spanish proficiency and open doors to multicultural competence.  Erie's responsive environment and engaging curriculum educate and elevate students to confidently enter a path of lifelong learning. The habits of Heart, Mind, and Work are woven throughout Erie's curriculum and community culture.

154.    Erie provides students with comprehensive wrap-around services, including an innovative family therapy model and social-emotional programming, during the school day.

155.    Erie serves an at-risk student population.  Seventy-three percent of Erie's students qualify for free or reduced-cost lunch, 46% are English-language learners, and 96% identify as Black or Hispanic.  Nonetheless, Erie's targeted interventions have shown significant growth for its students, with improving academic outcomes.

156. Erie receives public tuition funding through CPS pursuant to its charter agreement. In addition, Erie receives privately raised philanthropic and grant dollars, which support a number of its programs. Certain Erie employees support programs funded with non-public tuition funding sources.

157. Erie owns its campus property. Erie has a right to quiet enjoyment of its real property.

158. Erie is a not-for-profit corporation registered in the State of Illinois that is governed by an independent board of directors. Erie's board of directors is made up of volunteers interested in Erie's mission. Members of the board of directors are selected according to Erie's bylaws. No Erie board member is an elected official or accountable to any elected official. Neither CPS, nor any other state actor, has ever attempted to appoint or remove any member of the Erie board of directors.

159. Erie is not a political subdivision as defined by the NLRA.

160. Erie was approved for a renewed charter in May 2025 by Erie's authorizer, CPS. Erie received draft charter renewal agreements from CPS on or about July 28, 2025.

161. The July 2025 draft charter renewal agreements included a "union-neutrality" provision, requiring Erie to covenant and warrant that it shall comply with the following:

Public Act 103-0416. regarding union neutrality, whereby the Charter School, any educational management organization or other entity operating on their behalf, and all persons in their management positions shall agrees (1) to be and remain neutral regarding the unionization of any of its employees such that the school operator, management, or their agents will not at any time, Charter School will not at any time express a position on the matter of whether its employees will be unionized and such that the charter school will not threaten, intimidate, discriminate against, retaliate against, or take any adverse action against any employees based on their decision to support or oppose union representation; (2) to provide any bona fide labor organization access at reasonable times to non-work areas in which the Charter School's employees for the purpose of privately meeting with employees to discuss their right to representation, employment rights under the law, and terms and

conditions of employment; and (3) that union recognition shall be through a majority card check verified by a neutral third-party arbitrator mutually selected by the charter school and the bona fide labor organization through alternate striking from a panel of arbitrators provided by the Federal Mediation and Conciliation Service.

Unionized Employee Records. Within ten (10) days following a written request from a bona fide labor organization, the Charter School shall provide a list of every employee in the specific job classifications requested who are eligible to organize under the National Labor Relations Act, including their, classification or job title, work address, work email address and telephone number used by the Charter School to contact the employee, in the unit of employees so requested. The bona fide labor organization agrees to use all information provided under this Agreement solely for internal union administration and communication purposes.

Recognition and Bargaining Obligation. Upon written request from a bona fide labor organization, the Charter School shall recognize and bargain with a labor organization that establishes majority support (50% + 1) in its designated unit of unrepresented employees only after the absence of any disputes regarding the appropriate bargaining unit or, the showing of majority support. This recognition and bargaining obligation shall apply, provided the labor organization: i. Requests recognition for a unit of employees within its regular and historical craft jurisdiction; ii. Agrees in writing that the labor organization and its members will not engage in, support, encourage, or assist in any picketing, work stoppages, boycotts, or any other economic interference in aid of recognition of the labor organization as the exclusive bargaining representative; iii. Agrees in writing not to threaten, intimidate, or coerce employees to obtain authorization cards; iv. Agrees in writing that it will submit any disputes related to Union Neutrality and the Recognition Process to final and binding arbitration.

