**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

ILLINOIS NETWORK OF CHARTER SCHOOLS, INTRINSIC SCHOOLS, THE MONTESSORI NETWORK D/B/A THE MONTESSORI SCHOOL OF ENGLEWOOD, NAMASTE CHARTER SCHOOL, INC., CHICAGO CHARTER SCHOOL FOUNDATION D/B/A CHICAGO INTERNATIONAL CHARTER SCHOOL, NOBLE NETWORK OF CHARTER SCHOOLS, GREAT LAKES ACADEMY CHARTER SCHOOL, PERSPECTIVES CHARTER SCHOOL, CATALYST SCHOOLS, and ERIE ELEMENTARY CHARTER SCHOOL,

Plaintiffs,

v.

The BOARD OF EDUCATION OF THE CITY OF CHICAGO, and DR. TONY SANDERS, in his official capacity as the Illinois State Superintendent of Education,

Defendants.

Case No. 1:24-cv-05057

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR**
**MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Page


I. INTRODUCTION ..... 1

II. UNCONTESTED MATERIAL FACTS ..... 1

A. The Illinois Charter School Sector ..... 1

B. The Plaintiffs in This Action ..... 2

1. Plaintiff INCS ..... 2

2. The Charter School Plaintiffs ..... 2

III. RULE 56 SUMMARY JUDGMENT STANDARD ..... 3

IV. ARGUMENT ..... 4

A. The Neutrality Regulations ..... 4

B. Defendants' Neutrality Regulations Are Preempted by Federal Labor Law ..... 7

C. Defendants' Neutrality Regulations Violate The First Amendment (Free Speech) ..... 13

D. Defendants' Neutrality Regulations Violate The Takings Clause of the Fifth Amendment ..... 17

E. The Chicago Board of Education Is Liable Under Section 1983 ..... 20

F. Defendant Dr. Tony Sanders Is Liable Under Section 1983 ..... 21

G. Plaintiffs Have Standing To Sue ..... 22

H. Plaintiffs Have Met the Requirements for Injunctive Relief ..... 22

V. CONCLUSION ..... 23

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*ACLU of Ill. v. Alvarez*,
679 F.3d 583 (7th Cir. 2012) ........ 23

*Aeroground v. City & Cnty. of San Francisco*,
170 F. Supp. 2d 950 (N.D. Cal. 2001) ........ 12, 13

*Agency for Int'l Dev. v. Alliance For Open Soc'y Int'l, Inc.*,
570 U.S. 205 (2013) ........ 15, 16

*Ams. for Prosperity Found. v. Bonta*,
594 U.S. 595 (2021) ........ 14, 17

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ........ 3

*Apex Digital, Inc. v. Sears, Roebuck & Co.*,
735 F.3d 962 (7th Cir. 2013) ........ 4

*Ashcroft v. ACLU*,
535 U.S. 564 (2002) ........ 14

*BBLI Edison, LLC v. City of Chicago Dept. of Housing*,
2026 WL 2107132, ___ F.4th ___ (7th Cir., July 22, 2026) ........ 18

*Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*,
520 U.S. 397 (1997) ........ 20

*Bethesda Lutheran Homes & Servs., Inc. v. Leean*,
154 F.3d 716 (7th Cir. 1998) ........ 20

*Bldg. & Constr. Trades Council of the Metro. Dist. v. Associated Builders & Contractors of Massachusetts/Rhode Island, Inc.*,
507 U.S. 218 (1993) ........ 8, 9, 12

*Brown v. Ent. Merchs. Ass'n*,
564 U.S. 786 (2011) ........ 13, 14

*Cardinal Towing & Auto Repair, Inc. v. City of Bedford, Texas*,
180 F.3d 685 (5th Cir. 1999) ........ 8

*Carroll v. Lynch*,
698 F.3d 561 (7th Cir. 2012) ........ 4

*Cedar Point Nursery v. Hassid*,
594 U.S. 139 (2021)............................................................................................ 17, 18, 19

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)........................................................................................................ 3, 4

*Chamber of Com. of U.S.A. v. Brown*,
554 U.S. 60 (2008).......................................................................................................... 9, 10

*Chicago Women in Trades v. Trump*,
778 F. Supp. 3d 959 (N.D. Ill. 2025) ................................................................................ 16

*Christian Legal Soc'y v. Walker*,
453 F.3d 853 (7th Cir. 2006) ............................................................................................ 23

*City of Boerne v. Flores*,
521 U.S. 507 (1997)........................................................................................................... 14

*City of Chicago v. Sessions*,
321 F. Supp. 3d 855 (2018) .............................................................................................. 22

*Colfax Corp. v. Ill. State Toll Highway Auth.*,
79 F.3d 631 (7th Cir. 1996) .............................................................................................. 10

*Doe v. Holcomb*,
883 F.3d 971 (7th Cir. 2018) ............................................................................................ 21

*eBay Inc. v. MercExchange, L.L.C.*,
547 U.S. 388 (2006)........................................................................................................... 22

*Ex Parte Young*,
209 U.S. 123 (1908)........................................................................................................... 21

*Golden State Transit Corp. v. City of Los Angeles*,
475 U.S. 608 (1986)..................................................................................................... 12, 13

*Johnson v. Rancho Santiago Comty. Coll. Dist.*,
623 F.3d 1011 (9th Cir. 2010) ............................................................................................9

*Legal Servs. Corp. v. Velazquez*,
51 U.S. 533 (2001)............................................................................................................. 15

*Liebhart v. SPX Corp.*,
998 F.3d 772 (2021)........................................................................................................... 22

*Livadas v. Bradshaw*,
512 U.S. 107 (1994)........................................................................................................... 12

*Lodge 76, Int'l Ass'n of Machinists and Aero-Space Workers, AFL-CIO v. Wis. Emp. Rels. Comm'n*,
427 U.S. 132 (1976)........................................................................................................ 7, 13

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)........................................................................................................... 4

*McCullen v. Coakley*,
573 U.S. 464 (2014)......................................................................................................... 14

*Metro Milwaukee Ass'n of Commerce v. Milwaukee Cnty.*,
431 F.3d 277 (7th Cir. 2005) ............................................................................. 10, 11, 12

*Monell v. Dep't of Soc. Servs. of the City of New York*,
436 U.S. 658 (1978)......................................................................................................... 20

*N. Ill. Chapter of Associated Builders & Contractors, Inc. v. Lavin*,
431 F.3d 1004 (7th Cir. 2005) .......................................................................................... 11