Card Check Majority Support Verification. Within 30 days of a labor organization's written request, the charter school shall submit to card check majority support verification through a neutral mutually-selected arbitrator or by alternately striking from a panel of arbitrators provided by the Federal Mediation and Conciliation Service ("FMCS") or the American Arbitration Association ("AAA"). Any disputes pertaining to the appropriate unit and showing of majority support shall be decided by the arbitrator. The decision of the arbitrator shall be final and binding on all parties. The fees and costs of the arbitrator shall be equally apportioned to the charter operator and labor organization.

Exclusive Bargaining Representative. Upon a determination by the arbitrator that the labor organization represents a majority of the employees in the designated unit, the Charter School shall recognize the labor organization as the exclusive bargaining representative of the employees in the unit and enter into a written recognition agreement.

-47-

Arbitration. The Charter School and the labor organization shall submit any disputes related to Union Neutrality and to the Recognition Process to final and binding arbitration through a mutually-selected arbitrator or by alternately striking from a panel of arbitrators provided by the FMCS or by the AAA. Upon request of the labor organization, the arbitration shall be conducted in accordance with the FMCS expedited arbitration rules in effect as of the effective date of this Resolution. The arbitrator shall be empowered to fashion an appropriate remedy to any violation. The arbitrator's fees and expenses shall be paid by the losing party.

Majority Status Challenge. Following the voluntary recognition of a bona fide labor organization based on a showing of majority status, the Charter School shall not file or support any petition with the National Labor Relations Board that seeks to challenge the majority status of the bona fide labor organization within one year of the organization's initial request for recognition. Nothing in this provision shall be construed to limit the rights of employees under the National Labor Relations Act to file a decertification petition.

Standing. Any labor organization that is aggrieved by any violations of this Agreement shall have standing to bring suit in any court of competent jurisdiction to enforce the provisions of this Agreement.

Project Labor Agreement. The Charter School shall require that any contractors or entities performing construction or related work on a school shall sign a Project Labor Agreement for that work and pay at least the prevailing wage rate to all workers performing said work.

On-Site Contractor Requirements. All contractors providing educational, clinical, health, food service, custodial, transportation, construction, and security services on-site for the Charter School shall, as a condition of such contract, consent to be bound by the terms of paragraphs 5.17.1 to 5.17.9 of this Agreement.

## THE DEFENDANTS

162.    CPS is the governing entity for Chicago Public School District 299, which is a school district located in the Northern District of Illinois, organized pursuant to the Illinois School Code. CPS serves as the authorizer for 111 charter schools operating in the City of Chicago, including Montessori, Namaste, Chicago International, Noble, Perspectives, Great Lakes Academy, Catalyst, and Erie. CPS enacted the Resolution and is responsible for enforcing the Act's requirements in its contractual agreements with CPS-authorized charter schools.

-48-

163.    Tony Sanders is sued here in his official capacity as the Illinois State Superintendent of Education.  Sanders is the chief education officer of the State Board.  The State Board is the legal educational agency responsible for setting state policies and guidelines for public and private schools, preschool through grade 12.  The Illinois Charter Schools Law empowers the State Board to enforce various provisions of the law, including the power to reverse a local board's decision to revoke or not renew a charter based on the charter school's compliance with state law.  Illinois charter schools are additionally required to submit to the State Board copies of their annual audits and Form 990s.  In addition to its role with respect to enforcing the Charter Schools Law generally, the State Board serves as the authorizer for 11 charter schools operating in the State of Illinois, including Plaintiff Intrinsic's Downtown campus.  The State Board included the Act's so-called Neutrality Requirements in the draft charter agreement provided to Intrinsic.

164.    Defendants are governmental actors acting under color of state law for purposes of 42 U.S.C. § 1983.

## JURISDICTION AND VENUE

165.    This action for declaratory and injunctive relief arises under the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*; the National Labor Relations Act, 29 U.S.C. § 151 *et seq.*; the First and Fourteenth Amendments to the United States Constitution; Article VI, Clause 2 of the United States Constitution (the "Supremacy Clause"); 42 U.S.C. § 1983; and the Court's inherent equitable powers.