*N.N. ex rel. S.S. v. Madison Metro. Sch.*,
670 F. Supp. 2d 927 (W.D. Wis. 2009) ..................................................................... 20, 21

*Nat'l Endowment for the Arts v. Finley*,
524 U.S. 569 (1998)......................................................................................................... 15

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
585 U.S. 755 (2018).................................................................................................. 14, 17

*Nat'l People's Action v. Vill. of Wilmette*,
914 F.2d 1008 (7th Cir. 1990) .......................................................................................... 23

*NLRB v. Gissel Packing Co.*,
395 U.S. 575 (1960)........................................................................................................... 7

*NLRB v. Nash-Finch Co.*,
404 U.S. 138 (1971)........................................................................................................... 7

*NLRB v. Natural Gas Utility District of Hawkins Cnty., Tenn.*,
402 U.S. 600 (1971)......................................................................................................... 22

*Nollan v. Calif. Coastal Comm'n*,
483 U.S. 825 (1987)......................................................................................................... 18

*Pembaur v. City of Cincinnati*,
475 U.S. 469 (1986).................................................................................................. 20, 21

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015)......................................................................................................... 14

*Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*,
547 U.S. 47 (2006) .......... 15

*Rust v. Sullivan*,
500 U.S. 173 (1991) .......... 14, 15, 16

*San Diego Bldg. Trades Council, Millmen's Union Local 2020 v. Garmon*,
359 U.S. 236 (1959) .......... 7, 13

*TBS v. FCC*,
512 U.S. 622 (1994) .......... 14

*United Oil Mfg. Co. v. N.L.R.B.*,
672 F.2d 1208 (3d Cir. 1982) .......... 7

*Voices for Int'l Bus. & Educ., Inc. v. NLRB*,
905 F.3d 770 (5th Cir. 2018) .......... 22

*Whole Woman's Health v. Jackson*,
595 U.S. 30 (2021) .......... 21

*Wis. Dept. of Indus. Labor & Hum. Rels. v. Gould Inc.*,
475 U.S. 282 (1986) .......... 9, 11

**Statutes**

20 ILCS 689/15(a)(3) .......... 11

105 ILCS 5/27A .......... 22

105 ILCS 5/27A-3 .......... passim

105 ILCS 5/27A-6 .......... 4, 5, 6, 19

105 ILCS 5/27A-7.5 .......... 19

105 ILCS 5/27A-7.10 .......... 19

29 U.S.C.A. § 158(c) .......... 7

29 U.S.C.A. § 159(c) and (d) .......... 7

42 U.S.C. § 1983 .......... 20, 21, 22

United States Constitution, Article VI, Clause 2 .......... 7

**Rules**

Fed. R. Civ. P. 56(a) .......... 3, 23

## I. INTRODUCTION

The Illinois Network of Charter Schools ("INCS") and certain Illinois charter schools identified in Plaintiffs' Second Amended Complaint (collectively, "Plaintiffs") claim that Defendant Dr. Tony Sanders's enforcement of Illinois Public Act 103-0416 (the "Act") and the Board of Education of the City of Chicago's ("CPS") enforcement of a "Resolution Addressing Various Improvements Needed To The Board's Authorization and Renewal of Charter Schools" (the "Resolution") (the Act and Resolution collectively referred to as Defendants' "Neutrality Regulations"), both of which mandate the inclusion of a "union neutrality clause" in charter agreements and charter renewals, violate federal law. (ECF No. 95.) Plaintiffs allege that: the National Labor Relations Act ("NLRA") preempts the Neutrality Regulations (Count I); the Neutrality Regulations violate Plaintiffs' First Amendment rights (Count II); and the Neutrality Regulations constitute an impermissible taking under the Fifth Amendment (Count III). Plaintiffs seek injunctive relief against enforcement of Defendants' Neutrality Regulations. *Id*.

## II. UNCONTESTED MATERIAL FACTS

### A. The Illinois Charter School Sector

Illinois charter schools are free, independent, neighborhood public schools open to all children in the state, including students who are English-language learners and students with disabilities. (PSMF ¶ 1.) Charter schools do not have special entrance requirements and do not charge tuition. (PSMF ¶ 1.) Illinois charter schools serve public-school students, but they are created and governed by private, not-for-profit 501(c)(3) entities. (PSMF ¶ 2.)

Illinois currently has more than 120 charter school campuses, collectively serving more than 50,000 students statewide. Most of these Illinois charter schools are authorized by the Board of Education or the City of Chicago ("CPS"). (PSMF ¶ 3.) More than eighty percent of Illinois

charter school students receive free, or reduced-cost lunch, and Illinois charter schools serve a vastly diverse student population. (PSMF ¶ 4.)

### B. The Plaintiffs in This Action

#### 1. Plaintiff INCS

Plaintiff INCS is a not-for-profit corporation headquartered and established with its principal place of business in Chicago, Illinois. (PSMF ¶ 6.) INCS is an umbrella organization with approximately 128 Illinois charter school campus members. Collectively, INCS's members constitute 100% of Illinois charter schools and serve over 50,000 students in Illinois. (PSMF ¶ 7.) INCS advocates for Illinois charter schools on a variety of subjects, including legislation related to charter school authorization and unionization of Illinois charter school employees. (PSMF ¶ 8.)

#### 2. The Charter School Plaintiffs

Each Charter School Plaintiff operates a charter school in Chicago. (PSMF ¶¶ 10, 16, 22, 29, 36, 43, 49, 54, 59.) Although some Plaintiffs operate only one charter school campus, others operate many. (PSMF ¶¶ 10, 16, 22, 29, 36, 43, 49, 54, 59.) Collectively, the Charter School Plaintiffs operate 42 charter school campuses in Chicago and serve over 25,500 students from Pre-K through 12th grade. (PSMF ¶ 9.) Each Charter School Plaintiff is a not-for-profit corporation registered in the State of Illinois and governed by an independent board of directors. (PSMF ¶¶ 13, 19, 25, 33, 40, 46, 52, 57, 62.) The Charter School Plaintiffs' boards of directors are made up of volunteers interested in their respective missions and selected according to their respective bylaws. (PSMF ¶¶ 13, 19, 25, 33, 40, 46, 52, 57, 62.) No board member for any of the Charter School Plaintiffs is an elected official or accountable to any elected official. (PSMF ¶¶ 13, 19, 25, 33, 40, 46, 52, 57, 62.) Neither CPS, the Illinois State Board of Education (the "State Board"), nor any other state actor has ever attempted to appoint or remove any member of any of the Charter School Plaintiffs' board of directors. (PSMF ¶¶ 13, 19, 25, 33, 40, 46, 52, 57, 62.)