166.    The Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343 because Plaintiffs raise federal questions, including preemption by federal statute and federal constitutional violations.

167.    Pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2), venue is proper in this Court because all the Defendants are residents of the State of Illinois and because all or a substantial part of the events giving rise to the claim have occurred in this federal judicial district.

168.    A live and justiciable controversy exists between Plaintiffs and Defendants regarding the implementation and enforcement of the Neutrality Regulations.  Declaratory relief is authorized under 28 U.S.C. §§ 2201-2202 and Federal Rule of Civil Procedure 57.  Injunctive relief is authorized under Federal Rule of Civil Procedure 65 and the Court's inherent equitable powers.

**Allegations in Support of Permanent Injunctive Relief**

169.    Consistent with the Act's requirements, the renewal charter school agreements from CPS and the State Board include "union neutrality" clauses that are effective either immediately or upon final resolution of this judicial action.  Nonjudicial action is not an option for Plaintiffs.  The State Board informed one or more Plaintiffs that the State Board would not consider changes to the union neutrality provision.  CPS representatives also informed attorneys for certain of the Charter School Plaintiffs that CPS also is unwilling to consider changes to the union neutrality provision specified in the Charter Schools Law.

170.    With the promulgation by CPS of its Resolution, the renewal charter agreements for Namaste, Chicago International, Noble, Perspectives, Great Lakes Academy, Catalyst, and Erie include expanded "union neutrality" clauses as described herein.

171.    CPS and the State Board pressured the Charter School Plaintiffs to execute their renewal charter agreements.

172.    As a result of CPS and the State Board's actions (as implemented by Defendant Sanders), the Charter School Plaintiffs must presently choose to either (a) sign a charter that permits their continued funding but that violates federal law and the Constitution, or (b) refuse to sign a

renewal charter agreement containing the offending neutrality language, which would put their existence, including the education of their students and service to Illinois families, at risk.

173. Plaintiffs have no adequate or speedy remedy at law to correct or redress the violation of their rights under the United States Constitution by Defendants in their enactment and enforcement of the Neutrality Regulations.

174. The Neutrality Regulations deprive Plaintiffs of their constitutional and statutory rights and, in doing so, cause irreparable injury to Plaintiffs. Unless Defendants are enjoined from enforcing the Neutrality Regulations, Plaintiffs, their employees, their vendors, and their students will suffer irreparable injury.

175. The balance of equities weighs heavily in favor of Plaintiffs because implementation of the Act greatly harms charter schools and, without limitation, the families and students they serve, by denying charter school employers and employees their constitutional rights, while the absence of the Neutrality Regulations would not harm employees or any other parties. This is because the Neutrality Regulations take away federal constitutional and statutory rights of charter schools and their employees, while injunctive relief prohibiting the enforcement of the Neutrality Regulations would not change the status quo under which charter schools, their employees, and unions would retain their rights under the NLRA.

176. An injunction is also aligned with the public interest of preserving constitutional rights and complying with the NLRA.

177. Granting injunctive relief would permit Illinois charter schools, charter school employees, and charter school vendors to exercise their rights under the NLRA. Injunctive relief would also mean that charter schools—through their volunteer board members and leadership— could continue to exercise their constitutionally and statutorily protected right to freedom of speech,

giving charter school teachers and staff the opportunity to hear all sides of the debate regarding unionization. This would increase the flow of information and allow charter school employees to gain a comprehensive understanding of the nuances of unionization by getting access to both labor and employer-side perspectives.

178. Injunctive relief would further the strong public interest of encouraging—rather than censoring—robust political and ideological discourse about an issue of paramount importance in the education reform sector.

179. Implementation of the Neutrality Regulations also jeopardizes the public interest by denying Illinois charter school employees' federally protected right to vote in a secret-ballot election facilitated by the NLRB.