Each Charter School Plaintiff has at least one campus authorized by CPS. (PSMF ¶¶ 10, 16, 22, 34, 41, 47, 53, 58, 63.) Plaintiff Intrinsic also has one campus authorized by the State Board. (PSMF ¶ 10.) All Charter School Plaintiffs receive public tuition from their authorizers, pursuant to their charter agreements. (PSMF ¶¶ 11, 17, 23, 31, 38, 44, 50, 55, 60.) In addition to their public tuition allotment, many Illinois charter schools receive supplemental funding. (PSMF ¶¶ 11, 17, 23, 31, 38, 44, 50, 55, 60.) Such funds can be in the form of private philanthropic grants and federal funding that support specific programs or services. (PSMF ¶¶ 11, 17, 23, 31, 38, 44, 50, 55, 60.) Indeed, all of the Charter School Plaintiffs receive privately raised philanthropic dollars and/or grants, which support a number of their programs, including, for example, alumni scholarships and post-secondary education support. (PSMF ¶¶ 11, 17, 23, 31, 38, 44, 50, 55, 60.) Certain of the Charter School Plaintiffs' employees and vendors are funded in whole or in part through non-public tuition funding sources, such as federal grants. Additionally, certain of the Charter School Plaintiffs' employees support programs funded in whole or in part through non-public tuition funding sources, such as federal Head Start programs, mental health programs, after-school and summer-school programming, alumni scholarships and other post-secondary support programming. (PSMF ¶¶ 11, 16, 17, 23, 31, 38, 44, 50, 55, 60.) All of the Charter School Plaintiffs own and/or lease real estate for the purpose of operating charter school campuses. (PSMF ¶¶ 12, 18, 24, 32, 39, 45, 51, 56, 61.)

## III. RULE 56 SUMMARY JUDGMENT STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact is not demonstrated by the mere existence of "some alleged factual dispute between the parties," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986), or by "some metaphysical doubt as to

the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The moving party bears the initial burden of demonstrating the lack of any genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the party moving for summary judgment demonstrates the absence of a disputed issue of material fact, "the burden shifts to the non-moving party to provide evidence of specific facts creating a genuine dispute." *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012). In ruling on a motion for summary judgment, the Court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party. *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013) (citation omitted).

## IV. ARGUMENT

### A. The Neutrality Regulations

The Act amended the Charter Schools Law and imposed so-called union neutrality on Illinois charter schools by requiring that new charter proposals and renewal charter agreements include a "union neutrality clause."[1] 105 ILCS 5/27A-6(c-10); 105 ILCS 5/27A-3. In particular, the Act prohibits charter schools from expressing "any opinion" on the issue of the unionization

---

[1] The Act defines a "union neutrality clause" as meaning:

> a provision whereby a charter school agrees: (1) to be neutral regarding the unionization of any of its employees, such that the charter school will not at any time express a position on the matter of whether its employees will be unionized and such that the charter school will not threaten, intimidate, discriminate against, retaliate against, or take any adverse action against any employees based on their decision to support or oppose union representation; (2) to provide any bona fide labor organization access at reasonable times to areas in which the charter school's employees work for the purpose of meeting with employees to discuss their right to representation, employment rights under the law, and terms and conditions of employment; and (3) that union recognition shall be through a majority card check verified by a neutral third-party arbitrator mutually selected by the charter school and the bona fide labor organization through alternate striking from a panel of arbitrators provided by the Federal Mediation and Conciliation Service. As used in this definition, "bona fide labor organization" means a labor organization recognized under the National Labor Relations Act or the Illinois Educational Labor Relations Act. As used in this definition, "employees" means non-represented, non-management, and non-confidential employees of a charter school.

105 ILCS 5/27A-3.

of their employees. 105 ILCS 5/27A-3. Despite restricting charter schools' ability to speak about the unionization of their employees on their own premises, the Act also grants a right to third-party union organizations to enter charter schools' private property to speak about unionization and solicit charter school employees and contractors for representation. *Id.* The Act also mandates union recognition through majority card check, rather than secret-ballot election. *Id.* The Act does not contain any restrictions on unions' ability to strike or engage in work stoppages. *Id.* The Act became effective on August 4, 2023.

On May 29, 2025, CPS promulgated the Resolution, which incorporates the Act's neutrality requirements but goes further by imposing additional requirements on charter schools authorized by CPS. (PSMF ¶ 64.) The Resolution applies the Act's neutrality requirements to charter school operators, educational management organizations, and their management and agents, and requires that all on-site vendors at charter schools comply with all "union neutrality" requirements as well. (PSMF ¶ 64.) The Resolution also requires charter schools to provide unions with certain employee information, including name, job title, and contact information. (PSMF ¶ 64.) The Resolution further imposes regulatory mechanisms for implementing the neutrality requirements, such as processes for verifying card-check support and litigating disputes related to union neutrality and recognition. (PSMF ¶ 64.)

The Neutrality Regulations' speech restriction is not limited to speech in connection with programs funded by state or municipal dollars. 105 ILCS 5/27A-6(c-10); 105 ILCS 5/27A-3; PSMF ¶ 64. Any charter school operating under an authorizing charter agreement, and each of its agents, is prohibited from expressing a position on the unionization of its employees, at any time, at any location, and to anyone. *Id.* The requirement that charter schools express no opinion regarding the unionization of employees applies to *all* employees, regardless of whether the

employees work on-site at a charter school campus, regardless of their roles, and regardless of whether their positions are funded with state or municipal dollars. *Id*.

The CPS Resolution goes further because it censors any on-site vendor the charter school contracts with, requiring that such vendors be "neutral" with respect to all the vendor's employees and at all times, regardless of where the vendor's employees work or whether their positions are funded with state or municipal dollars. (PSMF ¶ 64.) The Resolution applies broadly to vendors who work with charter schools outside the City of Chicago and, indeed, outside the State of Illinois. (PSMF ¶ 64.)[2]

Similarly, the Neutrality Regulations' card check requirement applies to all CPS charter school employees regardless of whether the employees work on-site at a charter school campus, regardless of their roles, and regardless of whether their positions are funded with state or municipal dollars. 105 ILCS 5/27A-6(c-10); 105 ILCS 5/27A-3; PSMF ¶ 64. The Resolution goes further, imposing card-check procedures also for all employees of any on-site vendor, regardless of whether the vendor's employees work on-site at a CPS-authorized charter school campus, regardless of their roles, and regardless of whether their positions are funded with private, federal, state, or municipal dollars. (PSMF ¶ 64.)