## CLAIMS FOR RELIEF

### COUNT I
### NLRA preemption
### (all Plaintiffs against all Defendants)

180. Plaintiffs incorporate and re-allege the allegations of all preceding paragraphs as if fully set forth in this paragraph.

181. The United States Congress has regulated the field of labor relations by passing the NLRA, which resulted in an integrated scheme of regulations governing labor relations in the private sector.

182. The NLRA provides an existing statutory and regulatory framework governing (i) employer speech related to unionization and (ii) the determination of majority status and union representation. The NLRB and the Supreme Court have established a regulatory framework governing employers' rights to deny property access to nonemployee union organizers and agents under the NLRA and other applicable law.

183.     In regulating the field of labor relations, Congress intended to preempt states from enacting legislation that regulates labor relations for private employers, including with respect to employer speech on labor-related issues, the determination of majority status and union representation, and employers' property rights with respect to nonemployee labor union representatives.

184.     Illinois public charter schools, including the Charter School Plaintiffs, are "employers" within the meaning of the NLRA and are subject to the NLRA's statutory provisions and regulations.

185.     The Neutrality Regulations purport to regulate conduct that falls within the scope of the NLRA.

186.     Specifically, because Section 8(c) of the NLRA expressly precludes regulation of speech about unionization except as permitted by the NLRA, Congress explicitly directed states to leave non-coercive labor-related speech unregulated.

187.     In addition to enacting the NLRA, including its permitted regulation through the NLRB, Congress intended for certain conduct, including conduct pertaining to private employers' assistance, promotion, or deterrence of union organizing, to be left unregulated and controlled instead by the free play of economic forces.

188.     The Neutrality Regulations prohibit Illinois charter schools, through their agents (including volunteer board members and individual school leaders), from speaking on issues related to their employees' unionization, establish union representation under "card-check" procedures rather than secret-ballot election, and grant nonemployee union organizers access to charter school property, even over the charter school's objection.

189.    The Neutrality Regulations contravene the intent of Congress to preempt state or municipality ability to regulate labor relations in the private sector.  The Neutrality Regulations regulate conduct that Congress intended to be unregulated and subject to the free play of economic forces.

190.    The Neutrality Regulations also disrupt the careful, established balance that the NLRA strikes between employers' property rights and the rights of third parties, such as labor unions, to access employers' property.  The Neutrality Regulations ignore and alter this purposeful balance by imposing access rights to labor unions that are directly inconsistent with employers' property rights that have been upheld under the NLRA and federal law.

191.    The Neutrality Regulations also deny charter school employers' and their employees' rights specifically protected by the NLRA, including with respect to employer speech and election procedures.  By doing so, the Neutrality Regulations regulate conduct and speech that is expressly regulated, and protected, by the NLRA.

192.    The Neutrality Regulations also conflict with Section 8(d) of the NLRA, which provides that the NLRA does not require employers and unions to enter into contractual agreements with one another.  29 U.S.C. § 159(d) (stating that the NLRA "does not compel either party to agree to a proposal or require the making of a concession.").  The Neutrality Regulations, by compelling charter schools to agree to certain contractual terms with unions, are inconsistent with Section 8(d) of the NLRA and interfere with conduct that Congress intended to be unregulated.

193.    Finally, the Neutrality Regulations interfere with the exclusive jurisdiction of the NLRB to construe and enforce the NLRA, including the NLRB's exclusive jurisdiction to determine whether an employer's conduct or speech violates the NLRA.

194.     The Neutrality Regulations are expressly intended as regulations that replace the existing framework of labor policy for charter school employers.  The Neutrality Regulations do not have the objective or effect of reducing costs, increasing the quality of services provided, or preventing interruptions in charter schools' service.  The Neutrality Regulations impose restrictions beyond the scope of services paid for by the state or CPS.  The Neutrality Regulations, therefore, enjoy no exception to federal preemption on the ground that the state and CPS are merely exercising legitimate market participation or police powers.  Instead, Defendants are engaging in naked regulation that is preempted by the NLRA and unconstitutional.