Each Charter School Plaintiff has received a draft charter school renewal contract that includes a "union neutrality clause," consistent with the Act's requirement. (PSMF ¶¶ 15, 21, 27, 34, 41, 47, 53, 58, 63.) Namaste, Chicago International, Noble, Great Lakes Academy, Perspectives, Catalyst, and Erie's draft charter agreements include expanded union neutrality clauses, consistent with the language of the Resolution. (PSMF ¶¶ 28, 35, 42, 48, 53, 58, 63.)

---

[2] Plaintiff Chicago International, for example, uses a school management vendor that manages charter school operations inside and outside the State of Illinois. (PSMF ¶ 30.)

### B. Defendants' Neutrality Regulations Are Preempted by Federal Labor Law

The Supremacy Clause of the United States Constitution, Article VI, Clause 2, resolves conflicts between state and federal law by dictating that federal authority takes precedence. Here, the relevant federal authority is found in the NLRA, which was enacted to federalize and bring uniformity to labor-management relations. *See NLRB v. Nash-Finch Co*., 404 U.S. 138, 144 (1971) (the NLRA is designed "to obtain uniform application of its substantive rules and to avoid the diversities and conflicts likely to result from a variety of local procedures and attitudes toward labor controversies") (internal quotations omitted).

In particular, Section 8(c) of the NLRA provides that the expression of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute an unfair labor practice, provided that such expression contains no threat of reprisal or force or promise of benefit. 29 U.S.C.A. § 158(c). Also important, Section 9(c) and (d) of the NLRA provide that any election by a union as an exclusive bargaining representative shall be by secret ballot of the employees in the bargaining unit. 29 U.S.C.A. § 159(c) and (d). *See NLRB v. Gissel Packing Co*., 395 U.S. 575, 602 (1960) ("The Board itself has recognized, and continues to do so here, that secret elections are generally the most satisfactory—indeed the preferred--method of ascertaining whether a union has majority support."); *United Oil Mfg. Co. v. N.L.R.B.*, 672 F.2d 1208, 1214 (3d Cir. 1982) (Adams, J. concurring) ("[A] fundamental tenet of national labor policy is that a [National Labor Relations] Board-supervised, secret ballot election is 'the preferred method of selecting bargaining representatives.'").

The Supreme Court in *Lodge 76, Int'l Ass'n of Machinists and Aero-Space Workers, AFL-CIO v. Wis. Emp. Rels. Comm'n*, 427 U.S. 132, 139 (1976) ("*Machinists*"), and *San Diego Bldg. Trades Council, Millmen's Union Local 2020 v. Garmon*, 359 U.S. 236, 244-45 (1959), made clear that the NLRA preempts states and local governments from regulating conduct, including speech,

protected by the NLRA or intended to be left unregulated by Congress. The U.S. Supreme Court, however, has carved out a limited exception to preemption when the state is acting as a market participant, as opposed to a regulator of labor policy. In *Bldg. & Constr. Trades Council of the Metro. Dist. v. Associated Builders & Contractors of Massachusetts/Rhode Island, Inc*., 507 U.S. 218 (1993) ("*Boston Harbor*"), the Supreme Court held that a state, acting solely as a proprietor buying construction services, and doing so to reduce the cost or increase the quality of those services, can impose contract terms that dictate labor relations. *Id*. at 226-27.

In *Boston Harbor*, the Court confronted a situation in which a state agency was under a judicial order to complete a specific construction project (the Boston Harbor project) within a set time frame. To prevent time-consuming work stoppages, the agency agreed to employ a union workforce in exchange for a no-strike guarantee – a process expressly permitted in the construction industry under Section 8(f) of the NLRA. *Boston Harbor* focused on two key questions: First, does the challenged action essentially reflect the government entity's own interest in efficient procurement of needed goods and services, as measured by comparison with the typical behavior of private parties in similar circumstances? Second, does the narrow scope of the challenged action defeat an inference that its primary goal was to encourage a general policy rather than address a specific proprietary problem? *See Cardinal Towing & Auto Repair, Inc. v. City of Bedford, Texas*, 180 F.3d 685, 693-94 (5th Cir. 1999) (summarizing the key questions posed by *Boston Harbor*). "Both questions seek to isolate a class of government interactions with the market that are so narrowly focused, and so in keeping with the ordinary behavior of private parties, that a regulatory impulse can be safely ruled out." *Id*. at 693. In *Boston Harbor*, the Court answered each question affirmatively.

The so-called "market participant" exception, as applied by the Supreme Court, is quite narrow, and the Supreme Court twice has rejected its application. In *Wis. Dept. of Indus. Labor & Hum. Rels. v. Gould Inc.*, 475 U.S. 282, 288-289 (1986), the Court held that a Wisconsin statute that prohibited the state from purchasing goods and services from three-time NLRA violators was preempted by the NLRA. Even though the use of state funds was implicated, the state's objective was to regulate labor law. Wisconsin's choice "to use its spending power rather than its police power d[id] not significantly lessen the inherent potential for conflict" between the state and federal labor law schemes. *Id.* at 289. *See also Johnson v. Rancho Santiago Comty. Coll. Dist.*, 623 F.3d 1011, 1026 (9th Cir. 2010) ("*Gould* establishes that, where the state seeks to affect private parties' conduct unrelated to the performance of contractual obligations to the state, the state's direct participation in the market does not reflect its interest in 'efficient procurement' of goods and services.").

Similarly, in *Chamber of Com. of U.S.A. v. Brown*, 554 U.S. 60 (2008), the Court held that a California statute that prohibited state grant recipients from using state funds to promote or oppose unionization was preempted by the NLRA. *Id.* at 63. The Court rejected California's argument that the statutory tie to state funds meant that California was acting as a market participant and therefore not subject to NLRA preemption. The Court observed that "[i]n contrast to a neutral affirmative requirement that funds be spent solely for purpose of the relevant grant or program, [the California statute] imposes a targeted negative restriction on employer speech about unionization." *Id.* at 70-71. The statute's legislative purpose clearly furthered labor policy, and not the efficient procurement of goods and services. This distinguished the case from *Boston Harbor*. *Id.* ("[i]n finding that the state agency had acted as a market participant [in *Boston Harbor*], we stressed that the challenged action 'was specifically tailored to one particular job,'

and aimed 'to ensure an efficient project that would be completed as quickly and effectively as possible at the lowest cost'").