195.     The Neutrality Regulations, therefore, are preempted by the NLRA and unlawful under the Supremacy Clause of the United States Constitution, U.S. Constitution Article VI, Clause 2, and for that reason the Neutrality Regulations are unconstitutional and unenforceable.

196.     Acting under the color of state law and pursuant to the Resolution, Defendants CPS and Dr. Tony Sanders have sought to implement the Neutrality Regulations, which is a violation of Plaintiffs' rights as guaranteed by the United States Constitution.

197.     WHEREFORE, Plaintiffs pray that the Court (i) enter an Order declaring the Neutrality Regulations preempted by the NLRA and declaring that the Neutrality Regulations, facially and as applied to the Charter School Plaintiffs, violate the Supremacy Clause of the United States Constitution and for that reason are unconstitutional and void, (ii) enter an Order declaring that the Act, facially and as applied to the Charter School Plaintiffs, violates 42 U.S.C. § 1983, and (iii) enter a permanent injunction prohibiting Defendants from enforcing the Neutrality Regulations.

## COUNT II
### Violation of Freedom of Speech
### (all Plaintiffs against all Defendants)

198.     Plaintiffs incorporate and re-allege the allegations of paragraphs 1-179 as if fully set forth in this paragraph.

199.    The Act prohibits "charter schools"—through their agents—from speaking on issues related to unionization by requiring that charter schools agree not to "at any time express a position on the matter of whether its employees will be unionized[.]"  105 ILCS 5/27A-3.

200.    The Resolution prohibits charter school operators, any educational management organization or other entity operating on their behalf, and all persons in their management positions and their agents from speaking on issues related to unionization by requiring charter schools agree not to "at any time, directly or indirectly, express a position on whether its employees will be unionized."

201.    The Resolution's prohibition on speech also applies to "[a]ll contractors providing educational, clinical, health, food service, custodial, transportation, construction, and security services on-site for the charter school."

202.    The Neutrality Regulations' restriction on charter school speech is not limited to speech in connection with programs funded by state or municipal dollars.  The restrictions cover any speech by charter schools, or their agents, at any time and to anyone regarding the unionization of the schools' employees.  In the case of the Resolution, this restriction broadly extends to the speech of charter schools' on-site vendors as well.  The Neutrality Regulations accordingly regulate speech beyond any publicly funded programs.  In addition, the speech that the Neutrality Regulations restrict, speech about employee unionization, is ancillary to the educational programs that charter schools provide.

203.    Much of the affected speech about employee unionization is political and ideological in nature.  Additionally, the Neutrality Regulations' prohibition on charter schools expressing a position—either in favor of or against—on the matter of whether their employees will be unionized

is a content-based, prior restriction on the speech of charter schools and charter school employees, including the Charter School Plaintiffs.

204. The Illinois Charter Schools Law requires charter schools to be nonprofit entities or corporations, and that they be governed by a board of directors or other governing body. Each of the Charter School Plaintiffs is a nonprofit corporation, and each is governed by an independent board of directors.

205. The Charter School Plaintiffs, and all Illinois public charter schools, are run by private entities afforded the free-speech protections afforded under the First Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment. U.S. Const. amend. I ("Congress shall make no law . . . prohibiting the free exercise thereof; or abridging the freedom of speech . . . .").

206. Many charter schools in Illinois, including several of the Charter School Plaintiffs, have previously used their constitutionally protected free-speech rights to share their position on the unionization of their employees. If not for the Neutrality Regulations, and CPS and the State Board's attempts to implement the union-neutrality requirements, they would continue to do so.

207. The Neutrality Regulations' restriction on charter schools' speech deprives charter schools, including the Charter School Plaintiffs, of their constitutionally protected right to free speech under the First and Fourteenth Amendments to the United States Constitution by prohibiting them from discussing the unionization of their employees in any forum.