The Seventh Circuit Court of Appeals has addressed the market participant exception in several cases, each involving government purchasing of construction services. In the first case, *Colfax Corp. v. Ill. State Toll Highway Auth.*, 79 F.3d 631 (7th Cir. 1996), the Court found no NLRA preemption where the Illinois Tollway Authority declined to contract with a company for a specific construction project because the company refused to enter into a project labor agreement, barring contractors from locking out employees and preventing workers from striking, picketing, and engaging in conduct which would delay construction. *Id*. at 632. In *Colfax*, the State of Illinois had not enacted a specific state statute or rule governing labor relations. The Court found no attempt by the State of Illinois to use its spending power to regulate labor law generally. Thus, the Illinois Tollway Authority's insistence on a project labor agreement survived NLRA preemption because the state was acting as a private contractor on a specific project. *Id*. at 635.

In *Metro Milwaukee Ass'n of Commerce v. Milwaukee Cnty.*, 431 F.3d 277 (7th Cir. 2005), the Court examined whether the NLRA preempted a Milwaukee ordinance requiring all Milwaukee County contractors providing building access to elderly and disabled county residents to enter a mandatory labor-peace agreement. The Court acknowledged that a state has the same interest as any other purchaser in posing conditions in contracts with its vendors that will benefit the state in its capacity as a buyer. A state, however, may not use its spending power "as a pretext for regulating labor relations." *Id*. at 279. In *Metro Milwaukee*, the Court held that the state had, in fact, used its spending power as a pretext for regulating labor relations, as evidenced by the ordinance's broad spillover effect. The ordinance covered not only the contractors' employees working on County contracts, but also the contractors' employees working on non-County

contracts. "This means that disputes arising out of the private contracts, though unrelated to any spending or procurement activity of the County, are in fact regulated by the labor-peace agreements and therefore made subject to the County's philosophy of labor relations." *Id*. This spillover effect meant that the ordinance was not designed to enable the County to get a better quality of services. Instead, the ordinance reflected an attempt to regulate labor relations generally. As the Seventh Circuit noted, a state cannot invoke its spending power to "condition payment to [a contractor] on his agreeing to submit to a scheme of labor relations that the state considers an improvement over the National Labor Relations Act." *Id*. at 279-80.

The Seventh Circuit also considered the market participation exception in *N. Ill. Chapter of Associated Builders & Contractors, Inc. v. Lavin*, 431 F.3d 1004 (7th Cir. 2005), where the State of Illinois subsidized with grants the construction or renovation of renewable fuel plants. One condition of a grant was that the recipient "enter into a project labor agreement." *Id.* at 1005. *See* 20 ILCS 689/15(a)(3). The Court observed that "[c]onditions on spending may become regulation if they affect conduct other than the financed project." *Lavin*, 431 F.3d at 1006, citing *Gould Inc*., 475 U.S. 282. The Court concluded that the Illinois statute was not preempted because, even though the State was funding less than 100 percent of the renewable fuel plants, it was "project specific," with no spillover effect on employees or contractors working on matters unrelated to construction or renovation of renewable fuel plants. *Id*. at 1007.

Here, the spillover effect of the Neutrality Regulations is manifest. The Neutrality Regulations spill over into all aspects of the Charter School Plaintiffs' operations, including all programs, locations, teachers, staff, and vendors, regardless of whether they are funded with state dollars. The Neutrality Regulations, for example, spillover to federal Head Start programs funded entirely by the federal government but staffed with Illinois charter school employees, as well as

other supplemental programming charter schools provide that is not funded with public tuition dollars, such as mental health, after-school and summer school programming, and post-secondary support programs and scholarships. (PSMF ¶¶ 11, 16, 17, 23, 31, 38, 44, 50, 55, 60.) The Resolution's spillover effect is even greater – regulating the conduct of vendors that contract with CPS-authorized charter schools, including those who operate charter schools outside the State of Illinois. (PSMF ¶ 30.) Thus, the Neutrality Regulations are not project specific. Defendants are simply using their spending power as a pretext for regulating labor relations well beyond the "project" specifically funded by the State of Illinois. This they cannot do under Seventh Circuit authority. *See Metro. Milwaukee*, 431 F.3d at 278. They also cannot do this under *Boston Harbor* (507 U.S. at 231-32) and its progeny. Simply stated, conditioning charter school authorization on compliance with the state's preferred labor framework is not market participation. Instead, it is regulation governing participation in a public program, and it is preempted by the NLRA. *See Golden State Transit Corp. v. City of Los Angeles*, 475 U.S. 608, 618 (1986) (conditioning renewal of cab franchise on settlement of labor dispute was preempted by NLRA); *see also Livadas v. Bradshaw*, 512 U.S. 107, 116 (1994) (a state rule predicating benefits on refraining from conduct protected by federal labor law poses special dangers of interference with congressional purpose.) The market participation exception, therefore, does not shield Defendants' restriction of employer speech from preemption under the NLRA.

Also not shielded by the market participation exception is the Neutrality Regulations' requirement that union recognition shall be through majority card check. 105 ILCS 5/27A-3 (definition of "Union neutrality clause"); CPS Resolution, Para. K. Card check verification eviscerates the NLRA requirement of secret balloting for bargaining unit recognition. As explained in *Aeroground v. City & Cnty. of San Francisco*, 170 F. Supp. 2d 950, 957 (N.D. Cal.

2001), a card check rule "controls the conditions under which … employers can contract with private third parties . . . ."

> The card check rule is thus remarkably similar to the city action at issue in *Golden State Transit Corp. v. City of Los Angeles*, 475 U.S. 608, 2016 S. Ct. 1395, 89 L.Ed.2d 616 (1986). In that case, Los Angeles conditioned the renewal of a taxicab franchise upon the settlement of a labor dispute. *Id*. at 609 -11, 106 S. Ct. 1395. The Supreme Court concluded that such a condition was preempted by the *Machinists* doctrine.