208. The Neutrality Regulations' content-based restrictions on speech are overbroad because they prohibit "any" expression of a position on the matter of employees unionizing, including political and ideological speech, and they restrict speech no matter to whom the speech

is directed. The restrictions also apply in every context, including beyond the scope of programs funded by state or municipal dollars.

209. The First Amendment's "most basic" principle is that "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 790-91 (2011) (quoting *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002)). "Content-based regulations" are those that "target speech based on its communicative content." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 766 (2018) ("*NIFLA*") (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)). Such laws "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Id.* Strict scrutiny is strict because "governments have 'no power to restrict expression because of its message, its ideas, its subject matter, or its content.'" *Id.*

210. The Supreme Court is also "deeply skeptical of laws that distinguis[h] among different speakers, allowing speech by some but not others." *NIFLA*, 585 U.S. at 777-78. Speaker-based laws "present serious First Amendment concerns" especially when they "[fall] upon only a small number" of speakers. *TBS v. FCC*, 512 U.S. 622, 659 (1994). The Neutrality Regulations are speaker-based in just this way. They do not forbid every speaker's opinion addressing the topic of organized labor; they apply only when the employer proposes to do so.

211. Because the Neutrality Regulations impose a content- and speaker-based speech restriction, they are "presumptively unconstitutional and may be justified only if the government proves that [it is] narrowly tailored to serve compelling state interests." *NIFLA*, 585 U.S. at 766. To survive strict judicial scrutiny, Defendants must show that they "adopt[ed] 'the least restrictive means of achieving a compelling state interest.'" *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021) (quoting *McCullen v. Coakley*, 573 U.S. 464, 478 (2014)). Strict scrutiny is "the

-58-

most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997).

212. The Neutrality Regulations do not survive strict scrutiny because they do not serve a compelling state interest and are both underinclusive and overinclusive with respect to any interest that might be invoked in this litigation.

213. The Neutrality Regulations prohibit charter schools from expressing "any opinion" on the issue of the unionization of their employees. Neither state lawmakers nor Defendants have cited a compelling state interest to justify that restriction. Inasmuch as the state is concerned about preventing threats, intimidation, or coercion against unionization, the Neutrality Regulations do too little—they restrict employer speech while leaving open the possibility of threats, intimidation, or coercion by others. At the same time, they do too much by suppressing innocuous employer speech on union issues that raise no concerns for intimidation or coercion.

214. More generally, the Neutrality Regulations are not the least restrictive means of addressing concerns over intimidation. The NLRA itself demonstrates that the state could have taken a narrower approach if preventing threats and intimidation had been its objective. In the NLRA, Congress recognized that restraint of employer speech on matters as important as labor rights risks grave constitutional concerns. It thus drafted the NLRA narrowly to avoid encroaching on speech rights and expressly provides that "[t]he expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice . . . if such expression contains no threat of reprisal or force or promise of benefit." 29 U.S.C. § 158(c). The NLRA adequately protects labor and employers alike in the contexts where it applies. There is thus no doubt that there is a less restrictive means that would be at least as effective in achieving any purpose being served.

215.    The speech restrictions furthermore run afoul of the United States Supreme Court "unconstitutional conditions" doctrine because they are not focused on programs that government can legitimately choose to fund.  Instead, they seek to leverage funding to regulate speech outside the contours of the program itself.  *See, e.g.*, *Rumsfeld v. F. for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 59 (2006); *Camelot Banquet Rooms, Inc. v. U.S. Small Bus. Admin.*, 24 F.4th 640, 650 (7th Cir. 2022).  Defendants' restraints on free speech imposed by the Neutrality Regulations are not narrowly tailored to a compelling government interest.

216.    Facially and as applied to the Charter School Plaintiffs, the Neutrality Regulations' prohibition of speech related to the unionization of employees is unconstitutional under the First Amendment to the United States Constitution and the unconstitutional conditions doctrine, as applied to the states through the Fourteenth Amendment.