*Id*. Accordingly, the *Aeroground* court held that the defendants' card check rule was likely preempted by the NLRA because it applied uniformly to all employers at an airport and was not part of a particular project for which the county hired the plaintiff. *Id*. at 959. The county's card-check rule, therefore, did not reflect the acts of a government entity as a market participant. Instead, the rule reflected a government attempt to generally regulate labor law. *Id*.

So too here. Defendants' Neutrality Regulations, which mandate union card checks for all charter school employees, are not the legitimate acts of governmental entities acting as market participants. The union card check rules are not limited to employees working exclusively on teaching programs in Illinois funded by the State of Illinois or CPS. Neither the State of Illinois nor CPS is contracting for specific projects. These government entities are not acting to promote efficiency and to avoid disruptions of specific projects. Rather, they are just trying to impose their preferred version of labor law on Illinois charter schools. Under these circumstances, Defendants' mandated card check rules are preempted by the NLRA because they regulate conduct expressly protected by the NLRA or intended to be left unregulated by Congress. *Machinists*, 427 U.S. at 139; *Garmon*, 359 U.S. at 244-45.

### C. Defendants' Neutrality Regulations Violate The First Amendment (Free Speech)

The First Amendment's "most basic" principle is that "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Brown v. Ent.*

*Merchs. Ass'n*, 564 U.S. 786, 790-91 (2011) (quoting *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002). "Content-based regulations" are those that "target speech based on its communicative content." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 766 (2018) ("*NIFLA*") (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)). Such laws "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Id*. Scrutiny is strict because "governments have 'no power to restrict expression because of its message, its ideas, its subject matter, or its content.'" *Id*. The Supreme Court is "deeply skeptical of laws that distinguis[h] among different speakers, allowing speech by some but not others." *Id*. at 777-78. Speaker-based laws "present serious First Amendment concerns," especially when they "[fall] upon only a small number" of speakers. *TBS v. FCC*, 512 U.S. 622, 659 (1994).

State regulations that impose a content- and speaker-based speech restriction are "presumptively unconstitutional and may be justified only if the government proves that [it is] narrowly tailored to serve compelling state interests." *NIFLA*, 585 U.S. at 766. To survive strict judicial scrutiny, the State actors must show that they "adopt[ed] 'the least restrictive means of achieving a compelling state interest.'" *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021) (quoting *McCullen v. Coakley*, 573 U.S. 464, 478 (2014)). Strict scrutiny is "the most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997).

The Supreme Court has recognized a narrow exception to the presumption that state regulation of free speech is prohibited under the First Amendment. The exception is that the spending power of the federal or state government can be exercised to ensure that government funds are used by the funded program in the manner intended. *Rust v. Sullivan*, 500 U.S. 173, 193 (1991) ("The Government can, without violating the Constitution, selectively fund a program to

encourage certain activities it believes to be in the public interest, without at the same time funding an alternate program which seeks to deal with the problem in another way."). Thus, in *Rust*, the Court upheld restrictions on abortion-related speech in a family planning program to the extent that the program wanted to avail itself of federal funding for the program. *Id*. In *Rust*, the government insisted that public funds be spent for the purposes for which they were authorized, but the government did not restrict grantee recipients' speech outside of the government funding ("[t]he regulations govern the scope of the Title X *project's* activities, and leave the grantee unfettered in its other activities"). *Id.* at 196.

Government "may not deny a benefit to a person on a basis that infringes his constitutionally protected … freedom of speech even if he has no entitlement to that benefit." *Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 59 (2006). Stated similarly, "Congress cannot recast a condition on funding as a mere definition of its program in every case, lest the First Amendment be reduced to a simply semantic exercise." *Legal Servs. Corp. v. Velazquez*, 51 U.S. 533, 547 (2001). Government cannot "leverage its power to award subsidies on the basis of subjective criteria into a penalty on disfavored viewpoints or ai[m] at the suppression of dangerous ideas." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587 (1998). Although the government enjoys discretion in choosing which programs to fund, government is not free to terminate funding based on viewpoint discrimination. *Id*.

The line between constitutional program funding requirements and unconstitutional funding conditions "is not always self-evident." *Agency for Int'l Dev. v. Alliance For Open Soc'y Int'l, Inc*., 570 U.S. 205, 206 (2013). The relevant distinction "is between conditions that define the limits of the government spending program—those that specify the activities Congress wants to subsidize—and conditions that seek to leverage funding to regulate speech outside the contours

of the program itself. *Id*. at 214-15. As stated in *Rust*, "our 'unconstitutional conditions' cases involve situations in which the Government has placed a condition on the *recipient* of the subsidy rather than on a particular program or service, thus effectively prohibiting the recipient from engaging in the protected conduct outside the scope of the federally funded program." 500 U.S. at 197.

Recently, in *Chicago Women in Trades v. Trump*, 778 F. Supp. 3d 959 (N.D. Ill. 2025), the district court aptly summarized the "unconstitutional conditions" doctrine as follows:

> [T]he government may not use funding conditions to regulate speech generally. Although the government may use conditions to define the federal program, it may not reach outside the program to influence speech. Funding conditions can result in an unconstitutional burden on First Amendment rights when the government goes beyond defining the limits of the Government spending program and extends to leveraging funding to regulate speech outside the contours of the federal program itself.

*Id*. at 983 (internal citations omitted). Accordingly, the district court preliminarily enjoined the United States Department of Labor from requiring government grantees/contractors to certify, among other things, that it will cease all activities, including speech, related to diversity, equity and inclusion. *Id*. at 994.

Here, the Neutrality Regulations do not survive scrutiny under the First Amendment. Defendants' Neutrality Regulations are unconstitutional because they limit speech outside the scope of the charter school educational programs. The breadth of the restrictions means that charter schools must forfeit their First Amendment rights to speak on the topic of employee unionization, regardless of the audience or the funds used to further the speech, and in perpetuity. The forfeiture spills outside the funded education program and regulates the speech of not only staff salaries funded, in part, by Defendants, but also the teachers, staff, vendors, and contractors funded in whole, or in part, by the federal government and private philanthropy. This spill-over effect makes clear that Defendants' Neutrality Regulations have nothing to do with programming

for the instruction of children. They are a naked attempt to leverage funding to regulate speech outside the scope of educational programs and into the field of federally protected employer/employee speech. This spill-over effect is unconstitutional under bedrock First Amendment jurisprudence.