217.    WHEREFORE, Plaintiffs respectfully ask that the Court (i) enter an Order declaring that the Neutrality Regulations, facially and as applied to the Charter School Plaintiffs, violate the First Amendment to the United States Constitution and for that reason are unconstitutional and void, (ii) enter an Order declaring that the Neutrality Regulations, facially and as applied to the Charter School Plaintiffs, violate 42 U.S.C. § 1983, and (iii) enter a permanent injunction prohibiting Defendants from enforcing the Neutrality Regulations.

**COUNT III**
**Violation of the Takings Clause**
**(the Charter School Plaintiffs against all Defendants)**

218.    The Charter School Plaintiffs incorporate and re-allege the allegations of paragraphs 1-179 as if fully set forth in this paragraph.

219.    Many charter schools in Illinois own their school properties, and other charter schools lease their school properties.  The same is true of the Charter School Plaintiffs.  Certain of

the Charter School Plaintiffs own all or some of their school properties. Other Charter School Plaintiffs lease their school properties, including from CPS, the Catholic Bishop, and other lessors.

220. The Charter School Plaintiffs have the right to quiet enjoyment of their school properties and the right to strictly regulate who enters their premises, under what conditions, and for what purpose.

221. For the safety of their students and staff, charter schools must have the ability to monitor visitors and restrict access to their property.

222. The right to exclude people from property is a fundamental element of charter schools' property rights, including, without limitation, to protect staff and students and to promote a safe, productive educational environment.

223. The Act, at 105 ILCS 5/27A-3, requires charter schools to agree to grant property access to nonemployee union organizers by requiring them "to provide any bona fide labor organization access at reasonable times to areas in which the charter school's employees work for the purpose of meeting with employees to discuss their right to representation, employment rights under the law, and terms and conditions of employment . . . ."

224. The Resolution requires charter schools to "provide any bona fide labor organization access at reasonable times to non-work areas utilized by the charter or contract school's employees for the purpose of privately meeting with employees to discuss their right to representation, employment rights under the law, and terms and conditions of employment." The Resolution applies these same requirements to any on-site vendor that the charter school contracts with.

225. The Neutrality Regulations' property access requirements apply to any location at which the charter school's employees work, regardless of whether the employees work on-site at a charter school campus, what their roles are, or whether their positions are funded with state or

municipal dollars. The Resolution's requirements apply to each work site of a charter school's on-site vendor, regardless of where the vendor employees work or whether their positions are funded with state or municipal dollars.

226. The Neutrality Regulations grant "bona fide labor organizations" the right to access a charter school's property, regardless of the charter school's wishes and without compensation to the charter schools.

227. The Neutrality Regulations' forced easement is without any regard to charter schools' safety concerns or their rights to quiet enjoyment. Charter schools additionally bear the burden of the Neutrality Regulations' property access requirements. Charter schools will need to absorb costs, including staffing costs—such as security and custodial costs—to accommodate the easement the Neutrality Regulations grant to an unlimited number of union representatives to access charter school real estate.

228. The Neutrality Regulations accordingly impose an obligation that restricts charter schools' right to determine who enters their premises and under what conditions.

229. The Neutrality Regulations' property access mandate is not for the purpose of legitimate police power. Instead, it effectively mandates that charter schools grant a property easement to unknown persons and that charter schools devote their resources, including private funds, to subsidize union speech and charter school property access.

230. The Fifth Amendment to the United States Constitution prohibits the taking of private property for public use, without just compensation. U.S. Const. amend. V.

231. The Neutrality Regulations' requirement that charter schools grant property access to unions restricts the charter schools' rights to use their own property and appropriates charter schools' rights to exclude. The Neutrality Regulations do so for the enjoyment of third parties

characterized as "bona fide labor organizations." The Neutrality Regulations do not further any legitimate police power access to private premises by the state. The Neutrality Regulations do not reflect any legitimate exercise of Defendants' purchasing power. The Neutrality Regulations are simply a *per se* taking of charter school real estate and funds.