Equally problematic is that Defendants' Neutrality Regulations "distinguis[h] among different speakers, allowing speech by some but not others." *NIFLA*, 585 U.S. at 777-78. These Regulations mandate that Illinois charter schools allow union access to private property for the purpose of promoting unionization, all the while prohibiting charter schools from speaking on the same subject on their own property. Speaker-based speech restriction is "presumptively unconstitutional," and may survive strict scrutiny only if the state actors prove that they implemented the least restrictive means of achieving a compelling state interest. *Ams. For Prosperity Found.*, 594 U.S. at 607. Here, Defendants' Neutrality Regulations are speaker-based restrictions that do not survive strict scrutiny under well-settled United States Supreme Court jurisprudence.

### D. Defendants' Neutrality Regulations Violate The Takings Clause of the Fifth Amendment

The Takings Clause of the Fifth Amendment, applicable to the States through the Fourteenth Amendment, provides: "[N]or shall private property be taken for public use, without just compensation." *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 147 (2021). The Founders recognized that the protection of private property is indispensable to the promotion of individual freedom. As John Adams put it, "[p]roperty must be secured or liberty cannot exist." *Id.*; Discourses on Davila, in 6 Works of John Adams 280 (C. Adams ed. 1851). Accordingly, the Supreme Court has held that the government implicates the Takings Clause when the government imposes regulations that restrict an owner's ability to use his own property. *Id*. at 152-53.

As recognized in *Cedar Point*, however, a property owner's right to protect private property is not absolute. The government may require property owners to cede a right of access as a condition of receiving certain benefits without causing a taking. *Id*. The Court, however, has limited that right of access to legitimate exercises of police powers and to the access necessary for reasonable health and safety inspection. *Id*. at 161 ("When the government conditions the grant of a benefit such as a permit, license, or registration on allowing access for reasonable health and safety inspections, both the nexus and rough proportionality requirements of the constitutional conditions framework should not be difficult to satisfy.").

Applying this framework for addressing Takings Clause claims, the Court in *Cedar Point* invalidated a California regulation granting labor organizations a right of access to an agricultural employer's property in order to solicit support for unionization. The Court held that this regulation constituted an unconstitutional per se taking under the Fifth and Fourteenth Amendments. The Court concluded:

> Unlike a law enforcement search, no traditional background principle of property law requires the growers to admit union organizers on to their premises. And unlike standard health and safety inspections, the access regulation is not germane to any benefit provided to agricultural employers or any risk posed to the public.

*Id*. at 162. *See also BBLI Edison, LLC v. City of Chicago Dept. of Housing*, No. 25-1713, 2026 WL 2107132, at *2, ___ F.4th ___ (7th Cir., July 22, 2026) (Fifth Amendment Takings Clause "extend[s] to forced temporary occupations."); *Nollan v. Calif. Coastal Comm'n*, 483 U.S. 825, 835 (1987) (Fifth Amendment Takings Clause violated where state granted an easement for the public to cross private beach property and where such easement had no reasonable nexus to a legitimate use of state police powers).

Like in *Cedar Point*, Defendants' Neutrality Regulations constitute an unconstitutional taking. To be sure, the government may require property owners to cede a right of access to the

government as a condition of receiving certain benefits, without causing a taking. That exception to the Takings Clause is narrow. The *Cedar Point* court explained that this exception only applies when the State is exercising a legitimate police power, such as health and safety inspection. The access to real property granted by the state must be proportional to the legitimate police powers. In *Cedar Point*, the Court noted that, unlike standard health and safety inspections, the California farm access regulation was not germane to any benefit provided to agricultural employers or any risk posed to the public.

So too here, Defendants' Neutrality Regulations are not germane to teaching children or to any risk posed to the children or the public. Defendants' Neutrality Regulations have nothing to do with the exercise of legitimate police power. Instead, the Neutrality Regulations effectively grant an easement to private, charter school property, not to the State or the City, but to third parties; namely, private labor unions that have no health, safety, or other legitimate police powers.

Moreover, Plaintiffs' participation in Defendants' regulatory regime is anything but voluntary. To operate charter schools, the Charter School Plaintiffs must contract with CPS and/or the State Board. 105 ILCS 5/27A-3, 105 ILCS 5/27A-6; 105 ILCS 5/27A-7.5; 105 ILCS 5/27A-7.10. There are no alternative government bodies that can authorize these charter schools and thus no alternative markets for operating as an Illinois charter school. *Id*. The Charter School Plaintiffs either must agree to the easement or they lose their charter.

This is like telling doctors that they cannot renew their license to practice medicine in the State of Illinois, even if they are otherwise qualified, unless they consent to allow unions broad access to private medical centers for the purpose of unionizing the staff. That doctors may have a choice to renew or not renew their medical license is of no constitutional importance. Here too, Defendants' real estate easement is unconstitutional.

### E. The Chicago Board of Education Is Liable Under Section 1983

Individuals may sue state or local government officials in federal court for violating their constitutional or federal rights while acting "under color of law." 42 U.S.C. § 1983. The Supreme Court, however, has held that municipalities are liable only when a constitutional deprivation results from an official policy or custom. *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 691-92 (1978). "Once a municipal policy is established, it requires only one application . . . to satisfy fully Monell's requirement that a municipal corporation be held liable only for constitutional violations resulting from the municipality's official policy." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 n.6 (1986). The plaintiff must show that municipal action was the "moving force" behind the federal rights violation. *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 404 (1997).

The Seventh Circuit has extrapolated from this "moving force" language the rule that "[w]hen the municipality is acting under compulsion of state or federal law, it is the policy contained in that state or federal law, rather than anything devised or adopted by the municipality, which is responsible for the injury." *Bethesda Lutheran Homes & Servs., Inc. v. Leean*, 154 F.3d 716, 718 (7th Cir. 1998). When a municipality exercises discretion in enforcing a state law and goes beyond that mandated by state law, then liability can arise from unconstitutional policies. *Id.*

That is what happened in *N.N. ex rel. S.S. v. Madison Metro. Sch.*, 670 F. Supp. 2d 927 (W.D. Wis. 2009), where the school district did more than just enforce state law. As stated by the court in that case, "the difference between this case and *Bethesda Lutheran* is that the defendant was not simply applying § 118.51(7) [Wisconsin Statute] directly but applying its own interpretation of the law in its own guidelines." *Id*. at 937. The district court further stated: "[i]f defendant had 'various alternatives' in front of it, some constitutional, some not, but it made the 'deliberate choice to follow a course of action' that violated the Constitution, *Pembaur*, 475 U.S.

at 483, 106 S. Ct. 1292, that would weigh heavily in favor of finding that defendant adopted an unconstitutional policy that caused plaintiff's injury." *Id*.