232. A taking of private property interests like this passes constitutional muster only if the government provides just compensation, which Defendants' charter contracts do not provide. It is no answer to say that agreeing to intrusions on property is a condition of voluntary participation in a regulated program. That follows from the Supreme Court's "unconstitutional conditions doctrine," which prohibits the government from using a valuable government benefit (*i.e.*, participation in the charter school system) to "coerc[e]" a private party "into voluntarily giving up property for which the Fifth Amendment would otherwise require just compensation." *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 605 (2013). For example, a state may not "condition[] a building permit on the owner's deeding over a public right-of-way . . . ." *Id*. "Extortionate demands of this sort frustrate the Fifth Amendment right to just compensation, and the unconstitutional conditions doctrine prohibits them." *Id*. Just so here.

233. WHEREFORE, Plaintiffs respectfully ask that the Court (i) enter an Order declaring that the Neutrality Regulations, facially and as applied to the Charter School Plaintiffs, violate the Fifth and Fourteenth Amendments to the United States Constitution, and for that reason are unconstitutional and void, (ii) enter an Order declaring that the Act, facially and as applied to the Charter School Plaintiffs, violates 42 U.S.C. § 1983, and (iii) enter a permanent injunction prohibiting Defendants from enforcing the Neutrality Regulations.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully ask the Court to enter judgment against Defendants and to provide the following relief:

1. A declaration that facially, and as applied to the Charter School Plaintiffs, the Neutrality Regulations are preempted by the NLRA, in violation of the Supremacy Clause of the United States Constitution, and are thus unconstitutional and void;

2. A declaration that facially, and as applied to the Charter School Plaintiffs, the Neutrality Regulations violate the First, Fifth, and Fourteenth Amendments of the United States Constitution, and are thus unconstitutional and void;

3. A declaration that facially, and as applied to the Charter School Plaintiffs, the Act violates 42 U.S.C. § 1983;

4. Attorneys' fees, costs, and nominal damages pursuant to 42 U.S.C. § 1988;

5. A permanent injunction to stop Defendants and any person acting in concert with them from enforcing the Neutrality Regulations, facially and as applied to the Charter School Plaintiffs; and

6. Any other relief that the Court deems equitable and just in the circumstances.

Dated: May 5, 2026

PLAINTIFFS ILLINOIS NETWORK OF
CHARTER SCHOOLS, INTRINSIC
SCHOOLS, THE MONTESSORI NETWORK
D/B/A THE MONTESSORI SCHOOL OF
ENGLEWOOD, NAMASTE CHARTER
SCHOOL, INC., CHICAGO CHARTER
SCHOOL FOUNDATION D/B/A CHICAGO
INTERNATIONAL CHARTER SCHOOL,
NOBLE NETWORK OF CHARTER
SCHOOLS, GREAT LAKES ACADEMY
CHARTER SCHOOL, PERSPECTIVES
CHARTER SCHOOL, CATALYST
SCHOOLS, and ERIE ELEMENTARY
CHARTER SCHOOL

By: /s/ Michael L. Sullivan
    One of Their Attorneys

Michael L. Sullivan
Jon E. Klinghoffer
Meredith S. Kirshenbaum
GOLDBERG KOHN LTD.
55 East Monroe Street, Suite 3300
Chicago, Illinois 60603
(312) 201-4000
michael.sullivan@goldbergkohn.com
jon.klinghoffer@goldbergkohn.com
meredith.kirshenbaum@goldbergkohn.com

Kimball R. Anderson
Winston & Strawn LLP
300 N. LaSalle Drive, Suite 4600
Chicago, Illinois 60654
(312) 558-5858
kanderson@winston.com

Michael B. Kimberly
Winston & Strawn LLP
1901 L Street, N.W.
Washington, D.C. 20036-3506
(202) 282-5096
mkimberly@winston.com