Here, Defendant Chicago Board of Education adopted the Resolution on May 29, 2025, which goes beyond merely enforcing the Illinois state statute requiring a union neutrality clause in charter school contracts. For example, under the Resolution, Chicago charter schools must now allow union access to "non-work areas," and must provide lists of every employee in the specific classifications requested who are eligible to organize under the NLRA, including personal contact information. Moreover, within 30 days of a labor organization's written request, the charter school must submit to a card check majority support verification through a neutral, mutually selected arbitrator. Thus, the Resolution requires Chicago charter schools, including each of the Charter School Plaintiffs, to expand the places where unions have access, to publish individual employee contact information and to submit to labor arbitration. The Resolution even covers Chicago charter school vendors who may or may not be funded by CPS. CPS, therefore, made a deliberate choice to expand the so-called "union neutrality" requirements under state law. Under these circumstances, CPS is liable as a "moving force" under 42 U.S.C. § 1983.

### F. Defendant Dr. Tony Sanders Is Liable Under Section 1983

State officials are generally immune from suit in their official capacities under the Eleventh Amendment. *Whole Woman's Health v. Jackson*, 595 U.S. 30, 39 (2021). Under *Ex Parte Young*, however, a plaintiff may sue state officials to enjoin enforcement of an allegedly unconstitutional statute where the official has "some connection with the enforcement of the act." 209 U.S. 123, 157, 159-61 (1908). In other words, the named state official must play some role in enforcing the statute. *Doe v. Holcomb*, 883 F.3d 971, 975 (7th Cir. 2018).

Here, Defendant Dr. Tony Sanders is the State Superintendent of Education appointed by the Illinois State Board of Education to administer the policies and procedures of the State Board.

The State Board is the state agency charged by statute with administering the State of Illinois Charter Schools Law, 105 ILCS 5/27A, which includes the so-called "union neutrality" provision at issue in this action. In addition, the State Board is the authorizer of, and charter counterparty to, Plaintiff Intrinsic's downtown campus. (PSMF ¶ 10.) Under these circumstances, Dr. Tony Sanders is liable under 42 U.S.C. § 1983.

### G. Plaintiffs Have Standing To Sue

For the reasons stated in this Court's Memorandum Opinion and Order (ECF No. 79, at 7-8), Plaintiffs have standing to sue, they do not constitute political subdivisions, and they are "employers" subject to the NLRA. *See also Voices for Int'l Bus. & Educ., Inc. v. NLRB*, 905 F.3d 770, 777 (5th Cir. 2018) (collecting NLRB cases from many jurisdictions validating NLRA jurisdiction over charter schools under the Supreme Court's test in *NLRB v. Natural Gas Utility District of Hawkins Cnty., Tenn.*, 402 U.S. 600 (1971)).

### H. Plaintiffs Have Met the Requirements for Injunctive Relief

The Seventh Circuit applies the traditional four-factor equitable test articulated by the Supreme Court for permanent injunctive relief. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). A plaintiff must demonstrate "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Liebhart v. SPX Corp.*, 998 F.3d 772, 779 (2021). This test applies across various types of disputes, including constitutional violations. *City of Chicago v. Sessions*, 321 F. Supp. 3d 855 (2018).

Plaintiffs have met these requirements. Demonstrating a violation of constitutional rights (e.g., the U.S. Supremacy Clause, First Amendment, and Fifth Amendment) is sufficient to prove

irreparable harm. *Nat'l People's Action v. Vill. of Wilmette*, 914 F.2d 1008, 1013 (7th Cir. 1990). Moreover, no amount of monetary damages is adequate to afford relief. The Neutrality Regulations pose an existential threat to Plaintiffs. If they do not agree to this contractual clause, their legal status as charter schools can be terminated and they will be forced to close. Plaintiffs' demonstration of a violation of their constitutional rights moots the traditional balancing of equities requirement. *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 589-90 (7th Cir. 2012). Moreover, enjoining a statute or regulation that violates a plaintiff's constitutional rights does not harm the public interest. *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859-60 (7th Cir. 2006).

## V. CONCLUSION

No genuine issues of material fact exist regarding the terms and conditions of Defendants' Neutrality Regulations, or regarding how they affect the operations of Illinois charter schools and the Charter School Plaintiffs. Moreover, Plaintiffs have demonstrated that Defendants' Neutrality Regulations are preempted by the NLRA, and that they violate the First and Fifth Amendments to the United States Constitution. Under these circumstances, Fed. R. Civ. P. 56(a) provides that the court "shall grant summary judgment" in favor of the movants.

Dated: July 31, 2026

PLAINTIFFS ILLINOIS NETWORK OF CHARTER SCHOOLS, INTRINSIC SCHOOLS, THE MONTESSORI NETWORK D/B/A THE MONTESSORI SCHOOL OF ENGLEWOOD, NAMASTE CHARTER SCHOOL, INC., CHICAGO CHARTER SCHOOL FOUNDATION D/B/A CHICAGO INTERNATIONAL CHARTER SCHOOL, NOBLE NETWORK OF CHARTER SCHOOLS, GREAT LAKES ACADEMY CHARTER SCHOOL, PERSPECTIVES CHARTER SCHOOL, CATALYST SCHOOLS, and ERIE ELEMENTARY CHARTER SCHOOL

By: /s/ Michael L. Sullivan
One of Their Attorneys

Michael L. Sullivan
Jon E. Klinghoffer
Meredith S. Kirshenbaum
GOLDBERG KOHN LTD.
55 East Monroe Street, Suite 3300
Chicago, Illinois 60603
(312) 201-4000
michael.sullivan@goldbergkohn.com
jon.klinghoffer@goldbergkohn.com
meredith.kirshenbaum@goldbergkohn.com

Kimball R. Anderson
Winston Taylor LLP
300 N. LaSalle Drive, Suite 4600
Chicago, Illinois 60654
(312) 558-5858
kimball.anderson@winstontaylor.com

Michael B. Kimberly
Winston Taylor LLP
1901 L Street, N.W.
Washington, D.C. 20036-3506
(202) 282-5096
michael.kimberly@winstontaylor.com